Steven G. Biddle; AZ Bar No. 012636
sbiddle@littler.com
Cory G. Walker; AZ Bar No. 027853
cgwalker@littler.com
LITTLER MENDELSON, P.C.
2425 East Camelback Road, Suite 900
Phoenix, AZ  85016
Telephone:   602.474.3600
Facsimile:   602.957.1801
Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephanos Keele, individually and on behalf of those similarly situated,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Rite of Passage, Inc.,<br><br>　　　　　Defendant. | Case No. 2:14-cv-02135-PHX-DLR<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Rite of Passage, Inc. ("ROP"), by and through undersigned counsel, hereby moves the Court for summary judgment on Plaintiff's claim under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").  This Motion is supported by the following Memorandum of Points and Authorities, Defendant's Statement of Facts ("DSOF") and attached exhibits, and the pleadings and documents contained in the record, all of which are incorporated by this reference.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

As a Group Leader working for ROP, Plaintiff Stephanos Keele ("Keele" or "Plaintiff") was expected to interview and aid in hiring candidates for employment; assess the job performance of those he supervised; train and supervise those subordinates; and, in

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

short, ensure the proper functioning of ROP's operations. Despite being clearly exempt from the overtime requirements of the FLSA as a bona fide executive employee, Plaintiff now claims he is owed overtime for work he performed as a Group Leader. Even when viewing the facts in a light most favorable to Plaintiff, his claim for overtime must fail as a matter of law and summary judgment must be granted for Defendant.

## II.     FACTUAL BACKGROUND

ROP is a national provider of programs and opportunities for troubled and at-risk youth from social service agencies, welfare agencies, and juvenile courts. DSOF ¶ 1. For 30 years, ROP has developed and operated a continuum of least-restrictive residential and non-residential programs, including education services and community-based programs. *Id*. Among other facilities, ROP owns, operates, and manages Canyon State Academy ("CSA"). *Id*. CSA is a large, multi-building campus that includes an administration building, classrooms, athletic facilities, farming areas, dining commons, and residential cottages for the students. *Id*. Cottages are staffed with Group Living Coach Counselors and Group Leaders. Full-time Group Living Coach Counselors ("Coach Counselors") are responsible for supervising and mentoring student-residents. *Id*. Coach Counselors report directly to a Group Leader who is responsible for the supervision and management of each cottage and of the Coach Counselors. *Id*. On December 14, 2011, Keele was promoted from Coach Counselor to Group Leader, a position he held until December 2012. DSOF ¶ 2. As a Group Leader, Keele was paid a salary to compensate him for all hours worked in that position, as the position is exempt from the overtime requirements of the FLSA. Keele brought this action asserting a single claim for allegedly unpaid overtime wages, premised on his theory that he should not have been exempted from federal overtime requirements. DSOF ¶ 3.

## III.    LEGAL ANALYSIS

### A.     Standard of Review

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show there is no genuine issue

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact is one which, if proven at trial, would result in a reasonable jury finding in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). While the moving party bears the initial burden of proof for its motion, the party opposing the motion must come forth with sufficient proof to support its claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-movant may not rely solely upon conclusory allegations, but rather must come forward with affirmative evidence which establishes her claims and raises a genuine issue of material fact. *Id.* at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### B. Keele Qualifies as an Exempt Executive Under the FLSA.

The FLSA requires that an employee receive overtime pay if he or she works more than forty hours in a work week. 29 U.S.C. § 207(a)(1). The statute exempts from this requirement "any employee employed in a bona fide executive ... capacity." 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") has promulgated regulations that describe and interpret the scope of this exemption. Specifically, the regulations provide that employees qualify as an executive if:

(1) They are compensated on a salary basis at a rate of at least $455 per week;
(2) Their primary duty is management of the enterprise;
(3) They customarily and regularly direct the work of two or more other employees; and
(4) They have the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a). The DOL has promulgated additional regulations that further describe and define these tests, and in consideration of these regulatory requirements and Keele's testimony, he clearly qualifies as an exempt employee.

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-3-

### 1. Keele's Employment Satisfies the Salary Basis Test.

Keele's employment as a Group Leader satisfies the first element of the executive exemption test under the FLSA because ROP compensated him on a salary basis of at least $455 per week. An employee will be considered to be paid on a "salary basis" if the employee "regularly receives each pay period ... a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). Keele testified that ROP paid him a fixed annual salary of between $35,000 and $40,000 a year. DSOF ¶ 4. Payroll records show Keele was compensated as a Group Leader at a salary of $36,000 a year ($692.30 a week), which amount was not subject to reduction based on hours worked. DSOF¶¶ 5 and 6. Thus, the salary basis test is satisfied.

### 2. Keele's Employment Also Satisfies the Primary Duty Test.

#### a. Keele Performed Management Tasks.

All relevant evidence demonstrates that Keele's primary duty was the management of a defined subdivision of ROP's Canyon State Academy, where he was employed as a Group Leader. As he acknowledged during his deposition, and as set forth in the Group Leader Job Description, the position oversees and takes responsibility for the running of a living unit at CSA and for the Coach Counselors generally. DSOF ¶ 7 (Keele testifying that "Supervising [his] cottage was the number one priority" and explaining that Group Leaders, including himself, would monitor the performance of all Coach Counselors and provide correction where necessary).

The regulations provide a list of examples of "management" activities, including:

> Interviewing, selecting and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining the production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-4-

1
2
      materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

3 29 C.F.R. § 541.102. "An employee need not perform all management duties listed in the
4 regulations, or even regularly perform such duties, in order to be considered an exempt
5 executive." *Grace v. Family Dollar Stores, Inc.*, 2012 U.S. Dist. LEXIS 108773, at *26-27
6 (W.D.N.C. Aug. 3, 2012) (citing *Aguirre v. SBC Commc'n, Inc.*, 2007 U.S. Dist. Lexis
7 72666 at * 63-62 (S.D. Tex. Sept. 30, 2007) (finding that "plaintiffs' 'primary duty' for
8 purposes of the executive exemption was 'management,' despite the fact that the plaintiffs
9 did not perform other 'managerial' duties listed in Section 541.102.")).  However, Keele
10 regularly performed many of these management activities:

11
12
- Keele testified that he was required as a Group Leader to interview and hire candidates for the Coach Counselor position and make recommendations as to who would be the best fit for the job.  DSOF ¶ 8.

13
14
15
16
17
- Keele testified that he was told that, if he determined an employee should be fired he simply needed to document the reasons for the termination, indicating he had authority to issue and document discipline that could affect the termination of an employee he supervised.  DSOF ¶ 9 (testifying that he was told that if he wanted to terminate an employee's employment he had to provide a reason for doing so).  Keele also testified that he disciplined one of his Coach Counselors saying that if "he couldn't maintain the safety of the children, then he could not maintain" his job.  DSOF ¶ 10.

18
19
20
21
22
- Though attempting to evade the fact during his deposition, Keele's testimony makes clear that he was expected to monitor and ensure Coach Counselors were up to date on required training and attended preferred training courses.  DSOF ¶ 11 (admitting he was trained as a Coach Counselor by his Group Leader at the time); DSOF ¶ 11 (testifying that as a Group Leader he was "[p]rimarily responsible for the supervision, mentoring, training, and evaluation of Coach Counselors and overseeing the supervision of students to ensure the Rite of Passage normative peer culture program [was] consistently implemented."[1]

23
24
- Keele knew that, as a Group Leader, he was responsible for disciplining Coach Counselors.  DSOF ¶13 (explaining that as a Coach Counselor, if his performance

---

25 [1] The actual deposition testimony is:
26 **Q.** The next line says, "Primarily responsible for the supervision, mentoring, training and evaluation of Coach Counselors and overseeing the supervision of students to ensure the Rite
27 of Passage normative peer culture program is consistently implemented." Is that something that you did as a Group Leader?
28 **A.** Yes, and then report to my unit manager or site director or my group living and site program director or the supervisor Coach Counselors.  DSOF ¶ 12.

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

- ever needed to be corrected, that correction, if not "really serious" would come directly from the Group Leader).
- As a Group Leader, Keele had responsibility for helping to monitor labor hours, testifying that, when he was a Coach Counselor, if his Group Leader was ever felt that he, Keele, was "going over in hours" he would be told, by his Group Leader, that his practices need to change so he could get clocked out on time and that it is incumbent on the Group Leader to see that such problems are rectified. DSOF ¶ 14. Keele also testified that during his time as a Group Leader he was required to discipline Coach Counselors when they worked unauthorized overtime and ensuring they were clocking in and out on time. DSOF ¶ 15 (explaining that if he was told one of his Coach Counselors was going over on hours he was to make sure it did not happen again and to tell the Coach Counselor to "[m]ake sure you work the hours you were scheduled.").
- Keele explained that it was his practice to allow Coach Counselors to help determine the schedule for when they would stay on site overnight, based on their availability, testifying he would typically let the Coach Counselors select the nights they would stay first, then he would select whatever night they did not choose for himself. DSOF ¶ 16.
- Keele testified that he maintained the safety of his living unit (i.e., cottage), including the safety of Coach Counselors and students, and that this function was one of his most important responsibilities. DSOF ¶ 17 ("[s]upervising my cottage was the number one priority, the safety of the kids. I want my staff that I was given to and assigned to stay with me . . . ."); DSOF ¶ 17 (his conception of running his building flawlessly was to "have Coaches on staff to make sure the kids were sage and they were actually getting the information that was designed to get to them . . . ."); DSOF ¶ 17 (Keele also testified that he verbally disciplined a Coach Counselor for not performing in a manner such that safety was maintained). DSOF ¶ 17.
- Keele testified that he evaluated the performance of his Coach Counselors based on his own observations of job performance and comments received from others touching on his Coach Counselors' job performance. DSOF ¶ 18.
- Keele ensured that compliance was maintained with regard to legal, agency licensing, and Company policies with regard to safety. DSOF ¶ 19 (testifying ". . . I would understand it to mean that it's a safe environment and that we're listening to all the state and federal regulations that we're supposed to to have kids on the campus.").

The evidence—especially Keele's **own** admissions—demonstrates conclusively that Keele's duties and tasks were undeniably managerial in nature and met the requirements of the executive exemption. *See Pollard v. GPM Inv., LLC,* 2011 U.S. Dist. LEXIS 24199, **10-13 (E.D. Vir. Mar. 10, 2011) (store manager and deli managers performed management

duties where they kept track of hours worked, interviewed and trained new employees, disciplined and/or recommended discipline to district manager, and ordered and checked store inventory); *Guinup v. Petr-All Petroleum Corp.*, 2010 U.S. Dist. LEXIS 86280, at *20-21 (N.D.N.Y., Aug. 23, 2010) (store manager performed managerial tasks including interviewing and hiring new employees, scheduling, training, writing performance evaluations, and controlling behavior like employee theft); *Hartman v. Dolgencorp of Texas, Inc.*, 2010 U.S. Dist. LEXIS 140314, **8-11 (N.D. Tex. June 24, 2010) (store manager performed managerial duties where she planned and coordinated schedules, interviewed and recommended candidates for employment, trained employees, reviewed and appraised employee performance).

### b.    Performing Management Tasks was Keele's Primary Duty.

There is likewise no reasonable argument that these management tasks were not Keele's "primary duty," regardless of his contention that he performed some of the same work as Coach Counselors. The regulations provide guidance as to how an employee's primary duty may be determined, "based on all the facts in a particular case." 29 C.F.R. § 541.700(a). A "primary" duty "means the principal, main, major or most important duty that the employee performs" and that the "major emphasis" should be on the character of the employee's job as a whole. 29 C.F.R. § 541.700(a). The regulations set forth these factors to consider in this analysis: (1) relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. 29 C.F.R. § 541.700(a).

In *Phillips v. Tacala, LLC*, 883 F. Supp. 2d 1138, 1145, 1153-54 (N.D. Ala. 2012), the plaintiff (a Taco Bell assistant manager) contended that she spent more time performing non-managerial duties. However, the court held that the evidence supported the conclusion that her managerial duties were more important to her employer than her non-managerial

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-7-

duties. The court reasoned that although she had to comply with company policies and was supervised by a general manager, the general manager did not control her daily activities and she had considerable discretion in performing her job duties, including when it was "appropriate for her to perform exempt vs. non-exempt tasks." *Id.* at 1154-55. Further, the record demonstrated that the plaintiff still acted in a managerial capacity even when she was performing non-exempt duties. *Id.* at 1155. For example, the plaintiff testified that when she was "in charge" of a shift, she was responsible for employee discipline, cleanliness, safety, paperwork, and customer service, and "that she had these managerial responsibilities most of the time, even if she was actually performing other, non-managerial tasks." *Id.* Accordingly, the court concluded that the plaintiff fell within the executive employee exemption. *Id.* at 1153-55 (granting defendant's motion for summary judgment and holding plaintiff was executive exempt because she was paid a salary of more than $455 per week, customarily directed the work of at least two other employees, her suggestions and recommendations on employment decisions about other employees were given significant weight by the restaurant general manager, and her primary duty was management of the restaurant).

### (1) Keele's Managerial Duties Were More Important Than Other Duties He Performed.

By his own admission, the most important aspects of Keele's job as a Group Leader were to "supervis[e] [his] cottage" and to ensure that state and federal regulations were followed in providing a safe environment. DSOF ¶ 20. Without Keele's management as a Group Leader there would have been no direct supervision of Coach Counselors in the assigned cottages. Indeed, as indicated above, Keele testified that it was his responsibility to oversee his cottage to ensure that the cottage was running in a manner consistent with law, regulations, licensing requirements, and Company policies and procedures:

> **Q.** . . . Number 29, the last one there on the first page, talks about ensuring the highest standards are maintained to prevent illegal, unethical or improper conduct and to ensure the program remains in compliance with agency licensing and Rite of Passage policies and procedures....
>
> . . .
>
> **A.** I would understand it as a safe -- I would understand it to mean that it's a

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

> safe environment and that we're listening to all the state and federal regulations that we're supposed to have kids on the campus.
>
> **Q.** Is that something that you did as a Group Leader?
> **A.** Understand it or provide a safe environment? Yeah, that was our number one. We wanted -- safety was our number one goal for the kids. I don't know if I answered that correct.

DSOF ¶ 21. Keele was quite clear that the most important aspect of his job was to ensure ROP could continue pursuing its business of assisting the children placed in its care. Based on even Keele's representation of the circumstances of his employment as a Group Leader, his managerial duties were indisputably more important than any other tasks he performed.

Indeed, where an individual directs day-to-day operations, has oversight over employees, implements policies, and makes recommendations as to hiring and firing, as was the case with Keele as a Group Leader, that person will be viewed to have management as his most important duty. *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113-16 (9th Cir. 2001) (affirming summary judgment for defendant because the primary duty of managers of the RV park was management where they directed the "day-to-day operations of the park," had oversight over employees, recommended hiring and firing of employees, and were responsible for implementing corporate policies, even though they spent ninety percent of their time on non-exempt tasks). This conclusion only becomes more clear when, as is the case here, the individual is the person in charge of the business unit like a store or, in this case, a cottage. *See Donovan v. Burger King Corp.*, 672 F.2d 221, 227 (1st Cir. 1982) ("The person 'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions."); *see also Phillips*, 883 F. Supp. 2d at 1155 (during the time an employee is responsible for ensuring that "the shift r[uns] smoothly" that employee is, as a matter of law, engaged in the primary duty of management). Keele was responsible for supervising his cottage, for monitoring the performance of the Coach Counselors, for ensuring the Coach Counselors were in proper position to properly monitor the students, and for generally ensuring the shift ran smoothly such that ROP could conduct its business in the proper, legal manner. Such circumstances establish without question that management was Keele's most important function.

Keele had responsibility for interviewing and hiring, he was held responsible for ensuring his Coach Counselors were properly trained, he monitored the performance of his Coach Counselors (correcting that performance where necessary), and completed required paperwork. DSOF ¶ 22. Without Keele's handling of these tasks, his cottage simply could not run. *See Jones v. Virginia Oil Co., Inc.*, 2003 U.S. App. LEXIS 14675, **13 (4th Cir. July 23, 2003)(managerial functions such as hiring, training, scheduling employees and completing paperwork were critical to the success of the organization); *Thomas v. Speedway SuperAmerica LLC*, 506 F.3d 496, 505-06 (6th Cir. 2007) (managerial duties were more important because the organization could not function without the manager performing essential tasks such as training and scheduling). Keele's managerial duties were indisputably more important than his other tasks because they were essential to the functioning of his cottage and, coincidently, the safety of the students.

### (2) Keele Cannot Defeat the Exemption By Claiming He Spent the Majority of His Time Performing Non-Managerial Duties.

The regulations set forth a general rule of thumb that an employee who spends more than 50 percent of his or her time performing managerial work will typically satisfy the primary duty requirement. 29 C.F.R. § 541.700(b). The regulations emphasize, however, that "time alone ... is not the sole test" and that exempt executives are **not** required to spend more than 50 percent of their time performing exempt work if other factors support the conclusion that management is their primary duty. *Id.*

Similarly, the regulations specifically address the concept of concurrent duties. 29 C.F.R. § 541.106. "[C]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met." *Id*. Exempt executives typically makes the decision about when to perform nonexempt duties and remain responsible for the business operations under their management while they perform the nonexempt work, as opposed to a nonexempt employee who is directed by a supervisor to perform nonexempt work and usually performs it for a

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-10-

defined time period. *Id.* For example, an assistant manager in a retail establishment may perform tasks including serving customers, stocking shelves and cleaning the establishment without losing the exemption. 29 C.F.R. § 541.106(b) ("an exempt employee can also simultaneously direct the work of other employees and stock shelves").

Here, Keele was responsible for the overall management of his cottage at all times and, as a Group Leader, was expected to correct the performance of any Coach Counselor he encountered if the need arose. DSOF ¶ 23. Indeed, Keele testified that he, in making his rounds one day, came upon a Coach Counselor acting inappropriately and acted immediately to rectify the situation, showing that, whatever else he was doing, Keele was always in a supervisory and managerial role. DSOF ¶ 24. Indeed, Keele testified that:

> **A.** We would try to. Often we would get a UM or other GL, hey, you're man's out of position, reminding you, you know, hey, make sure that -- you know, when it comes to what you're doing there at Canyon State, there is a lot of liberty and freedom for other Group Leaders and other unit managers to also be your boss due to seniority and situational events.
> **Q.** So if another Group Leader, for example, saw one of the Coach Counselors that were assigned to your cabin doing something improperly --
> **A.** Absolutely....
> **Q.** -- they could sort of intervene into that situation?
> **A.** It would be most likely a seasoned GL that was a UM or on the way to a UM but, yes, seasoned GLs actively corrected other GLs, other Coaches. They had the liberty to do that.
> **Q.** Did you ever notice anybody else's Coach Counselor doing something improperly you had to step in to resolve?
> **A.** I did eventually have to say things to other Coach Counselors, yes.
> **Q.** What type of situations would those be?
> **A.** I was put in charge of an -- I was taken out of my cottage to help a flailing or faltering cottage. At this time, I noticed one of the employees inappropriately touching another student. I had to discipline and write up that employee.

DSOF ¶ 25.

As noted, courts have routinely held that managerial employees performing such concurrent duties are exempt even if they spend the majority of their time performing non-managerial work. *See Soehnle v. Hess Corp.*, 2010 U.S. App. LEXIS 22768, *6 (3d Cir. Oct. 26, 2010) (plaintiff qualified as an exempt employee despite spending 85% of her time

-11-

operating a cash register).[2] Keele simply cannot create an issue of fact by insisting that he spent most of his time performing work that was performed by Coach Counselors.

### (3) Keele was Relatively Free From Direct Supervision.

Keele's testimony also clearly shows he was relatively free from direct supervision in running of his cottage and supervising his Coach Counselors. Indeed, when he went to his superior regarding problems he was having with Coach Counselors, he was explicitly told that he, Keele, needed to address the problems with coaching and discipline and that Keele's boss could not do such things for him. DSOF ¶26. The exemption is not defeated where a superior leaves instructions or guidelines for a manager to follow. *See Donovan*, 675 F.2d at 522 ("The record also shows that for the great bulk of their working time, Assistant Managers are solely in charge of their restaurants and are the 'boss' in title and fact.... That the Restaurant Manager is available by phone does not detract in any substantial way from this conclusion. Being available for advice is in no sense the exercise of supervision."); *Mitchell v. Abercrombie & Fitch, Co.*, 428 F. Supp. 2d 725, 743 (S.D. Ohio 2006) (rejecting argument that complying with directives from higher level management jeopardizes the exemption); *Thomas*, 506 F.3d at 507 ("Even though [supervisor's] discretion was somewhat circumscribed by her district manager's supervision ... she daily exercised discretion over

---

[2] *See also Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) ("[O]ne can still be managing if one is in charge, even while physically doing something else."); *Jones*, 2003 U.S. App. LEXIS at *11 (plaintiff's testimony that she spent 80% of her time carrying out tasks such as cooking food, serving ice cream, stocking shelves, and cleaning the store unpersuasive, where the plaintiff simultaneously performed management tasks, such as supervising employees and handling customer complaints, while performing nonexempt duties); *Thomas*, 506 F.3d at 499, 504-509 (plaintiff's non-managerial duties often overlapped with her managerial duties and the court therefore "refuse[d] to give undue weight" to plaintiff's testimony that she spent 60% of her time on non-managerial work); *Murray v. Stuckey's*, 939 F.2d 614, 618-20 (8th Cir. 1991) (in holding that store managers met the "primary duty" test even though 65-90% of their time was spent on non-managerial duties, the court stated that even though a manager spent up to 90 percent of his time on non-managerial duties it was "not a controlling factor under the regulations."); *Velazquez-Fernandez v. NCE Foods, Inc.*, 476 F.3d 6, 19 (1st Cir. 2007) (a warehouse manager was an exempt executive because employees can manage while still performing other work).

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-12-

matters vital to the success of her station.").

### (4) Keele Earned Significantly More Than Nonexempt Coach Counselors.

As established above, ROP paid Keele, in his very first year as a Group Leader, an annual fixed salary of $36,000, which equates to approximately $692.30 a week. DSOF ¶ 5. In comparison, as an hourly, nonexempt Coach Counselor at ROP, even after a rate increase, Keele was paid $11.10 an hour ($440 a week assuming a full 40-hour work week with no overtime). DSOF ¶ 27. Even assuming Keele worked eight hours of overtime each and every week, this would equate to $573.20 a week, and $29,806.40 a year. Accordingly, conservatively, Keele made at least $119.10 more per week (and over $6,000 more per year) as a Group Leader than as a Coach Counselor. This evidences a significant difference in wages between Keele and the hourly, nonexempt Coach Counselors who worked for him, underscoring the fact that management was his primary duty. *See Jones,* 2003 U.S. App. LEXIS at *15-16 (plaintiff earned approximately $165 more per week than the average hourly worker); *Thomas,* 506 F.3d at 508-09 (plaintiff's calculated salary per hour of $10.44 was significantly more than typical hourly wage of $7.00 paid to nonexempt employees).

### 3. Keele Regularly and Customarily Directed the Work of Two or More Coach Counselors.

The regulations require that an employee "customarily and regularly" direct the work of two or more other employees in order to qualify as an executive. 29 C.F.R. § 541.100(a)(3). "[C]ustomarily and regularly means a frequency that must be greater than occasional but which, of course, may be less than constant." 29 C.F.R. § 541.701. The regulations also require that the employee direct the work of "two full-time employees or the equivalent." 29 C.F.R. § 541.104(a). Thus, an exempt executive may direct two full-time employees, one full-time employee and two half-time employees, four half-time employees, etc. 29 C.F.R. § 541.104(b). Notably, Keele did not need to supervise these employees all the time; the regulations merely require that he "customarily and regularly" supervised subordinates. This means the supervision "may be less than constant" and "include work

LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

normally and recurrently performed every workweek." DOL Wage and Hour Opinion Letter FLSA 2006-35, Sept. 21, 2006.

Keele's testimony makes clear that, as a Group Leader, he was responsible for supervising the work of any Coach Counselor he encountered during his day and there were an average of about 85-90 Coach Counselors at CSA while Keele was working there as a Group Leader. DSOF ¶ 28. Further, Keele explained that he was directly assigned to supervise two Coach Counselors and that while he claims one of those Coach Counselors often had an assignment away from Keele's cottage for a day, Keele remained ultimately responsible as that Coach's supervisor, being required to monitor and evaluate the Coach Counselor's performance. DSOF ¶ 29. Keele, therefore, customarily and regularly supervised at least two full-time employees.

### 4. Keele Had Authority and Discretion to Interview, Hire, Discipline and Effectively Recommend Termination of Employment.

Finally, Keele's deposition testimony establishes that he meets the final prong of the executive exemption test, namely, that his suggestions and recommendations as to the hiring and firing of Coach Counselors were given particular weight. 29 C.F.R. § 541.100(a)(4). The DOL provides guidance with respect to whether an employee's recommendations satisfy this standard. Specifically, the "factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Importantly, the employee's recommendations "may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.*

Here, Keele was actively involved in interviewing, hiring, and, if necessary, terminating employees. He explicitly testified that he was "expected to interview and hire people." DSOF ¶ 30. Keele further acknowledged that during the very brief time he worked

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-14-

as a Group Leader he did, in fact, interview "a few people" (DSOF ¶ 31), but he never interviewed anyone when he was employed as a Coach Counselor. DSOF¶ 32. Keele attempts to detract from his obligation as a Group Leader to interview and take part in the hiring process by mentioning an individual his brother interviewed as a Group Leader who was ultimately hired, despite his brother's recommendation that the individual not be hired. DSOF ¶ 33. Despite this being hearsay and the vaguest of tangential anecdote, Keele explained that the reasons his brother gave for suggesting the individual not be hired were: (1) the applicant's age, the individual being over 40; and (2) the fact that the individual was "too nice." DSOF ¶ 34. This anecdote does not show Group Leaders were not listened to with regard to hiring, but does show that some oversight over questionable hiring decisions was needed.

Keele's view of his hiring authority seems to mirror that of his authority with regard to discipline and recommendations regarding the termination of subordinate employees. Indeed, though Keele seems to deny the inevitable conclusion, his testimony shows conclusively that he, as a Group Leader, had the authority to effectively recommend the termination of a subordinate employee, so long as he followed the Company's protocol regarding discipline when doing so. Specifically, Keele testified as follows:

> **Q.** The final item here says dismissals. Did you ever recommend that an employee be dismissed?
> **A.** Yes.
> **Q.** Who?
> **A.** Mr. Kent.
> **Q.** Okay. Anyone else?
> **A.** No, sir.
> **Q.** How did you make the recommendation that Mr. Kent or Coach Counselor Kent be dismissed?
> **A.** Verbally to UM Robinson and CS-3 Woodsen.
> **Q.** Why did you do that?
> **A.** I can't dismiss him. I mean **their thing to me was, all right, you got to start a paperwork trail and we'll fire him**.

DSOF ¶ 35. Keele later offered further testimony to this regard, showing that there was no misunderstanding to his statement, saying (in response to questions posed by his own legal

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-15-

counsel):

> **Q.** Earlier there was a reference with you talking to Coach Kent and saying something about him needing to get in line with the program, otherwise his job might be on the line. Do you recall saying something along those lines?
> **A.** Yes.
> **Q.** When you said his job might be on the line, was that something you had control over, whether he would be fired of not?
> **A.** No. As a matter of fact, when I brought it up to my boss, the UM, he was like I can't do anything until you do the proper form of trying to help, verbal, written and all that stuff, but you need to do that. I can't do that for you. . . .

DSOF ¶ 36.

Keele's testimony leaves no doubt that he was explicitly informed that, as a Group Leader, his "boss" could not adequately discipline or terminate Keele's Coach Counselors if there was a problem. This also shows that, if the problem was significant enough to require termination of employment, Keele merely needed to follow "proper form" by documenting the problem and that doing so would lead to the employee's employment being terminated. Keele's own statements leave no doubt that, as a Group Leader, he had the authority to effectively recommend the termination of subordinate employees.

Indeed, even if someone else was consulted regarding all potential new hires or terminations, including those Keele specifically recommended, it is sufficient for purposes of the executive exemption that Keele screened applicants, interviewed them, could recommend termination with adequate documentation, and communicated his recommendations to his superiors. *See Richter v. Dolger Corp., Inc.*, 2012 U.S. Dist. LEXIS 151268, at **19-20 (N.D. Ala. Oct. 22, 2012). Interviewing a prospective employee, and particularly performing an interview that can result in the elimination of an applicant from consideration, demonstrates exempt status, because interviewing job applicants is a quintessentially managerial task requiring judgment about one of a business's most critical resources and assets - its personnel. *See Gardner v. Western Beef Prop., Inc.*, 2013 U.S. Dist. LEXIS 56511, at **20-23 (E.D.N.Y. Mar. 25, 2013); *Gellhaus*, 769 F. Supp. 2d at 1083 (although plaintiff did not have sole authority to make hiring decisions, her influence over such

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

decisions was sufficient to fulfill requirement); *McDowell v. Cherry Hill Twp.*, No. 04-1350, 2005 U.S. Dist. LEXIS 29327, at *39 (D.N.J. Nov. 21, 2005) (concluding executive exemption applied to plaintiff because although he did not have ultimate authority to interview and hire employees, he played a role in the hiring process for full-time and part-time employees); *Rooney v. Town of Groton*, 577 F. Supp. 2d 513, 531-32 (D. Mass. 2008) (recognizing it "is not necessary for the exempt employee to play a role in every single hire, fire, or promotion" and that it was sufficient for the exempt employee to merely participate in the hiring process on "multiple occasions"); *Buechler v. Davco Rest., Inc.*, 2009 U.S. Dist. LEXIS 106607, **20-21 (D. Md. Nov. 16, 2009) (assistant manager fell within final prong of executive exemption where his job description included interviewing and recommending candidates for employment, even though there was no evidence of the frequency with which plaintiff's suggestion was requested or relied upon); *Haines v. Southern Retailers*, 939 F. Supp. 441, 450 (E.D. Va. 1996) (manager who could not hire, fire, or discipline without approval from her superior still retained enough discretion over day-to-day activities to warrant the executive exemption); *Lovelady v. Allsup's Convenience Stores, Inc.*, 2008 U.S. App. LEXIS 26190, at **10 (5th Cir. Dec. 23, 2008) (managers who did not have authority with regard to employment decisions nevertheless satisfied the "particular weight" test where they made recommendations which were followed on multiple occasions).  Here, the evidence establishes that Keele had significant authority with regard to hiring and firing employees consistent with the requirements of the executive exemption test under the FLSA.

## IV.   CONCLUSION

Because Plaintiff cannot establish an entitlement to overtime compensation under the FLSA as he was an exempt employee, Defendant respectfully requests that the Court enter judgment in its favor.

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-17-

DATED this 14th day of December 2015.

*/s/ Steven G. Biddle*
Steven G. Biddle
Cory G. Walker
LITTLER MENDELSON, P.C.
Attorneys for Defendant

I hereby certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants, and mailed a copy of same to the following if non-registrants, this 14th day of December 2015.

Joshua W. Carden
JOSHUA CARDEN LAW FIRM, P.C.
16427 N. Scottsdale Rd., Suite 410
Scottsdale, AZ 85254
Attorney for Plaintiff

*/s/ Tisha Davis*

Firmwide:137546526.1 027330.2028

LITTLER MENDELSON, P.C.
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-18-