1  Steven G. Biddle; AZ Bar No. 012636
   sbiddle@littler.com
2  Cory G. Walker; AZ Bar No. 027853
   cgwalker@littler.com
3  LITTLER MENDELSON, P.C.
   2425 East Camelback Road, Suite 900
4  Phoenix, AZ  85016
   Telephone:    602.474.3600
5  Facsimile:    602.957.1801
   Attorneys for Defendant
6

7

8                    UNITED STATES DISTRICT COURT

9                    FOR THE DISTRICT OF ARIZONA

10 Stephanos Keele, individually and on behalf    Case No. 2:14-cv-02135-PHX-DLR
   of those similarly situated,
11                                                 **DEFENDANT'S STATEMENT OF**
                 Plaintiff,                        **FACTS IN SUPPORT OF ITS**
12                                                 **MOTION FOR SUMMARY**
   v.
13
   Rite of Passage, Inc.,
14
                 Defendant.
15

16        Defendant Rite of Passage, Inc. ("ROP"), by and through undersigned counsel, hereby

17 submits its Statement of Facts in Support of its Motion for Summary Judgment.

18        1.     ROP is a national provider of programs and opportunities for troubled and at-

19 risk youth from social service agencies, welfare agencies, and juvenile courts.  Declaration of

20 Rick Wright ("Wright Decl."), attached hereto as **Exhibit A**, at ¶ 3.  For 30 years, ROP has

21 developed and operated a continuum of least-restrictive residential and non-residential

22 programs, including education services and community-based programs.  *Id*.  Among other

23 facilities, ROP owns, operates, and manages Canyon State Academy ("CSA").  *Id*.  CSA is a

24 large, multi-building campus that includes an administration building, classrooms, athletic

25 facilities, farming areas, dining commons, and residential cottages for the students.  *Id*.

26 Cottages are staffed with Group Living Coach Counselors and Group Leaders.  Full-time

27 Group Living Coach Counselors ("Coach Counselors") are responsible for supervising and

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

1   mentoring student-residents. *Id*. at ¶ 4. Coach Counselors report directly to a Group Leader

2   who is responsible for the supervision and management of the cottage and the Coach

3   Counselors. *Id*.

4          2.      On December 14, 2011, Keele was promoted to the position of Group Leader,

5   a position he held until December 2012. *See* December 14, 2011 Personnel Action Form,

6   Bates No. ROP/KEELE000214, attached hereto as **Exhibit B**; and

7          3.      Keele brought this action asserting a single claim for allegedly owed overtime

8   wages, premised on his theory that he should not have been exempted from federal overtime

9   requirements. *See generally* Plaintiff's First Amended Complaint (Dkt. 22).

10          4.      Keele testified that ROP paid him a fixed annual salary of between $35,000

11   and $40,000 a year. Deposition of Stephanos Keele ("Keele Dep."), attached hereto as

12   **Exhibit C**, at 186:12-20.

13          5.      Actually, Keele was compensated as a Group Leader at a rate of $36,000 a year

14   ($692.30 a week). **Exh. B**.

15          6.      Keele's salary was not subject to reduction based on the quantity or quality of

16   his work. Wright Decl. (**Exh**. **A**) at ¶ 7.

17          7.      As Keele acknowledged during his deposition, and as set forth in the Group

18   Leader job description, the position oversees and takes responsibility for the running of a

19   living unit (also called a cottage) at CSA and for Coach Counselors generally. Keele Dep.

20   (**Exh. C**) at 25:18-24 (Keele testifying that "Supervising [his] cottage was the number one

21   priority"); 63:14-15; 64:5-65:10 (explaining that Group Leaders, including himself, would

22   monitor the performance of all Coach Counselors and provide correction where necessary);

23   Rite of Passage Position Description attached hereto as **Exhibit D**.

24          8.      Keele testified that he was required as a Group Leader to interview and hire

25   candidates for the Coach Counselor position and make recommendations as to who would be

26   the best fit for the job. *See* Keele Dep. (**Exh. C**) at 78:14-79:3 ("we were expected to

27   interview and hire people.").

28          9.      Keele testified that he was told that, if he determined an employee should be

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-2-

1  fired he simply needed to document the reasons for the termination, showing he had

2  authority to issue and document discipline which could affect the termination of an employee

3  he supervised.  *Id*. at 91:13-92:1; 92:9-22 (testifying that he was told that if he wanted to

4  terminate an employee's employment he had to provide a reason for doing so).

5       10.    Keele also testified that he disciplined one of his Coach Counselors saying that

6  if "he couldn't maintain the safety of the children, that he could not maintain" his job.  *Id*. at

7  30:7-15.

8       11.    Though attempting to evade the fact during his deposition, Keele's testimony

9  makes clear that he was expected to monitor and ensure Coach Counselors were up to date

10 on required training and that they attended preferred training courses.  *Id*. at 13:10-22

11 (explaining that Keele was trained as a Coach Counselor by his Group Leader at the time);

12 *Id*. at 52:2-53:3 (testifying that as a Group Leader he was "[p]rimarily responsible for the

13 supervision, mentoring, training, and evaluation of Coach Counselors and overseeing the

14 supervision of students to ensure the Rite of Passage normative peer culture program [was]

15 consistently implemented."); *Id*. at 52:2-53:3.

16      12.    During his deposition, Keele testified as follows:

17  **Q.** The next line says, "Primarily responsible for the supervision, mentoring,
       training and evaluation of Coach Counselors and overseeing the supervision of
18     students to ensure the Rite of Passage normative peer culture program is
       consistently implemented." Is that something that you did as a Group Leader?
19
    **A.** Yes, and then report to my unit manager or site director or my group living and
20     site program director or the supervisor Coach Counselors.

21
*Id*. at 52:2-53:3.
22
        13.    Keele knew that, as a Group Leader, he was responsible for disciplining Coach
23
Counselors.  *Id*. at 14:22-15:5 and 15:9-16 (explaining that as a Coach Counselor, if his
24
performance ever needed to be corrected that correction, if not "really serious" would come
25
directly from the Group Leader).
26
        14.    As a Group Leader, Keele had responsibility for helping to monitor labor
27
hours, testifying that, when he was a Coach Counselor, if his Group Leader was ever told
28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

1    that he, Keele, was "going over in hours" he would be told, by his Group Leader, that his

2    practices need to change so he could get clocked out on time and that it is incumbent on the

3    Group Leader to see that such problems are rectified.  *Id*. at 19:6-20:3.

4        15.    Keele also testified that during his time as a Group Leader he was required to

5    discipline Coach Counselors regarding their working unauthorized overtime and ensuring

6    they were clocking in and out on time.  *Id*. at 20:12-21 (explaining that if he was told one of

7    his Coach Counselors was going over on hours he was to make sure it did not happen again

8    and to tell the Coach Counselor to "[m]ake sure you work the hours you were scheduled.").

9        16.    Keele explained that it was his practice to allow Coach Counselors to help

10   determine the schedule for staying on site overnight, based on their availability, testifying

11   that he would typically let the Coach Counselors select the nights they would stay first,

12   selecting whatever night they did not choose for himself.  *Id*. at 42:9-19.

13       17.    Keele testified that he maintained the safety of his living unit, including the

14   safety of Coach Counselors, and that this function was one of his most important

15   responsibilities.  *Id*. at 25:18-24 (testifying "[s]upervising my cottage was the number one

16   priority, the safety of the kids.  I want my staff that I was given to and assigned to stay with

17   me . . . ."); *Id*. at 49:17-22 (testifying that his conception of running his building flawlessly

18   was to "have coaches on staff to make sure the kids were sage and they were actually getting

19   the information that was designed to get to them . . . ."); *Id*. at 63:14-65:10 (testifying "I was

20   put in charge of an -- I was taken out of my cottage to help a flailing or faltering cottage.  At

21   this time, I noticed one of the employees inappropriately touching another student.  I had to

22   discipline and write up that employee."); *Id*. at 28:14-19; 30:7-15 (Keele testifying that he

23   verbally disciplined a Coach Counselor for not performing in a manner such that safety was

24   maintained).

25       18.    Keele testified that he evaluated the performance of his Coach Counselors

26   based on his own observations of job performance and comments received from others

27   touching on his Coach Counselors' job performance.  *Id*. at 143:3-144:20.

28       19.    Keele ensured that compliance was maintained with regard to legal, agency

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

licensing, and company policy with regard to safety.  *Id*. at 106:22-107:2; 108:1-10

(testifying ". . . I would understand it to mean that it's a safe environment and that we're

listening to all the state and federal regulations that we're supposed to to have kids on the

campus.").

20.     By his own admission, the most important aspects of Keele's job as a Group

Leader were to "supervis[e] [his] cottage" and to ensure that state and federal regulations

were followed to provide a safe environment.  *Id*. at 25:18-24; 106:22-107:2; 108:1-10.

21.     Keele testified that it was his responsibility to oversee his cottage to ensure that

the living unit was running in a manner consistent with law, regulation, licensing

requirements, and company policies and procedures:

> **Q.** . . . Number 29, the last one there on the first page, talks about ensuring the highest standards are maintained to prevent illegal, unethical or improper conduct and to ensure the program remains in compliance with agency licensing and Rite of Passage policies and procedures. Do you know what agency licensing they're talking about there?
> . . .
> **A.** I would understand it as a safe -- I would understand it to mean that it's a safe environment and that we're listening to all the state and federal regulations that we're supposed to to have kids on the campus.
> **Q.** Is that something that you did as a Group Leader?
> **A.** Understand it or provide a safe environment? Yeah, that was our number one. We wanted -- safety was our number one goal for the kids. I don't know if I answered that correct.

*Id*. at 106:22-107:2; 108:1-10.

22.     Keele had responsibility for interviewing and hiring, was held responsible for

ensuring his Coach Counselors were properly trained, monitored the performance of his

Coach Counselors, correcting that performance where necessary, and completed required

paperwork.  *Id*. at 79:1-3; 52:2-53:3; 143:3-144:20; 46:19-47:5.

23.     Keele was responsible for the overall management of his cottage at all times

and, as a Group Leader was expected to correct the performance of any Coach Counselor he

encountered if the need arose.  *Id*. at 63:14-15; 64:5-65:10.

24.     Indeed, Keele testified that he, in making his rounds one day, came upon a

Coach Counselor acting inappropriately and acted immediately to rectify the situation,

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

-5-

1  showing that, whatever else he was doing, Keele was always in a supervisory and managerial

2  role. *Id*.

3     25.    Keele testified that:

4
   **A.** We would try to. Often we would get a UM or other GL, hey, you're man's
5        out of position, reminding you, you know, hey, make sure that -- you know,
        when it comes to what you're doing there at Canyon State, there is a lot of
6        liberty and freedom for other Group Leaders and other unit managers to
        also be your boss due to seniority and situational events.
7
   **Q.** So if another Group Leader, for example, saw one of the Coach Counselors
8        that were assigned to your cabin doing something improperly --
   **A.** Absolutely. I'm sorry. I didn't mean to interrupt.
9  **Q.** -- they could sort of intervene into that situation?
   **A.** It would be most likely a seasoned GL that was a UM or on the way to a
10        UM but, yes, seasoned GLs actively corrected other GLs, other coaches.
        They had the liberty to do that.
11
   **Q.** Did you ever notice anybody else's Coach Counselor doing something
12        improperly you had to step in to resolve?
   **A.** I did eventually have to say things to other Coach Counselors, yes.
13 **Q.** What type of situations would those be?
   **A.** I was put in charge of an -- I was taken out of my cottage to help a flailing
14        or faltering cottage. At this time, I noticed one of the employees
15        inappropriately touching another student. I had to discipline and write up
        that employee.
16
17 *Id*.

18     26.    When Keele went to his superior regarding problems he was having

19 with Coach Counselors he was explicitly told that he, Keele, needed to address the

20 problems with coaching and discipline and that Keele's boss could not do such things

21 for Keele. *Id*. at 194:10-23; 200:21-201:17.

22     27.    As an hourly, nonexempt Coach Counselor working at ROP, even after

23 a rate increase, Keele was paid at a rate of $11.10 an hour ($440 a week assuming a

24 full 40 hour work week with no overtime: $11.10 x 40 hours = $440). *See* Personnel

25 Action Form from December 1, 2011, Bates No. ROP/KEELE000323, attached hereto

26 at **Exhibit E**.

27     28.    As a Group Leader, Keele was responsible for supervising the work of

28 any Coach Counselor he encountered during his day and there were 85-90 Coach

LITTLER MENDELSON
A Professional Corporation
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-6-

1   Counselors at CSA while Keele was working there as a Group Leader.  Keele Dep.

2   (**Exh. C**). at 132:17-25; and Wright Decl. (**Exh. A**) at ¶ 5.

3        29.    Keele explained that he was directly assigned to supervise two Coach

4   Counselors and that while he claims one of those Coach Counselors often had

5   assignment away from Keele's cottage for a day, Keele remained ultimately

6   responsible as that Coach's supervisor, being required to monitor and evaluate the

7   Coach Counselor's performance.  Keele Dep. (**Exh. C**) at 143:3-144:20.

8        30.    Keele testified that, while he felt he was not trained regarding

9   interviewing, he was "expected to interview and hire people." *Id*. at 79:1-3.

10       31.    Keele acknowledged that during the very brief time he was a Group

11  Leader he did, in fact, interview "a few people." *Id*. at 79:9-10.

12       32.    Keele never interviewed anyone when he was employed in the role of

13  Coach Counselor. *Id*. at 203:3-6.

14       33.    Keele attempts to detract from his obligation as a Group Leader to

15  interview and take part in the hiring process by mentioning an individual his brother

16  interviewed as a Group Leader was ultimately hired, despite his brother's

17  recommendation that the individual not be hired. *Id*. at 195:12-18.

18       34.    Keele explained that the reasons his brother gave for suggesting the

19  individual referenced in Paragraph 33 not be hired were: (1) the applicant's age, the

20  individual being over 40; and (2) the fact that the individual was "too nice." *Id*. at

21  27:6-13.

22       35.    Keele testified as follows:

23  **Q.** The final item here says dismissals. Did you ever recommend that an
24      employee be dismissed?
    **A.** Yes.
25  **Q.** Who?
    **A.** Mr. Kent.
26  **Q.** Okay. Anyone else?
    **A.** No, sir.
27
    **Q.** How did you make the recommendation that Mr. Kent or Coach Counselor
28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

Kent be dismissed?

**A.** Verbally to UM Robinson and CS-3 Woodsen.

**Q.** Why did you do that?

**A.** I can't dismiss him. I mean **their thing to me was, all right, you got to start a paperwork trial and we'll fire him**.

*Id*. at 91:13-92:1 (emphasis added).

36.     Keele later offered further testimony to this regard, showing that there was no misunderstanding to his statement, saying (in response to questions posed by his own legal counsel):

**Q.** Earlier there was a reference with you talking to coach Kent and saying something about him needing to get in line with the program, otherwise his job might be on the line. Do you recall saying something along those lines?

**A.** Yes.

**Q.** When you said his job might be on the line, was that something you had control over, whether he would be fired of not?

**A.** No. As a matter of fact, when I brought it up to my boss, the UM, he was like I can't do anything until you do the proper form of trying to help, verbal, written and all that stuff, but you need to do that. I can't do that for you. . . .

*Id*. at 194:10-23.

RESPECTFULLY SUBMITTED this 14th day of December 2015.

/s/ *Steven G. Biddle*
Steven G. Biddle
Cory G. Walker
LITTLER MENDELSON, P.C.
Attorneys for Defendant
Rite of Passage, Inc.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2425 East Camelback Road
Suite 900
Phoenix, AZ  85016
602.474.3600

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I hereby certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants, and mailed a copy of same to the following if non-registrants, this 14th day of December 2015.

Joshua W. Carden
JOSHUA CARDEN LAW FIRM, P.C.
16427 N. Scottsdale Rd., Suite 410
Scottsdale, AZ 85254
Attorney for Plaintiff


*/s/ Tisha Davis*


Firmwide:137546648.1 027330.2028

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

-9-