Exhibit A

Steven G. Biddle; AZ Bar No. 012636
sbiddle@littler.com
Cory G. Walker; AZ Bar No. 027853
cgwalker@littler.com
LITTLER MENDELSON, P.C.
2425 East Camelback Road, Suite 900
Phoenix, AZ 85016
Telephone:   602.474.3600
Facsimile:   602.957.1801

Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Stephanos Keele, individually and on behalf of those similarly situated, | Case No. 2:14-cv-02135-PHX-DLR |
|---|---|
| Plaintiffs, | **DECLARATION OF RICK WRIGHT IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Rite of Passage, Inc., | |
| Defendant. | |

I, RICK WRIGHT, hereby declare as follows:

1.      I am currently employed as the Corporate Human Resources Director at Rite of Passage, Inc. ("Rite of Passage").

2.      I have personal knowledge of the facts set forth in this Declaration and/or knowledge based on personal review of business records made at or near the time by someone with knowledge, or knowledge from review of information transmitted by someone with knowledge.  Such records are kept in the course of regularly conducted business activity and were made as part of a regular practice of that activity.

3.      ROP is a national provider of programs and opportunities for troubled and at-risk youth from social service agencies, welfare agencies, and juvenile courts.  For 30 years, ROP has developed and operated a continuum of least-restrictive residential and non-residential programs, including education services and community-based programs.  Among other facilities, ROP owns, operates, and manages Canyon State Academy ("CSA").  CSA is

LITTLER MENDELSON
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

1   a large, multi-building campus that includes an administration building, classrooms, athletic

2   facilities, farming areas, dining commons, and residential cottages for the students.

3       4.   Cottages are staffed with Group Living Coach Counselors and Group Leaders.

4   Full-time Group Living Coach Counselors are responsible for supervising and mentoring

5   student-residents.   Coach Counselors report directly to their Group Leader who is

6   responsible for the supervision and management of the cottage and the Coach Counselors.

7       5.   Approximately (85-90) CSA employees worked as Coach Counselors between

8   December 2011 to December 2012.

9       6.   Group Leaders are hired with the expectation that management will be their

10   primary and most important duty and ROP would not be able to function without the

11   management and supervision Group Leaders provide.

12       7.   After being promoted to a Group Leader, Stephanos Keele was paid on a salary

13   basis, receiving a predetermined amount each pay period which amount was not subject to

14   reduction because of variations in the quality or quantity of the work he performed.

15       I declare under penalty of perjury that the foregoing is true and correct.

16

17       Executed this 14th day of December 2015.

18

19                                                     Rick Wright

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
Camelback Esplanade
2425 East Camelback Road
Suite 900
Phoenix, AZ 85016
602.474.3600

# Exhibit B

  

Print Form



*Rite of Passage*

*PERSONNEL ACTION FORM*

| Today's Date: | Dec 14, 2011 | Date of Hire | 5/16/2011 |
|---|---|---|---|
| | | Date of Action: | Dec 14, 2011 |

Employee ID: KE7739

Employee Name: Stephanos Keele
(PLEASE PRINT)

☐ Is this a Name Change Request?
( check only if "yes")

Position: Coach Counselor     Site: CSA

Shift  ☐ A   ☒ B   ☐ OTHER     Telephone #

Home Address:

☐ Is this an Address Change
Request? ( check only if "yes")

City:     State: Arizona     Zip:

### Status Change ( Check all that apply)

| | | |
|---|---|---|
| ☐ New Hire | ☐ Full - Time | ☐ Direct Deposit (attach voided check) |
| ☐ Re-Hire | ☐ Part - Time | |
| ☐ Transfer | ☒ Promotion | ☐ Training Material Deduction |
| ☐ Leave of Absence | ☐ Demotion | ☐ PTO Request |
| ☐ Resigned** | ☐ Rate Change | ☐ OTHER ( please explain) |
| ☐ Suspended | ☐ Payroll Deduction | |
| ☐ Terminated** | ☐ Clothing Deduction | |

Eligible for Rehire?
(check only if this is
for resignation or
termination, and
only if yes)

**If "Employee Status Changes from FT to PT",or if  "Resignation" or "Termination" is checked - COBRA NOTIFICATION MUST BE SENT

### DETAILS:

Mr. Keele will be promoted to Group Leader effective 12/14 at the rate of $36,000/yr

Employee's Signature _____     Date 12/14/11

Supervisor's Signature _____     Date 12/14/11

Print Supervisor's Name  Mr. Bates

Human Resources
Signature _____     Date 12/14/11

Print HR Personnel's Name  Rochelle Lindsey

**ROP/KEELE 000214**

Exhibit C

# In The Matter Of:

*Keele vs.*
*Rite of Passage*

---

*Stephanos Keele*
*September 28, 2015*

---

*Griffin & Associates Court Reporters*
*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*
*www.arizonacourtreporters.com*
*602.264.2230*

Original File SK09282015.txt
Min-U-Script®

13

1       A.    UM Farler, F-A-R-L-E-R.

2       Q.    Was anyone else involved in the interviewing

3  process?

4       A.    That was it.

5       Q.    What location did you interview at?

6       A.    Canyon State Academy, the actual location of the

7  school.

8       Q.    What was your first position?

9       A.    Coach counselor.

10       Q.    To whom did you report when you were a coach

11  counselor?

12       A.    At the beginning, it was UM Farler.

13       Q.    Anyone else?

14       A.    At the beginning?  That's what you're asking,

15  while I was a coach counselor?

16       Q.    Right.

17       A.    UM Farler was the manager of the unit and then it

18  was GL, for group leader, Gillette, like the razor.  He

19  was my -- he was just the gentleman that got the

20  instructions from UM Farler and made sure we were in our

21  areas and stuff, so he was the guy that was training me at

22  the time.

23       Q.    Was there anyone else when you were a coach

24  counselor at any point?

25       A.    No.  I spent the entire time as coach counselor

14

1    with one UM, that was it.

2         Q.    Okay.

3         A.    I'm sure, I mean, the CS-3 which is CS -- what

4    did that stand for?  CS-3 is the boss of the neighborhood

5    on your shift, and you would answer to him also if your UM

6    wasn't available.  He was -- I mean you had a lot of --

7    because there were a lot of people telling you what to do,

8    but if you were a coach, on your shift, while you were

9    there, your UM wasn't there as much as the CS-3, so you

10   would answer to the CS-3, as he was your unit manager as

11   well.  It was like he was the immediate unit manager when

12   yours wasn't available.

13        Q.    How often was the CS-3 there?

14        A.    I had contact with him -- there's always the CS-3

15   on-site.

16        Q.    What about the group leader, how often would --

17        A.    GL Gillette was -- I'm sorry.  Did I let you

18   finish the question?

19        Q.    That's okay.  Go ahead.

20        A.    GL Gillette was on-site as much as the coach

21   counselors were, if not more.

22        Q.    So as a coach counselor, if your performance ever

23   needed to be corrected, if discipline was ever issued, who

24   was it who would issue that?

25        A.    Any of those guys, depending on who had the need.

15

1   It's normally like if -- like if it's super bad, that is a

2   UM or CS-3 or GL will be told, hey, you need to talk them

3   and they will send them out to talk to whoever has the

4   issue.  If your GL has a direct issue, he needs to go to

5   the unit manager to approve their write-ups and stuff.

6        Q.   You said if it was really serious, the UM or CS-3

7   would be --

8        A.   Yeah, mm-hmm, yes.

9        Q.   So otherwise, would it be the group leader then?

10       A.   For what?

11       Q.   That would issue the discipline.

12       A.   Your group leader needs to get permission from

13  your UM or the CS-3.  They can verbally give you a

14  write-up, you know, like a -- whatever that is, but as far

15  doing any real discipline, no, you would need to get it

16  from the UM or CS-3.

17       Q.   They would need to get approval from UM or CS-3?

18       A.   To get any serious -- anything really -- like

19  anything that's going to go on your record needs to get

20  approved by somebody above a GL, absolutely.  I didn't

21  have -- well, we're not to that point yet.

22       Q.   And how were you compensated as coach counselor?

23       A.   Very poorly.

24       Q.   Was that by the hour --

25       A.   Yes.

19

1  for working my hours and clocking out when I was supposed

2  to, but I'm not here for a coach counselor.  I am here for

3  a GL so --

4      Q.   So in those circumstances where you were, you

5  said, disciplined for --

6      A.   GL Gillette was told by one of the UMs or CS-3s

7  that I was going over in hours, and clocking in and out

8  was a huge deal always on that kind of you're over in

9  hours; we can't budget this kind of thing so, no matter

10  what you do, you need to get clocked out on time.

11      Q.   Okay.

12      A.   So that was a very big thing.

13      Q.   Do you know if there was a process for seeking

14  approval for overtime hours?

15      A.   Not that I'm aware of, because you don't know

16  when a kid's going to run.

17      Q.   Was there someone that you could go to if you did

18  foresee that you might need to work some overtime hours

19  that you could discuss that with?

20      A.   Hours were handled by the UM and distributed

21  schedules through the GL.  So whoever was in charge of

22  seeing -- because the unit managers put in the hours for

23  the GLs, the coach counselors, and then whoever was in

24  human resources that handled that would tell them, hey,

25  you're over in this; you need to talk to this person, and

20

1  then that would get filtered down to the GL and then the

2  GL would tell the coach counselor what was being done

3  wrong and rectify that per the UM.

4      Q.   So human resources would identify --

5      A.   Whoever handles that.  I don't know if it's human

6  resources.  I just know that the UMs were told you're over

7  and it would --

8      Q.   So --

9      A.   -- filter.

10     Q.   Okay.  I apologize if I cut you off there.

11     A.   I am trying to go slow, too.  So I apologize.

12     Q.   So someone would tell the UM, hey, your --

13     A.   Hours.

14     Q.   -- unit is over hours.  Then the UM would tell

15  the group leader, hey, we have issues with hours; you need

16  to talk to X, this employee and then the group leader

17  would essentially talk to the coach counselor saying, hey,

18  you're over on hours.  What's going on?

19     A.   Yeah.  The UM wants us to handle this.  Don't let

20  this happen again.  Make sure you work the hours you were

21  scheduled.

22     Q.   Did you ever work at any other Rite of Passage

23  locations?

24     A.   No.  Does that mean a visit, like when I took my

25  students to another place or does that mean I actually go

25

1   to the restroom, and their showers are three minutes, for

2   instance, so you have to be there saying time's up and you

3   have to have another coach making sure the rest of the

4   children are sitting quietly and you have to have another

5   coach supervising a hallway.  So there is a minimum of

6   three coaches needed for a number of activities.

7        Q.   And so if I understand correctly, one of the

8   reasons that you resigned was that you felt like you

9   weren't able to run the cottage safely?

10       A.   I made zero difference at that cottage when it

11  came to the structure of business and how that place was

12  ran.  I made a lot of difference with the kids, but as far

13  as my voice being heard on what was good or what we should

14  be doing or how we should be doing or what was right, I

15  made no difference.

16       Q.   What were those issues -- the issues you felt

17  should have been changed?

18       A.   Supervising my cottage was the number one

19  priority, the safety of the kids.  I want my staff that I

20  was given to and assigned to to stay with me, not to be

21  juggled out constantly, not to be left so I'm working and

22  they are doing other things.

23       Q.   Right.

24       A.   Just need my group of assigned coaches.  If I may

25  go back for a moment to the coach that I said wasn't up to

27

1     Q.   And he thought that this person wasn't up to

2  standard?

3     A.   That is correct.

4     Q.   And the person got hired anyway?

5     A.   That is correct.

6     Q.   Did your brother tell you why he thought that the

7  coach counselor wasn't up to standard?

8     A.   Yes.

9     Q.   What was the reason he gave?

10     A.   Age and demeanor.

11     Q.   Can you explain that a little?

12     A.   Age.  He was in his sixties, I believe, and

13  demeanor was -- he was too nice.

14     Q.   Okay.  Did you have the same assessment of the

15  coach counselor after you started working with him?

16     A.   Absolutely, and it was expressed in a meeting

17  prior to me quitting.

18     Q.   Who did you tell?

19     A.   Unit manager Wesley.  Unit manager -- he brought

20  him in.  He was an African American fellow.  Shoot.  UM

21  Robinson, unit manager Robinson, unit manager Bennett and

22  one other unit manager and CS-3 -- what was his name?  The

23  CS-3.  They will know who it was at the time.  That is all

24  a lot of brass.

25     Q.   Did you document any of your concerns?

28

1       A.   That was my documentation, speaking to my unit

2   managers.  That was me bringing it up to them and had a

3   conversation, verbal conversation, with the employee

4   himself.

5       Q.   Do you recall the employee's name?

6       A.   No.  Kent, I believe.  I'm not sure.  No, I

7   don't.  If I read it, I could see it, you know, that would

8   be -- sorry.

9       Q.   I was just going to say if we refer to him as

10  Kent for the purposes of just being able to give him a

11  name, will you understand who I'm talking about if I say

12  Kent?

13      A.   Yes.

14      Q.   So when Kent was a coach counselor in your

15  cottage, was he one of the ones that would be taken out

16  and placed in other cottages?

17      A.   I would be left with him.

18      Q.   Did you ever discipline coach counselor Kent?

19      A.   Verbally, yes.

20      Q.   On what basis?

21      A.   We were escorting two cottages from a football

22  game, approximately 42 kids.  He and I were in the middle

23  portion of the two cottages walking them toward our

24  cottages from the football field.  Rival gang members had

25  an issue.  There was about 16 kids involved.  It was

30

1    situation.  Ultimately it is left up to the coach, the GL,

2    but if a coach is physically or a GL is physically in a

3    situation, that's the ticket; that's the cue to maintain

4    the crowd.  That is the cue to do something to make sure

5    that it doesn't get out of hand and turn into a riot which

6    was not done.

7        Q.   So do you recall what it was you told to coach

8    counselor Kent after this occurred?

9        A.   That if -- that if he couldn't maintain the

10   safety of the children, that he could not maintain a job

11   here.

12       Q.   This is another fairly obvious question, but what

13   was your purpose in talking to coach counselor Kent after

14   that?

15       A.   Safety.

16       Q.   So you were telling him you need to be more aware

17   because --

18       A.   People could be killed.

19       Q.   -- this was not safe?  So coach counselor Kent

20   was the one that sort of got left in your cottage then?

21       A.   Yes, sir.

22       Q.   Was there ever any other coach counselor that was

23   left to you in your cottage?

24       A.   Coach counselor Kimball was assigned to me, but

25   he was taken out of my cottage on a daily basis.  So I

42

1   5:00 a.m. through 10:00 p.m.?

2       A.   Roughly, yes, that's correct.

3       Q.   Was there an evening that you needed to stay

4   through the night?

5       A.   They did ask coach counselors to dictate, once

6   they worked there, an evening specifically for them to

7   stay the night.  The GL was recommended at least one

8   night, if not more, but, yes, one night.

9       Q.   How did you determine which night you would stay?

10      A.   Availability of the other coaches would dictate

11  when I would stay or not.

12      Q.   So does that mean if another coach counselor

13  could stay you wouldn't have to or --

14      A.   No.  We would just use days that they were

15  available.  So if one coach was available on Thursday, I

16  would pick Friday or so on, whatever the availability was

17  that -- I would usually let them pick first and I would

18  take the time that they didn't choose or that was left

19  over.

20      Q.   Okay.  Did -- was there always a coach counselor

21  there at the night?

22      A.   Every night?

23      Q.   Yeah.

24      A.   No.

25      Q.   So essentially, the coach counselor would just

46

1      Q.    Did you do anything with the paperwork that the

2   coach counselors gave you?

3      A.    I didn't per se get the coach counselors'

4   paperwork that was handed in.  They had books that they

5   would hand in.  We would all hand them in together or

6   leave them on a counter and somebody would pick them up.

7   It wasn't my responsibility to hand in their paperwork,

8   no.

9      Q.    The paperwork that you filled out as a group

10  leader, were there any differences in that paperwork?

11     A.    Total counts.  So we had to count different

12  things and have responsibilities for, like, you know, the

13  amount of children were there and present, that kind of

14  thing.

15          As a coach counselor you were responsible

16  for the child and behavior.  We had to count the kids,

17  kind of make sure they were all there and take head counts

18  more often.

19     Q.    Other than head counts, was there anything else

20  involved in that?

21     A.    Like the paperwork and stuff?

22     Q.    Yeah.

23     A.    Just overall -- no, because you have to give

24  overall synopsis of your group as a coach counselor and

25  you give overall synopsis of your group as a GL as well.

47

1    My GL paperwork for shift ending was making sure that

2    their checklist was taken care of.  So I was just making

3    sure that everything was handed in, so, I guess,

4    that's the difference is they would ask me did you get

5    your paperwork in.

6         Q.   Who's the they you're talking about?

7         A.   Unit manager or the CS-3.

8                   (Deposition Exhibit No. 5 marked for

9    identification.)

10   BY MR. WALKER:

11        Q.   So you've been handed what's been marked Defense

12   Exhibit 5.  Have you seen this document before?

13        A.   I have yes.

14        Q.   In the lower right-hand corner of this document,

15   you will see the letters and numbers ROP/KEELE 000202.  Is

16   that the same as on your paper?

17        A.   That is correct, yes.

18        Q.   And that's the only page of this exhibit,

19   correct?

20        A.   Yes, that is correct.

21        Q.   All right.  What is this document?

22        A.   This is a letter of commendation.

23        Q.   And this was a letter that you received as a

24   group leader; is that correct?

25        A.   That is not correct.

49

1      Q.   What was your understanding of what you were

2   doing for the GL you were covering for that day?

3      A.   I was given a set of instructions from the unit

4   manager to follow and to make sure it happened and that's

5   what I made sure happened.

6      Q.   What instructions were those; do you recall?

7      A.   Run the building like it's supposed to be ran.

8   Don't let anybody run.

9      Q.   Other than not letting people run, what does it

10   mean to run the building like it's supposed to be run?

11      A.   To be honest with you, I don't know how they

12   wanted the building to be run, because his definition of

13   flawlessly as a -- UM Bennett and my definition of

14   flawlessly as a coach counselor, even as a GL, were

15   completely different.  So I do not know what is -- all I

16   know is they were happy at the time of what I did.

17      Q.   You mentioned your conception as a GL of what it

18   meant to run the building flawlessly.  What was that?

19      A.   To have coaches on staff, to make sure the kids

20   were safe and they were actually getting the information

21   that was designed to get to them to help them be better

22   people.

23      Q.   How did that differ from your understanding of

24   what UM Bennett thought needed to be done?

25      A.   He was more of a physical approach kinda guy,

52

1      Q.   Great.   Do you have an understanding of what this
2   document is?
3      A.   I do.   It basically says give and complete tasks
4   given to you by your unit manager basically.
5      Q.   More generally, do you have an understanding of
6   this, the purpose of this document?
7      A.   The document is so we have a general outline on
8   what I need to try to do while I'm a group leader, I
9   believe is what this is trying to say.
10     Q.   Under the box that starts, "Position summary," do
11  you see where I'm at there toward the top of the document?
12     A.   Yes.
13     Q.   The first line says, "The group leader is a
14  direct-care staff member of an assigned living unit."
15  What's an assigned living unit?
16     A.   That would be the cottage we referred to earlier.
17     Q.   So cottage, assigned living unit mean the same
18  thing?
19     A.   Yes, sir.
20     Q.   The next line says, "Primarily responsible for
21  the supervision, mentoring, training and evaluation of
22  coach counselors and overseeing the supervision of
23  students to ensure the Rite of Passage normative peer
24  culture program is consistently implemented."   Is that
25  something that you did as a group leader?

53

1       A.   Yes, and then report to my unit manager or site

2   director or my group living and site program director or

3   the supervisor coach counselors.

4       Q.   Okay.  What -- and do you have an understanding

5   of what the Rite of Passage normative peer culture program

6   is?

7       A.   Not offhand anymore, no.

8       Q.   While you were a group leader, did you have an

9   understanding of what that would refer to?

10      A.   Yes.

11      Q.   The next line says, "Group leaders report to the

12  unit manager, site director of group living and the site

13  program director."  So the unit manager -- we have

14  discussed that a little bit -- that was Rob --

15      A.   We have Rob Bennett and also UM Robinson.

16      Q.   And the site director of group living?

17      A.   I remember his name now.  CS-3 Woodsen.

18      Q.   Okay.  So that's the position that's referred to

19  as CS-3?

20      A.   I do believe that is, and then site program

21  director was above him.

22      Q.   Okay.  So did you have an understanding of who

23  was your immediate or direct supervisor as a group leader?

24      A.   Absolutely not.

25      Q.   So it could have been any one of these three

1      Q.   What about the safety of the coach counselors,

2  did you do anything to make sure that they were able to

3  operate?

4      A.   Seeing as I was the coach counselor and the GL at

5  the time with one other coach counselor, we were very good

6  about watching our backs, but we were one person short, so

7  it was very important that he and I were equal and, you

8  know, made sure that he pulled as much weight as I did as

9  far as making sure the kids were supervised and safe.

10     Q.   I guess practically, as -- when you were a group

11  leader, how did you go about trying to ensure that the

12  other coach counselor could do his job safely?

13     A.   How did I ensure that he could do it safely?

14     Q.   How did you provide for the safety of the other

15  coach counselor?

16     A.   It's hard to explain providing anything, but if I

17  can give you an example of what we do, maybe that will be

18  give you an idea what we go through.

19              They're very, very adamant about where we

20  stand in line, where we stand in a room, where we stand on

21  any occasion about supervision and being safe.  We also

22  have a rule that we have to put our arm up, arm's length

23  apart between us and any other person or human being.

24  It's arm's up and it -- the arm's up.  Make sure you have

25  an arm's length between the two of you.  That was always

64

1    maintained for safety.  So the little things that we could

2    do was follow the rules and make sure, for the amount of

3    supervision we had, that we followed those rules the best

4    we could for the amount of supervision we had.

5         Q.    Okay.  So as a group leader you would make sure

6    that those rules were being followed?

7         A.    We would try to.  Often we would get a UM or

8    other GL, hey, you're man's out of position, reminding

9    you, you know, hey, make sure that -- you know, when it

10   comes to what you're doing there at Canyon State, there is

11   a lot of liberty and freedom for other group leaders and

12   other unit managers to also be your boss due to seniority

13   and situational events.

14        Q.    So if another group leader, for example, saw one

15   of the coach counselors that were assigned to your cabin

16   doing something improperly --

17        A.    Absolutely.  I'm sorry.  I didn't mean to

18   interrupt.

19        Q.    -- they could sort of intervene into that

20   situation?

21        A.    It would be most likely a seasoned GL that was a

22   UM or on the way to a UM but, yes, seasoned GLs actively

23   corrected other GLs, other coaches.  They had the liberty

24   to do that.

25        Q.    Did you ever notice anybody else's coach

65

1    counselor doing something improperly you had to step in to

2    resolve?

3       A.   I did eventually have to say things to other

4    coach counselors, yes.

5       Q.   What type of situations would those be?

6       A.   I was put in charge of an -- I was taken out of

7    my cottage to help a flailing or faltering cottage.  At

8    this time, I noticed one of the employees inappropriately

9    touching another student.  I had to discipline and write

10   up that employee.

11      Q.   Okay.  And that was someone -- in someone else's

12   cottage essentially?

13      A.   There was nothing done to that employee.  She was

14   not fired.

15      Q.   Do you recall the name of that employee?

16      A.   I do.

17      Q.   What was it?

18      A.   Coach counselor Torres, T-O-R-R-E-S, Viviana

19   Torres.

20      Q.   What were you doing when you noticed this was

21   happening?

22      A.   I was doing my rounds.  I was walking each room

23   to check if the students were in bed.

24      Q.   The fourth bullet point there, "Organizes all

25   program elements efficiently to promote positive

78

1   straw.   I ended up quitting over that.

2        Q.   Were you told at any point that someone would try

3   to address your concerns?

4        A.   We were ostracized if we brought up anything that

5   created an issue or a speed bump in the road.   It was --

6   things were made difficult for you.

7        Q.   But did anyone ever say that they would look into

8   it or ask you for additional information?

9        A.   Absolutely not.   This is something that was

10  rampant all over the site at the time.   There was a

11  shortage of employees.

12       Q.   Is that the reason that was given to you when you

13  asked for --

14       A.   We're short.   We need your guys because you have

15  a good cottage.   We're going to take your employees.

16       Q.   Did you have a response to that?

17       A.   If they are my employees, can I say no?

18       Q.   And you were told no?

19       A.   They essentially took them, yes, and I was told,

20  no.

21       Q.   Going back for a second, since we mentioned him

22  again, coach counselor Kent, you said that he was

23  interviewed by your brother --

24       A.   Constantine Keele.

25       Q.   -- who was a group leader at the time?   Do you

1   know if he was trained at all in interviewing?

2       A.   No, he was not, nor was I, but we were expected

3   to interview and hire people.

4       Q.   Do you know if any group leaders were given any

5   training in hiring or interviewing?

6       A.   I do not know if any at all were.

7       Q.   But can you say at least you weren't given any

8   training?

9       A.   I was never trained and I interviewed a few

10  people.

11      Q.   Did you ever recommend that anyone be hired?

12      A.   Yes.

13      Q.   Was that individual hired?

14      A.   No.

15      Q.   Did you ever recommend that an individual not be

16  hired?

17      A.   The only recommendation I had was they should not

18  have the guy in my cottage that they had.

19      Q.   So other than the one instance we just talked

20  about where you recommended somebody be hired and they

21  weren't hired was --

22      A.   The other instance, my brother recommended that

23  he not be hired and he was hired and then I recommended

24  somebody be hired that was not hired, that's right.

25      Q.   Other than that, after you had interviewed

Stephanos Keele - September 28, 2015

81

1   counselor?

2       A.    No.  I don't know what the position was for, to

3   be honest with you.  I was just interviewing to see if

4   they fit the culture.

5       Q.    What sort of things would you ask them during the

6   interview process?

7       A.    I would just ask how they heard about us, how

8   they felt about disciplining kids, how they felt about our

9   overall philosophy once it was explained to them what we

10  do there, just basic questions.  I wasn't really given any

11  script or anything.  It was kind of like if you think they

12  will fit, let us know, and when I gave them my opinion,

13  they did what they wanted with it.

14      Q.    So what would you base your determination on

15  then?  How would you assess --

16      A.    Gut feeling.  I had nothing to predicate as far

17  as -- like if they fit the requirement of age, they looked

18  like they were in a physical ability and they had the

19  requirements to work with Canyon State, because they give

20  you requirements.  You have to have some experience in the

21  field.  If you have those minimal requirements, they --

22  you technically could do the job, so it was more about if

23  they would fit in with the team.

24      Q.    Looking at essential function number ten on

25  Exhibit 7, "Ensures that PE program is operated in

82

1    compliance with the site operations manual and that the

2    daily scores and grades are recorded in the PE grade

3    books."

4        A.    I don't know what the PE grade books are.

5        Q.    Do you know what the PE program is?

6        A.    Physical education program was our daily

7    workouts, what we were supposed to do, yeah.  That one's

8    kind of -- we didn't do that.

9        Q.    Were there, I guess, regulations or policies that

10   governed how the PE program was supposed to be run in the

11   site operations manual?

12       A.    That is correct.

13       Q.    Did you have any responsibility for insuring that

14   the PE program was run in accordance with the policies in

15   the site operations manual?

16       A.    Depending on the day, but yes, I did have some

17   overall overseeing of that yes.

18       Q.    Number 11 says, "Provides staff coverage on

19   logistical requirements in conjunction with the shift

20   supervisor."

21       A.    We covered that already.  That wasn't happening

22   and it wasn't anything I could control.  If I can say

23   dangerous more in this interview, I would.  It was

24   dangerous working there in the conditions they allowed to

25   happen.

1   position which everybody, you know, can do to you or

2   whatever -- I got told it a million times, Keele, get with

3   your group.  So I don't remember reprimanding, no, I do

4   not.

5        Q.   As a coach counselor, do you ever remember being

6   reprimanded by a group leader?

7        A.   Yes.

8        Q.   In what situations would that occur?

9        A.   UM Farler --

10       Q.   I'm talking about as a group leader

11  reprimanding --

12       A.   No, no.  I got promoted pretty quickly though.

13       Q.   The final item here says dismissals.  Did you

14  ever recommend that an employee be dismissed?

15       A.   Yes.

16       Q.   Who?

17       A.   Mr. Kent.

18       Q.   Okay.  Anyone else?

19       A.   No, sir.

20       Q.   How did you make the recommendation that Mr. Kent

21  or coach counselor Kent be dismissed?

22       A.   Verbally to UM Robinson and CS-3 Woodsen.

23       Q.   Why did you do that?

24       A.   I can't dismiss him.  I mean their thing to me

25  was, all right, you got to start a paperwork trial and

92

1   we'll fire him.

2       Q.   What was it that made you go to them in the first

3   place?

4       A.   They're my boss.

5       Q.   And what was it that you requested of them?

6       A.   Hey, you got to get this guy out of my cottage or

7   he's not fit; this guy is not fit.  He needed to do

8   something less strenuous than the job description.

9       Q.   And their response to you was to create a paper

10  trial?

11      A.   Yeah.  They said you got to do -- if you want us

12  to do something, you want us to fire her, you have to give

13  us a reason -- or fire him, sorry -- you have to give us a

14  reason.

15      Q.   And did you -- what paperwork did you understand

16  they were referring to there?

17      A.   I guess they wanted me to write him up for

18  something or I guess document what had happened on that

19  physical encounter that was earlier in the week.

20      Q.   Did you do that?

21      A.   No.  I shortly thereafter got called into a

22  meeting where I quit.

23      Q.   Number 18 talks about reviewing, revising and

24  approving coach counselor time and attendance in the

25  Stromberg system.  Do you know what the Stromberg system

1   group leader interview, I was asked about certain

2   procedures, names of those procedures, when they were

3   supposed to be used.  How I answered them and interacted

4   during the interview constituted whether or not I got the

5   job.  I believe this -- I looked at it when I got it and

6   signed it but that was it.

7       Q.   Were you able to ask, for example, the CS-3

8   questions?

9       A.   During that time or just overall?

10      Q.   Any time?

11      A.   The CS-3 was the person I went to with all my

12  questions, yes.

13      Q.   Would you typically get a response when you went

14  to the CS-3 with a question?

15      A.   Yeah, yes, I would.  Can I call a time out,

16  please?  I got --

17              MR. WALKER:  Yeah, please.  Yeah, please.

18              (Recess taken, 12:10 p.m. to 12:16 p.m.)

19  BY MR. WALKER:

20      Q.   Back to Exhibit 7, and I think we're almost done

21  with this one.  Number 29, the last one there on the first

22  page, talks about ensuring the highest standards are

23  maintained to prevent illegal, unethical or improper

24  conduct and to ensure the program remains in compliance

25  with agency licensing and Rite of Passage policies and

1  procedures.  Do you know what agency licensing they're

2  talking about there?

3       A.    I think the state.

4       Q.    Were you ever -- did anyone ever talk to you

5  about licensing requirements?

6       A.    No.  Are you talking about like for CSA, for like

7  the school?

8       Q.    When you were a group leader, did anyone tell you

9  anything that you needed to do to help maintain compliance

10 with agency licensing?

11      A.    We got yelled at for cussing all the time.

12      Q.    Do you know why?

13      A.    Because we're not allowed to cuss in front of the

14 kids I believe was the reason.

15      Q.    Not allowed to based on --

16      A.    I don't know.  They just told us not to curse.  I

17 think that's what you were getting at, whenever we were

18 told not to do something in front of the kids, for fear --

19 because they said we would lose our license if we cursed

20 in front of the kids.

21      Q.    I was just trying --

22      A.    I don't know if I am answering it right.

23      Q.    No.  Whatever you know is the right answer.  I'm

24 just looking for sort of the basis behind this number 29,

25 what they're getting at here.

108

1      A.   I would understand it as a safe -- I would

2   understand it to mean that it's a safe environment and

3   that we're listening to all the state and federal

4   regulations that we're supposed to to have kids on the

5   campus.

6      Q.   Is that something that you did as a group leader?

7      A.   Understand it or provide a safe environment?

8   Yeah, that was our number one.  We wanted -- safety was

9   our number one goal for the kids.  I don't know if I

10  answered that correct.

11     Q.   That's just great.  Ask -- like I said, if you

12  ever need clarification on anything, please let me know.

13              Number 31 talks about attending and

14  participating in all required meetings.  We talked about

15  the group leader meeting with the unit manager.  Were

16  there any other required meetings for group leaders?

17     A.   That one meeting I was telling you about that

18  they would call us out of our cottage in the middle of the

19  night and have us meeting with all the group leaders

20  during the B shift, we'd have to do that.  That was just

21  ridiculous.

22     Q.   Was that the only meeting?

23     A.   On a regular basis.  We would have like award

24  ceremonies and updates and stuff like that.  We would have

25  random meetings.  Those are the ones that consisted of

132

1   group leader and I was not correct.

2       Q.   And as a coach counselor, you worked with a group

3   leader for six months prior to becoming a --

4       A.   That's what I did.  Normally, I believe they said

5   their rule of thumb -- this is just an estimate -- that

6   you usually go a year to two years before anybody was

7   promoted to GL and I got it within the first year, yes.

8       Q.   Had you worked with a group leader prior to

9   becoming a group leader?

10      A.   You can't work in a cottage without being a group

11  leader unless they say you're an acting group leader which

12  I was an acting group leader for a little bit before group

13  leader.

14      Q.   Okay, but I -- what I am trying to get at is you

15  had an understanding of the group leader position before

16  you actually became a group leader, correct?

17      A.   When I first started working there as a coach, I

18  thought the group leader was my boss and I found out that

19  I was wrong; that every group leader can be your boss but

20  the bosses' boss are the UMs and the site manager.

21      Q.   You learned that every group leader could be your

22  boss?

23      A.   Every group leader -- as a coach counselor, you

24  answer to everybody.  That's what is told.  You answer to

25  everybody.  Make sure you get everything done.  Number

143

1    not the date that this was completed?

2         A.    No, I don't have any reason.

3         Q.    Do you recall completing this evaluation for

4    coach counselor Kimball?

5         A.    I do not know, but this is definitely my

6    signature, but I don't recall it, no.  I don't remember

7    it.  They would tell us that things needed to be done,

8    like I was telling you earlier, paperwork that needs to be

9    handed in.  This would be one of the duties.  If you don't

10   have it done, your file is incomplete as well.  So it's

11   something we would hustle through or whatever.  The UMs

12   would ultimately end up having to do this.  If we didn't

13   do it, they would do it.

14        Q.    Now, under essential functions, number six, on

15   that first page, "Models and supports program norms", I

16   remember you saying coach Kimball typically did a pretty

17   good job.  It looks like you gave him higher-than-normal

18   marks on this.

19        A.    Yes.

20        Q.    Do you recall what it was about coach Kimball

21   that made you mark exceeds standards on this?

22        A.    Yeah.  He cared about the kids.  The norms were

23   to make sure of the kids' safety, and I don't know them

24   verbatim anymore, not even close -- I don't really care to

25   remember them, to be honest -- but he was very good about

144

1  putting the children first, making sure when we lined up,

2  he was always in the spot that we were trained to line up

3  in.

4      Q.   How did you know that he was good at doing that?

5      A.   Well, I didn't have to have anybody from other

6  cottages rate us.  That happened a lot.  There was a lot

7  of other cottages trying to make sure you're doing the

8  right thing because it was so competitive for cottage of

9  the month.  There was no -- everybody always told me

10  whenever he was around them, he was -- he did well as a

11  coach counselor.

12      Q.   Did you ever observe his performance as a coach

13  counselor?

14      A.   He worked with me.  Well, he was supposed to be

15  with me on a daily basis but when he was with me,

16  everything he learned as a coach counselor, he would try

17  to follow, yes.

18      Q.   So part of this was based on your own

19  observations of his performance?

20      A.   Sure.  I can say that would be fair.

21      Q.   Number eight talks about completes daily

22  assignments specified by manager.  What was it about, if

23  you recall, Mr. Kimball that motivated you to mark the

24  exceeds standards evaluation on this topic?

25      A.   We had to -- the UM or the shift supervisor --

186

1   I don't think we even talked too much, if any, in person.

2   If we did, it was brief.

3       Q.   Did he give a reason as to why he didn't want to

4   participate in the litigation?

5       A.   I'm good I think was the response.

6       Q.   Any follow-up on that?

7       A.   Did I follow up with him?  No, I did not.

8       Q.   How were you compensated as a group leader?

9       A.   Very poorly.

10      Q.   Was it on an hourly basis?

11      A.   No.

12      Q.   On what basis were you compensated?

13      A.   I believe it was a salary, if I remember

14   correctly.

15      Q.   What was the salary?

16      A.   I don't remember.

17      Q.   Do you recall what it was annually?

18      A.   I don't.  It was supposed to be close to 35- or

19   something like that, some change, somewhere between 35-

20   and 40- I believe.

21      Q.   Did you make more as a group leader than you did

22   as a coach counselor?

23      A.   After it was averaged out and the hours worked,

24   no.

25      Q.   What do you mean by that?

194

1              MR. WALKER:  Objection, form.

2      A.    Other than the CS-3?

3      Q.    Other than the --

4      A.    And the shift managers, is what you're saying?

5      Q.    No.  Other than the write-ups that you reviewed

6  today, did anyone ever tell you that you were failing to

7  perform an essential function of the GL position?

8      A.    No.  I also don't have write-ups that they gave

9  me that aren't in here so -- but no.

10     Q.    Earlier there was a reference with you talking to

11 coach Kent and saying something about him needing to get

12 in line with the program, otherwise his job might be on

13 the line.  Do you recall saying something along those

14 lines?

15     A.    Yes.

16     Q.    When you said his job might be on the line, was

17 that something that you had control over, whether he would

18 be fired or not?

19     A.    No.  As a matter of fact, when I brought it up to

20 my boss, the UM, he was like I can't do anything until you

21 do the proper form of trying to help, verbal, written and

22 all that stuff, but you need to do that.  I can't do that

23 for you.  When I asked him why he couldn't talk to him or

24 take him out of my cottage, he said we didn't have a place

25 for him.

195

1    Q.   You mentioned interviewing a couple of people.

2 Is it your understanding as a group leader that you had

3 any authority at all to hire people for Rite of Passage?

4             MR. WALKER:  Objection, form.

5    A.   No.

6    Q.   Did anyone else sit in on the interviews when you

7 did interviews?

8    A.   No.  We did turn them over to the UM when we were

9 done for the UM to finish the conversation with them.

10    Q.   There was a continuation of the interview?

11    A.   After I did on my occasions, yes.

12    Q.   Was that an unusual process or did you understand

13 that was what was supposed to happen?

14    A.   I am not aware of the process.  I know my brother

15 interviewed coach Kent.  After he interviewed him, he told

16 the UM that you shouldn't hire him and I know the UM spoke

17 to Kent after that and ended up putting him into my

18 cottage, and my brother was a group leader at that time.

19    Q.   The foot injury incident, do you recall whether

20 that happened at work or before work?

21    A.   That was during work.

22    Q.   If you look back at Exhibit 15, the first box of

23 Exhibit 15 where it states that you called in an hour

24 before the start of the shift, is that an accurate

25 statement?

200

1     Q.   What do you mean by okayed by somebody else?

2     A.   For instance, the only reason to tell a coach to

3  be in a certain area is if we need coverage.  I was not at

4  liberty to decide when we needed coverage.  If I was in my

5  cottage and I was short and I called for somebody, I was

6  not given help.  If I was going to school and I told my

7  coaches where to stand, I was never correct or they

8  already had places they needed to be by breakdown of that

9  sheet we got every morning.  It told the coaches exactly

10  where to go and when to be there.

11     Q.   So the sheet that you got that had the breakdown

12  of telling where people needed to be and when, if you saw

13  a coach counselor who wasn't where he or she needed to be,

14  would you tell that person to go be where the unit manager

15  wanted him or her to be?

16     A.   You probably would -- not that dude, but I am

17  sure that was in the scope of what we were supposed to be

18  doing.  I was never around the areas or in a position to

19  tell people what to do because I was always being told

20  what to do.

21     Q.   And is it your understanding that a coach

22  counselor, when they were told to do something by a group

23  leader, that they were supposed to do that thing?

24     A.   Unless it was me, yeah.

25     Q.   What do you mean by unless it was me?

201

1      A.    I was not your typical group leader.  They did

2   not give me the responsibilities.  I was not trained and I

3   was -- often looked like a surrogate coach.

4      Q.    So coach counselors were told that they didn't

5   need to obey the orders that you gave?

6      A.    I don't know if they were told but I had a lot of

7   disobedient coach counselors that were not in my cottage

8   very long; they were switched out.

9      Q.    Did you ever coach them on that issue?

10      A.    No.

11      Q.    Did you ever address that issue with one of your

12   supervisors?

13      A.    UM Robinson.

14      Q.    What did he tell you to do?

15      A.    I need to document.

16      Q.    Did you then document the issues?

17      A.    Absolutely not.  They were moved or I was moved.

18      Q.    Do you know if a record was kept of the nights

19   that you stayed on campus?

20      A.    I do not.

21      Q.    Did you ever indicate anywhere the nights that

22   you were staying overnight?

23      A.    We were verbally supposed to tell our UM the

24   nights we were supposed to stay.

25      Q.    And do you know if your UM kept a record of that?

203

1   and put it in the weaker cottages.  Again, I had no say

2   when or what coach would be taken.

3       Q.   Did you ever interview anyone as a coach

4   counselor?

5       A.   No, I don't think so.  I think you asked me that,

6   but I don't think I did.

7               MR. WALKER:  All right.  We are done.

8               MR. CARDEN:  We will read and sign.

9

10              (Deposition concluded at 3:32 p.m.)

11

12              _____

13                    Stephanos Keele

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Stephanos Kelle,                                    )
                                                    )
                              Plaintiff,            )
                                                    )
                vs.                                 )      Case No.
Rite of Passage, Inc.,                              )  2:14-cv-02135-PHX-DLR
                                                    )
                              Defendant.            )
_____)

**STATE OF ARIZONA**          )   ss.
**COUNTY OF MARICOPA**        )

      **BE IT KNOWN** that the foregoing deposition of **Stephanos Keele** was taken before me, Laura A. Ashbrook, a Certified Reporter in the State of Arizona, on <u>September 28, 2015,</u> that the witness elected to sign the deposition before filing with the taking attorney; that on <u>October 15, 2015,</u>

      \_\_\_\_\_**SIGNATURE** page from the original transcript was forwarded to **Attorney** so the transcript could be reviewed by the witness. As of this date, the signature page has not been returned, and being charged with the responsibility for filing the original transcript with the appropriate party, I herewith file said deposition.

      \_\_\_\_**ATTORNEY** was notified by mail to advise the witness to come to the office of **GRIFFIN AND ASSOCIATES**, Court Reporters within 30 days for the purpose of reviewing the transcript. As of this date, the witness has not contacted our office for an extension of time, and being charged with the responsibility for filing the original transcript with the appropriate party, I herewith file said deposition.

      \_\_X\_\_**WITNESS** was requested by mail to come to the office of **GRIFFIN AND ASSOCIATES**, Court Reporters, within 30 days for the purpose of reviewing the transcript. As of this date, the witness has not contacted our office for an extension of time, and being charged with the responsibility for filing the original transcript with the appropriate party, I herewith file said deposition.

      \_\_\_\_**COURTESY** copy was sent to the witness to be reviewed and for the purpose of making corrections. As of this date, the signature page has not been returned to this office, and being charged with the responsibility for filing the original transcript with the appropriate party, I herewith file said deposition.

I certify that GRIFFIN & ASSOCIATES, LLC, has complied with the ethical obligations set forth in ACJA 7-206(J) (g) (1) through (6).

Pursuant to Rule 80(i), Arizona Rules of Civil Procedure, I declare under penalty of perjury that the foregoing is true and correct.

**DATED** at Phoenix, Arizona, this _____2nd_____ day of ____Dec.____, 20_15_.

LAURA A. ASHBROOK, RMR
Certified Reporter
Arizona CR No. 50360
Griffin & Associates, LLC
RRF No. R1005

Exhibit D

 **Rite of Passage**
**Position Description**  069

| Title | | | Department | |
|---|---|---|---|---|
| Group Leader | | | Group Living | |

| Status | | | | |
|---|---|---|---|---|
| ☒ Full-Time | | ☐ Part-Time | ☐ Part-Time On Call | ☐ Temporary |

| Class | | | | |
|---|---|---|---|---|
| ☒ Exempt | | ☐ Hourly | ☐ Salaried Nonexempt | |

**SHIFT:**
Typical schedule: Shifts (number of days and hours) vary depending on location. Weekend days and overnights required during the scheduled shift.

**POSITION SUMMARY:**
The Group Leader is a direct-care staff member of an assigned living unit. Primarily responsible for the supervision, mentoring, training and evaluation of Coach Counselors and overseeing the supervision of students to ensure the Rite of Passage normative peer culture program is consistently implemented. Group Leaders report to the Unit Manager, Site Director of Group Living and the Site Program Director and supervise the Coach Counselors and students in the assigned living unit.

**ESSENTIAL FUNCTIONS:**
1. Adheres to the facility and daily schedule, including PM Program, to ensure the unit is on time for all elements and the students participate in all of the scheduled activities.
2. Completes daily assignments as specified by the Unit Manager.
3. Provides consistent interactive supervision of Coach Counselors and student athletes to ensure the safety, health and welfare of staff and students at all times.
4. Organizes all program elements efficiently to promote positive behavioral traits with the students and ensures staff supervises all elements effectively to reduce incidents.
5. Ensures the coaching staff maintains compliance with all current policies and procedures, the Site Operations Manual and licensing regulations.
6. Ensures staff maintains age appropriate relationships with the students and that the student personal rights are intact.
7. Develops the athletic training schedules and weekend intramural competition.
8. Assists with coaching sports or vocations.
9. Ensures the afternoon sports and vocational programs have adequate staffing and that the staff is actively involved in the programs.
10. Ensures the PE Program is operated in compliance with the Site Operations Manual and that the daily scores and grades are recorded in the PE Grade Books.
11. Provides staff coverage on logistical requirements in conjunction with the Shift Supervisor.
12. Interacts during and supervises community service events.
13. Assists with extra-curricular activities.
14. Ensures adequate classroom coverage by direct-care staff.
15. Assists with facilitating the scheduled Guided Group Meetings, provides feedback and interaction with students and staff.
16. Monitors students and prepares Daily Assessment Plan Notes.
17. Conducts Coach Counselor hiring, evaluations, commendations, reprimands and dismissals.
18. Reviews, revises and approves Coach Counselor time and attendance in the Stromberg system if applicable.
19. Assists with developing Coach Counselors by conducting daily training sessions and action plans.
20. Provides encouragement, guidance and resources to the staff and students when needed.
21. Models and ensures all program norms are upheld without compromise.
22. Acts as a positive role model and mentor for both staff and students.
23. Treats others with respect, confronts negative behavior and supports confrontations.
24. Ensures proper safe physical management techniques are followed at all times.
25. Assists other staff members with emergency situations.
26. Encouraged to participate in at least 50% of the daily physical activities required of the students.
27. Completes required reports and documentation in a timely manner; collects, collates and summarizes all weekly paperwork. Provides management with required reports and advises of any problematic situations.
28. Complies with and implements the Rite of Passage Policies and Procedures as detailed in the appropriate manuals/handbooks.
29. Ensures the highest standards are maintained to prevent illegal, unethical, or improper conduct and to

ROP/KEELE 000002

 

069

ensure the program remains in compliance with agency licensing and Rite of Passage policies and procedures.

30. Assists with the correction of deficiencies and quality improvement efforts.
31. Attends and participates in all required meetings.
32. Commits to attending and tracking all training and staff development classes in order to ensure sufficient hours of training for this position and all supervised staff are completed on an annual basis. Notifies the supervisor if annual training hours are deficient.
33. Other duties as assigned, verbally or in written form.

## MARGINAL FUNCTIONS:
1. Participates in Site, Region and/or Company events as required.

## MINIMUM QUALIFICATIONS:
1. Internal applicants must be a Coach Counselor with no less than standard performance and at least three months of experience at Rite of Passage. External candidates must have prior experience working with at-risk youth, at least 60 hours of college education and/or military experience.
2. Supervisory experience preferred.
3. For sites operating in Maryland, all direct-care staff must comply with COMAR 14.31.06.06.
4. Good interpersonal skills including the ability to interview potential employees if required.
5. If required to operate a company vehicle during the course of employment, must meet the requirements to be an eligible ROP driver. Must possess a current State Driver's License and have an acceptable driving record for the past three (3) years.
6. Strong knowledge of overall company operations and an ability to understand correlations between internal operating departments.
7. Ability to pass a criminal background clearance check, drug screen, physical and TB test.
8. Ability to perform work with little or no supervision.
9. Ability to utilize resources available to complete assigned projects.
10. Ability to prepare written reports and correspondence.
11. Ability to understand and follow verbal and written instructions.
12. Ability to effectively communicate, verbally and in writing.
13. Able to work in excess of 40 hours per week with the possibility of a varied schedule.
14. Must be able to maintain a high level of confidentiality.
15. Must have excellent organization and time management skills.
16. Ability to build and maintain positive internal and external relationships.
17. Ability to provide exemplary customer service to all employees and outside constituents.
18. Ability to function independently and as a member of a team in a multi-task environment.
19. Must be flexible and able to handle multiple priorities, with the ability to adjust to high pressure and rapidly changing business conditions.
20. Proficient in the use of computers and associated software.

## WORK CONDITIONS and PHYSICAL REQUIREMENTS:
This section identifies "Physical Requirements" of a particular job. All requirements are subject to possible modification to reasonably accommodate individuals with disabilities. Individuals who pose a direct threat or significant risk to the health and safety of themselves or others in the workplace, because physical requirements cannot be eliminated or reduced by reasonable accommodation, will not be considered qualified for employment. Notify the Human Resources Manager if you require any accommodation(s) to perform any of the essential functions of this position.

☐ **Sedentary work** - Exerting up to 10 pounds of force occasionally, and/or a negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time. Jobs are sedentary if walking and standing are required only occasionally, and all other sedentary criteria are met.

☐ **Light work** - Exerting up to 20 pounds of force frequently, and/or a negligible amount of force constantly to move objects. If the use of arm and/or leg control requires exertion of forces greater than that of sedentary work and if the worker sits most of the time, the job is considered light work.

☐ **Medium work** - Exerting up to 50 pounds of force occasionally, and/or up to 20 pounds of force frequently, and/or up to 10

ROP/KEELE 000003

 

069

pounds of force constantly to move objects.

☐ **Heavy work** - Exerting up to 100 pounds of force occasionally, and/or up to 50 pounds or force frequently, and/or up to 20 pounds of force constantly to move objects.

☒ **Very heavy work** - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force constantly to move objects. Applies to all Group Living Employees.

| Physical Requirements | | | Conditions |
|---|---|---|---|
| ☒ Climbing  ☒ Balancing  ☒ Stooping<br>☒ Kneeling  ☒ Crouching  ☒ Reaching<br>☒ Standing  ☒ Walking  ☒ Pushing<br>☒ Pulling  ☒ Lifting  ☒ Grasping<br>☒ Seeing  ☒ Hearing  ☒ Talking<br>☒ Tactile sense  ☒ Repetitive motions<br>☒ Visual acuity (color, depth perception and field of vision)<br>☐ Other: | | | **Environment:**<br>☒ Noise  ☒ Extreme temperatures  ☒ Wet and/or humid<br>☒ Dust ☐ Fumes ☐ Exposure to _____<br>☒ Limited/office environment<br><br>**Hazards:**<br>☐ Mechanical ☐ Electrical ☐ Chemical<br>☒ Physical Activities ☐ Burns ☐ Other, _____ |

## IMPORTANT NOTICE:

This position is not limited to those duties in the job description. Duties and responsibilities can be changed, expanded, reduced, or deleted to meet the business needs of Rite of Passage. The duties listed above are intended only as illustrations of the various types of work that may be performed. The omission of specific statements of duties does not exclude them from the position if the work is similar, related or a logical assignment to the position.

All employees of this Company are employees at will and, as such, are free to resign at any time without reason. The Company, likewise, retains the right to terminate an employee's employment at any time with or without reason or notice. Nothing contained in this document or any other document provided to the employee is intended to be, nor should it be, construed as a guarantee that employment or any benefit will be continued for any period of time. Any salary figures provided to an employee in annual or monthly terms are stated for the sake of convenience or to facilitate comparisons and are not intended and do not create an employment contract for any specific period of time.

## ACKNOWLEDGEMENT:

I have read and understand the contents of this Position Description. I also acknowledge that it is my responsibility to notify the Human Resources Manager if I require an accommodation to perform any essential function(s) of this position.

I do* ☐ or do not ☒ require an accommodation to perform the essential functions of this position.

Stephanus Keele _____ 1/28/12 _____ [signature]
Employee Name (Please Print)           Date            Employee Signature

Rochelle Lindsey _____ 1/28/12 _____ R Lindsey
Human Resources (Please Print)          Date            Human Resources Signature

\* Employee Completes the Request for Accommodation Form

**ROP/KEELE 000004**

Exhibit E

12/14/2011   15:51   RECEIVED  12/14/2011 15:01   7752679419   ROP CORP HR
4800822   CSA HUMAN RESOURC   PAGE   01/04

Print Form

## Rite of Passage

### PERSONNEL ACTION FORM

| | | | |
|---|---|---|---|
| Today's Date: | 12/1/2011 | Date of Hire | 5/16/2011 |
| | | Date of Action: | 12/1/2011 |

Employee ID:  KE7739

Employee Name: STEPHANOS KEELE
(PLEASE PRINT)

☐ Is this a Name Change Request?
( check only if "yes")

Position: Coach Counselor          Site: CSA

Shift   ☐ A   ☒ B   ☐ OTHER          Telephone #  336-482-6444

Home Address: [                    ]
☐ Is this an Address Change
Request? ( check only if "yes")

City: [            ]          State: Arizona          Zip: [            ]

### Status Change ( Check all that apply)

| | | |
|---|---|---|
| ☐ New Hire | ☐ Full - Time | ☐ Direct Deposit (attach voided check) |
| ☐ Re-Hire | ☐ Part - Time | |
| ☐ Transfer | ☐ Promotion | ☐ Training Material Deduction |
| ☐ Leave of Absence | ☐ Demotion | ☐ PTO Request |
| ☐ Resigned** | ☒ Rate Change | ☐ OTHER ( please explain) |
| ☐ Suspended | ☐ Payroll Deduction | |
| ☐ Terminated** | ☐ Clothing Deduction | |

Eligible for Rehire?
(check only if this is
for resignation or
termination, and
only if yes)

**If "Employee Status Changes from FT to PT",or if "Resignation" or "Termination" is checked - COBRA NOTIFICATION MUST BE SENT

### DETAILS:

ENT____
HR  11.10      DEC 1 4 2011
Rate Change due to position adjustment increase - $30,000      OT  16.65      PPE DATE
DY  164.91
SH  1154.40

| | | | |
|---|---|---|---|
| Employee's Signature | [signature] | Date | 12/2/11 |
| Supervisor's Signature | [signature] | Date | 12/1/2011 |
| Print Supervisor's Name | Jonathan Trost | | |
| Human Resources Signature | [signature] | Date | 12/1/2011 |
| Print HR Personnel's Name | Rochelle Lindsey | | |