Joshua W. Carden, SBN 021698
Joshua Carden Law Firm, P.C.
16427 North Scottsdale Road, Suite 410
Scottsdale, AZ 85254
joshua@cardenlawfirm.com
(480) 454-1100
(480) 454-1101 (Fax)
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephanos Keele,<br><br>                     Plaintiff,<br><br>v.<br><br>Rite of Passage, Inc.,<br><br>                     Defendant. | No. 2:14-cv02135-DLR<br><br>**PLAINTIFF'S CONTROVERTING AND ADDITIONAL STATEMENTS OF FACT OPPOSING SUMMARY JUDGMENT AND DECLARATION OF JOSHUA W. CARDEN** |

Plaintiff provides these Controverting and Additional Statements of Fact in opposition to Defendant's Motion for Summary Judgment ("CSOF" and "ASOF"). The Additional Statements of Fact begin on page 13 herein.

1.      ROP is a national provider of programs and opportunities for troubled and at-risk youth from social service agencies, welfare agencies, and juvenile courts. Declaration of Rick Wright ("Wright Decl."), attached hereto as Exhibit A, at ¶ 3. For 30 years, ROP has developed and operated a continuum of least-restrictive residential and non-residential programs, including education services and community-based programs. *Id.* Among other facilities, ROP owns, operates, and manages Canyon State Academy ("CSA"). *Id.* CSA is a large, multi-building campus that includes an administration building, classrooms, athletic facilities, farming areas, dining commons, and residential cottages for the students. *Id.* Cottages are staffed with Group Living Coach Counselors and Group Leaders. Full-time Group Living Coach Counselors ("Coach Counselors") are responsible for supervising and mentoring student-residents. *Id.* at ¶ 4. Coach



Counselors report directly to a Group Leader who is responsible for the supervision and management of the cottage and the Coach Counselors. *Id.*

> **Response: Admitted, except for last two sentences, which Plaintiff controverts as follows:  While serving as a Group Leader, Mr. Keele essentially served the function of Coach Counselor and Group Leader at the same time with one other Coach Counselor.** *See* **Deposition of Stephanos Keele ("Ex. 1" hereto) at 63:1-9.  Group Leaders are also directly responsible for supervising and mentoring student-residents.** *See* **Ex. 2 and Ex. 4 hereto (Job descriptions of Coach Counselor and Group Leader). Group Leaders report to Unit Managers and "CS-3s" (a.k.a Shift Supervisors) and Coach Counselors report to Group Leaders, Unit Managers, and CS-3s.** *Id.* **The Unit Managers and CS-3s actually ran the day to day operations.** *See* **ASOF ¶¶ 55-66.**

2.     On December 14, 2011, Keele was promoted to the position of Group Leader, a position he held until December 2012. See December 14, 2011 Personnel Action Form, Bates No. ROP/KEELE000214, attached hereto as Exhibit B; and

> **Response: Admitted.**

3.     Keele brought this action asserting a single claim for allegedly owed overtime wages, premised on his theory that he should not have been exempted from federal overtime requirements. See generally Plaintiff's First Amended Complaint (Dkt. 22).

> **Response: Admitted.**

4.     Keele testified that ROP paid him a fixed annual salary of between $35,000 and $40,000 a year. Deposition of Stephanos Keele ("Keele Dep."), attached hereto as Exhibit C, at 186:12-20.

> **Response: Admitted.**

5.     Actually, Keele was compensated as a Group Leader at a rate of $36,000 a year ($692.30 a week). Exh. B.

> **Response: Admitted.**

6.     Keele's salary was not subject to reduction based on the quantity or quality of his work. Wright Decl. (Exh. A) at ¶ 7.



**Response: Admitted.**

7.     As Keele acknowledged during his deposition, and as set forth in the Group Leader job description, the position oversees and takes responsibility for the running of a living unit (also called a cottage) at CSA and for Coach Counselors generally. Keele Dep. (Exh. C) at 25:18-24 (Keele testifying that "Supervising [his] cottage was the number one priority"); 63:14-15; 64:5-65:10 (explaining that Group Leaders, including himself, would monitor the performance of all Coach Counselors and provide correction where necessary); Rite of Passage Position Description attached hereto as Exhibit D.

**Response: Objection – mischaracterizes the testimony. Plaintiff controverts as follows:  "supervising the cottage" meant "to safely maintain and manage the children." Ex. 1 at 22:8-22.  He testified in the cited testimony that he and one other coach counselor were "equal" in that responsibility (Ex. 1 at 63:1-10); and that he reported one Coach Counselor for inappropriate touching (Ex. 1 at 65:5-10; 89:19-91:4) and that "seasoned" Group Leaders and Unit Managers would actively correct Group Leaders and Coaches. Ex. 1 at 64:5-24.**

8.     Keele testified that he was required as a Group Leader to interview and hire candidates for the Coach Counselor position and make recommendations as to who would be the best fit for the job. See Keele Dep. (Exh. C) at 78:14-79:3 ("we were expected to interview and hire people.").

**Response: Objection – mischaracterizes the testimony. Plaintiff controverts as follows: Mr. Keele was told to interview a total of four individuals to determine if they would be a good fit for the culture of the company. Ex. 1 at 79:4-18; 80:22-81:23. He did not have the final say on employment and none of his recommendations were ever followed. *Id.***

9.     Keele testified that he was told that, if he determined an employee should be fired he simply needed to document the reasons for the termination, showing he had authority to issue and document discipline which could affect the termination of an employee he supervised. *Id.* at 91:13-92:1; 92:9-22 (testifying that he was told that if he wanted to terminate an employee's



1  employment he had to provide a reason for doing so).

2  **Response: Objection – mischaracterizes the testimony. Plaintiff controverts as**
3  **follows: Mr. Keele testified that he could not dismiss an employee and his bosses told**
4  **him he had to create a "paper trail" so that they could dismiss an employee – but he**
5  **quit before he was able to do. Ex. 1 at 91:20-92:22.**

6      10.    Keele also testified that he disciplined one of his Coach Counselors saying that if
7  "he couldn't maintain the safety of the children, that he could not maintain" his job. *Id.* at 30:7-
8  15.

9  **Response: Objection – mischaracterizes the testimony. Plaintiff controverts as**
10  **follows:  Mr. Keele did not use the word "discipline" at all in the cited testimony.  In**
11  **fact, Mr. Keele was not allowed to issue formal discipline – that only happened from**
12  **the Unit Managers and the CS-3s. Ex. 1 at 14:22-15:21.**

13      11.    Though attempting to evade the fact during his deposition, Keele's testimony
14  makes clear that he was expected to monitor and ensure Coach Counselors were up to date on
15  required training and that they attended preferred training courses. *Id.* at 13:10-22 (explaining that
16  Keele was trained as a Coach Counselor by his Group Leader at the time); *Id.* at 52:2-53:3
17  (testifying that as a Group Leader he was "[p]rimarily responsible for the supervision, mentoring,
18  training, and evaluation of Coach Counselors and overseeing the supervision of students to ensure
19  the Rite of Passage normative peer culture program [was] consistently implemented."); *Id.* at
20  52:2-53:3.

21  **Response: Objection - argumentative and mischaracterizes the testimony. Plaintiff**
22  **controverts as follows: Mr. Keele had no knowledge of which Coach Counselors**
23  **needed which training or had missed training. All of that information was passed**
24  **down from Unit Managers or CS-3s. Ex. 1 at 68:5-69:7 & Ex. 4.**

25      12.    During his deposition, Keele testified as follows:
26  Q. The next line says, "Primarily responsible for the supervision, mentoring, training and
27  evaluation of Coach Counselors and overseeing the supervision of students to ensure the
28  Rite of Passage normative peer culture program is consistently implemented." Is that



something that you did as a Group Leader?

A. Yes, and then report to my unit manager or site director or my group living and site program director or the supervisor Coach Counselors.

*Id.* at 52:2-53:3.

**Response: Objection vague. Plaintiff admits this was his testimony but that it is taken out of context and controverts it as follows:  Counsel was reading a statement from the Group Leader job description.  As a Group Leader, Mr. Keele was certainly responsible for the supervision of students, but his "supervision" of Coach Counselors was almost non-existent.  See ASOF ¶¶ 55-66.  He did not train Coach Counselors, but simply relayed messages from the Unit Managers or CS-3s. Ex. 1 at 68:5-69:7.**

13.    Keele knew that, as a Group Leader, he was responsible for disciplining Coach Counselors. *Id.* at 14:22-15:5 and 15:9-16 (explaining that as a Coach Counselor, if his performance ever needed to be corrected that correction, if not "really serious" would come directly from the Group Leader).

**Response: Objection – speculation (as to "knew") and mischaracterizes the testimony. Plaintiff controverts as follows: Mr. Keele could not actually discipline Coach Counselors – he could verbally tell them to get in line, but so could everyone else, including other Coach Counselors. Ex. 1 at 14:22-15:21; 64:5-24.**

14.    As a Group Leader, Keele had responsibility for helping to monitor labor hours, testifying that, when he was a Coach Counselor, if his Group Leader was ever told that he, Keele, was "going over in hours" he would be told, by his Group Leader, that his practices need to change so he could get clocked out on time and that it is incumbent on the Group Leader to see that such problems are rectified. *Id.* at 19:6-20:3.

**Response: Objection – mischaracterizes the testimony. Plaintiff controverts as follows: When Mr. Keele was Group Leader (the relevant time frame), he did nothing as Group Leader with respect to Coach Counselor hours except pass along messages from the Unit Managers or CS-3s, the real supervisors. Ex. 1 at 92:23-93:12; 137:8-**



140:13.

15.     Keele also testified that during his time as a Group Leader he was required to discipline Coach Counselors regarding their working unauthorized overtime and ensuring they were clocking in and out on time. *Id.* at 20:12-21 (explaining that if he was told one of his Coach Counselors was going over on hours he was to make sure it did not happen again and to tell the Coach Counselor to "[m]ake sure you work the hours you were scheduled.").

> **Response: Objection mischaracterizes. Plaintiff controverts as follows: See response to No. 14.  Further, <u>actual</u> "discipline" came from the Unit Managers or CS-3s, the real supervisors. Ex. 1 at 14:22-15:21.**

16.     Keele explained that it was his practice to allow Coach Counselors to help determine the schedule for staying on site overnight, based on their availability, testifying that he would typically let the Coach Counselors select the nights they would stay first, selecting whatever night they did not choose for himself. *Id.* at 42:9-19.

> **Response: Objection - relevance and mischaracterizes the testimony. Plaintiff controverts as follows: All coach counselors <u>and</u> group leaders were expected to stay overnight at least one night per shift. Mr. Keele admits that he allowed the other Coach Counselors to pick their night first, and he would take the leftover night himself. Ex. 1 at 42:3-43:6.**

17.     Keele testified that he maintained the safety of his living unit, including the safety of Coach Counselors, and that this function was one of his most important responsibilities. *Id.* at 25:18-24 (testifying "[s]upervising my cottage was the number one priority, the safety of the kids. I want my staff that I was given to and assigned to stay with me . . . ."); *Id.* at 49:17-22 (testifying that his conception of running his building flawlessly was to "have coaches on staff to make sure the kids were sage and they were actually getting the information that was designed to get to them . . . ."); *Id.* at 63:14-65:10 (testifying "I was put in charge of an -- I was taken out of my cottage to help a flailing or faltering cottage. At this time, I noticed one of the employees inappropriately touching another student. I had to discipline and write up that employee."); *Id.* at 28:14-19; 30:7-15 (Keele testifying that he verbally disciplined a Coach Counselor for not performing in a manner



such that safety was maintained).

**Response: Objection – mischaracterizes the testimony. Plaintiff controverts as follows: There is no mention in the cited testimony of the "safety of Coach Counselors." Furthermore, Mr. Keele testified that he often did not even have a full allotment of staff in his cottage and was left alone to supervise the students without even a coach counselor to help. Ex. 1 at 22:8-23:10.  Furthermore, it was the responsibility of all Defendant's employees, regardless of title, to focus on safety. *See* Ex. 4 & 5.**

18.    Keele testified that he evaluated the performance of his Coach Counselors based on his own observations of job performance and comments received from others touching on his Coach Counselors' job performance. *Id.* at 143:3-144:20.

**Response: Objection – best evidence rule – the cited testimony refers to a document not in evidence.  Subject to that objection, admitted.**

19.    Keele ensured that compliance was maintained with regard to legal, agency licensing, and company policy with regard to safety. *Id.* at 106:22-107:2; 108:1-10 (testifying ". . . I would understand it to mean that it's a safe environment and that we're listening to all the state and federal regulations that we're supposed to to have kids on the campus.").

**Response: Objection – vague. Plaintiff controverts as follows:  This was the job of Group Leaders and Coach Counselors, as well as every employee at Defendant.  See Exs. 2, 4 & 5.**

20.    By his own admission, the most important aspects of Keele's job as a Group Leader were to "supervis[e] [his] cottage" and to ensure that state and federal regulations were followed to provide a safe environment. *Id.* at 25:18-24; 106:22-107:2; 108:1-10.

**Response: Objection – vague. Plaintiff controverts as follows: "supervising his cottage" meant focusing on the safety of the kids, where people were standing, and "making sure the kids were safe." Ex. 1 at 130:12-131:16.-All employees, including non-exempt Coach Counselors, were to ensure that state and federal regulations were followed to provide a safe environment. See Exs. 2, 4 & 5.**



21.     Keele testified that it was his responsibility to oversee his cottage to ensure that the living unit was running in a manner consistent with law, regulation, licensing requirements, and company policies and procedures:

Q. . . . Number 29, the last one there on the first page, talks about ensuring the highest standards are maintained to prevent illegal, unethical or improper conduct and to ensure the program remains in compliance with agency licensing and Rite of Passage policies and procedures. Do you know what agency licensing they're talking about there?

. . .

A. I would understand it as a safe -- I would understand it to mean that it's a safe environment and that we're listening to all the state and federal regulations that we're supposed to to have kids on the campus.

Q. Is that something that you did as a Group Leader?

A. Understand it or provide a safe environment? Yeah, that was our number one. We wanted -- safety was our number one goal for the kids. I don't know if I answered that correct. *Id.* at 106:22-107:2; 108:1-10.

**Response: Objection – vague mischaracterizes. Plaintiff controverts as follows: This was a requirement for all Defendant's employees, not unique to the Group Leader position. See Exs. 2, 4 & 5.**

22.     Keele had responsibility for interviewing and hiring, was held responsible for ensuring his Coach Counselors were properly trained, monitored the performance of his Coach Counselors, correcting that performance where necessary, and completed required paperwork. *Id.* at 79:1-3; 52:2-53:3; 143:3-144:20; 46:19-47:5.

**Response: Objection mischaracterizes. Plaintiff controverts as follows: Mr. Keele was asked to interview four individuals. Mr. Keele had no hiring authority.  Mr. Keele received all pertinent training and performance information from Unit Managers or CS-3s and completed the same paperwork Coach Counselors were expected to keep. See ASOF ¶¶ 67-71.**

23.     Keele was responsible for the overall management of his cottage at all times and, as

8

a Group Leader was expected to correct the performance of any Coach Counselor he encountered if the need arose. *Id.* at 63:14-15; 64:5-65:10.

**Response: Objection – cumulative of Nos. 7 & 17. Plaintiff controverts as follows: See Response to No. 20.**

24.   Indeed, Keele testified that he, in making his rounds one day, came upon a Coach Counselor acting inappropriately and acted immediately to rectify the situation, showing that, whatever else he was doing, Keele was always in a supervisory and managerial role. *Id.*

**Response: Objection – argumentative and conclusory.   Plaintiff controverts as follows: The rules required everyone to report misconduct. *See* Ex. 5.  Mr. Keele made a disclosure of that information to his supervisors, so that they could do something about it as he lacked the authority to do so. See Ex. 1 at 14:22-15:21; ASOF ¶ 70.**

25.   Keele testified that:

A. We would try to. Often we would get a UM or other GL, hey, you're man's out of position, reminding you, you know, hey, make sure that -- you know, when it comes to what you're doing there at Canyon State, there is a lot of liberty and freedom for other Group Leaders and other unit managers to also be your boss due to seniority and situational events.

Q. So if another Group Leader, for example, saw one of the Coach Counselors that were assigned to your cabin doing something improperly --

A. Absolutely. I'm sorry. I didn't mean to interrupt.

Q. -- they could sort of intervene into that situation?

A. It would be most likely a seasoned GL that was a UM or on the way to a UM but, yes, seasoned GLs actively corrected other GLs, other coaches. They had the liberty to do that.

Q. Did you ever notice anybody else's Coach Counselor doing something improperly you had to step in to resolve?

A. I did eventually have to say things to other Coach Counselors, yes.

Q. What type of situations would those be?

A. I was put in charge of an -- I was taken out of my cottage to help a flailing or faltering cottage. At this time, I noticed one of the employees inappropriately touching another

1    student. I had to discipline and write up that employee.

2    *Id.*

3    **Response: Objection – cumulative of No. 24. Plaintiff controverts as follows: See**

4    **Response to No. 24.**

5    26.    When Keele went to his superior regarding problems he was having with Coach

6    Counselors he was explicitly told that he, Keele, needed to address the problems with coaching

7    and discipline and that Keele's boss could not do such things for Keele. *Id.* at 194:10-23; 200:21-

8    201:17.

9    **Response: Objection mischaracterizes. Plaintiff controverts as follows:  He was told**

10   **that he could create a paper trail so that the Unit Manager could do something about**

11   **it. Ex. 1 at 91:20-92:22.**

12   27.    As an hourly, nonexempt Coach Counselor working at ROP, even after a rate

13   increase, Keele was paid at a rate of $11.10 an hour ($440 a week assuming a full 40 hour work

14   week with no overtime: $11.10 x 40 hours = $440). See Personnel Action Form from December 1,

15   2011, Bates No. ROP/KEELE000323, attached hereto at Exhibit E.

16   **Response: Admitted only that the math is correct.  Plaintiff controverts the weekly**

17   **hour requirements as the Coach Counselors were required to work 48 hours every**

18   **shift (not counting the overnight stay for which they were not paid) and made at least**

19   **$577.20 per week, not counting his other compensation from Defendant – slightly**

20   **under the $692.30 he made as a Group Leader. See Ex. 3 and CSOF ¶ 5.**

21   28.    As a Group Leader, Keele was responsible for supervising the work of any Coach

22   Counselor he encountered during his day and there were 85-90 Coach Counselors at CSA while

23   Keele was working there as a Group Leader. Keele Dep. (Exh. C). at 132:17-25; and Wright Decl.

24   (Exh. A) at ¶ 5.

25   **Response: Objection – mischaracterizes the testimony. The cited testimony actually**

26   **states that every group leader can be your boss as a coach and "as a coach counselor,**

27   **you answer to everybody." Ex. 1 at 132:17-25.**

28   29.    Keele explained that he was directly assigned to supervise two Coach Counselors



1  and that while he claims one of those Coach Counselors often had assignment away from Keele's
2  cottage for a day, Keele remained ultimately responsible as that Coach's supervisor, being
3  required to monitor and evaluate the Coach Counselor's performance. Keele Dep. (Exh. C) at
4  143:3-144:20.

5       **Response: Objection – mischaracterizes the testimony. Plaintiff controverts as**
6  **follows: Mr. Keele testified that he only had one counselor in his cottage, if that. Ex.**
7  **1 at 22:17-23:10.  He testified that he had no say when or what coach would be taken**
8  **out of his cottage. Ex. 1 at 202:22-203:2.**

9       30.    Keele testified that, while he felt he was not trained regarding interviewing, he was
10  "expected to interview and hire people." *Id.* at 79:1-3.

11       **Response: Admitted.**

12       31.    Keele acknowledged that during the very brief time he was a Group Leader he did,
13  in fact, interview "a few people." *Id.* at 79:9-10.

14       **Response: Admitted.**

15       32.    Keele never interviewed anyone when he was employed in the role of Coach
16  Counselor. *Id.* at 203:3-6.

17       **Response: Admitted.**

18       33.    Keele attempts to detract from his obligation as a Group Leader to interview and
19  take part in the hiring process by mentioning an individual his brother interviewed as a Group
20  Leader was ultimately hired, despite his brother's recommendation that the individual not be
21  hired. *Id.* at 195:12-18.

22       **Response: Objection - argumentative. Subject to that objection, Plaintiff admits that**
23  **his Group Leader brother also had his recommendations ignored.**

24       34.    Keele explained that the reasons his brother gave for suggesting the individual
25  referenced in Paragraph 33 not be hired were: (1) the applicant's age, the individual being over 40;
26  and (2) the fact that the individual was "too nice." *Id.* at 27:6-13.

27       **Response: Objection - relevance. Subject to that objection, admitted.**

28       35.    Keele testified as follows:



1  Q. The final item here says dismissals. Did you ever recommend that an employee be
2  dismissed?

3  A. Yes.

4  Q. Who?

5  A. Mr. Kent.

6  Q. Okay. Anyone else?

7  A. No, sir.

8  Q. How did you make the recommendation that Mr. Kent or Coach Counselor Kent be
9  dismissed?

10  A. Verbally to UM Robinson and CS-3 Woodsen.

11  Q. Why did you do that?

12  A. I can't dismiss him. I mean their thing to me was, all right, you got to start a paperwork
13  trial and we'll fire him. *Id.* at 91:13-92:1 (emphasis added).

14  **Response: Admitted.**

15      36.     Keele later offered further testimony to this regard, showing that there was no
16  misunderstanding to his statement, saying (in response to questions posed by his own legal
17  counsel):

18  Q. Earlier there was a reference with you talking to coach Kent and saying something about
19  him needing to get in line with the program, otherwise his job might be on the line. Do you
20  recall saying something along those lines?

21  A. Yes.

22  Q. When you said his job might be on the line, was that something you had control over,
23  whether he would be fired of not?

24  A. No. As a matter of fact, when I brought it up to my boss, the UM, he was like I can't do
25  anything until you do the proper form of trying to help, verbal, written and all that stuff,
26  but you need to do that. I can't do that for you. . . .

27  *Id.* at 194:10-23.

28  **Response: Objection – Argumentative. Subject to that objection, admitted.**



## ADDITIONAL STATEMENTS OF FACT

37.     Keele began his work at Defendant as a Coach Counselor, with specific job duties set forth in a written job description. Keele Depo. ("Ex. 1") at 13:8-9; *see* Coach Counselor Job Description (ROP/KEELE 000110-112) attached hereto as Ex. 2.

38.     As a Coach Counselor, he made $11.10 per hour on a 48 hour shift, for a total of $577.20 per week, assuming he <u>only</u> worked 8 hours per week of overtime.  *See* Coach Counselor Payroll Declaration (ROP/KEELE 000324) attached hereto as Ex. 3

39.     When he began as a Coach Counselor, he personally answered to a Unit Manager. Ex. 1 at 13:10-12 & Ex. 2.

40.     There was sometimes a Group Leader involved, but even he got his instructions from the Unit Manager. Ex. 1 at 13:16-14:1

41.     There was also a "CS-3" (a.k.a. Shift Supervisor) who was over the Unit Manager but also served in a supervisory function over Coach Counselors. Ex. 1 at 14: 2-12 & Ex. 2.

42.     Mr. Keele's primary job as a Coach Counselor and as a Group Leader was as a "direct care staff member of an assigned living unit" or cottage. Ex. 1 at 52:10-19; Ex. 2; *and see* Group Leader Job Description (ROP/KEELE 000002-4) attached as Ex. 4.

43.     Though some of the duties are listed in different order, the job descriptions for Coach Counselor and Group Leader are largely the same.  *Compare* Ex. 2 *with* Ex. 4.

44.     Mr. Keele spent 90-95% of his time with kids as a Group Leader and only 5-10% providing any oversight of other employees. Ex. 1 at 189:15-190:3.

45.     A "cottage" was the 24-hour home of up to 26 students, for which there were supposed to be a ratio of students to employees of approximately 10 or 12 to one. Ex. 1 at 22:3-13.

46.     Though there were supposed to be two Coach Counselors with Mr. Keele in the cottage, more often than not he just had one in the cottage – if that. Ex. 1 at 22:3-23:25.

47.     Group leaders had to do the same paperwork and conduct the same guided meetings as Coach Counselors did, with the exception that the Group Leaders also had to do "total counts" of the kids – all paperwork was submitted to the Unit Managers or CS-3s and Mr. Keele was not required as a Group Leader to review the Coach Counselor paperwork. Ex. 1 at 44:25-47:7; 84:2-



86:18; Ex. 2 & Ex. 4.

48.     As a Group Leader, Mr. Keele had no say in which Coach Counselor was in the cottage with him or if there was one at all. Ex. 1 at 21:20-22:2; 202:22-203:3

49.     Mr. Keele essentially served the function of Coach Counselor and Group Leader at the same time with one other Coach Counselor. Ex. 1 at 63:1-9.

50.     A Group Leader had to get permission from the Unit Manager to approve any serious write-ups or discipline that would end up on an employee's record – Group Leaders could only issue verbal discipline. Ex. 1 at 14:22-15:21.

51.     Mr. Keele's Group Leader was instructed by a Unit Manager or CS-3 to verbally warn him as a Coach Counselor for working more hours than he was supposed to "on the clock" and thus incurring overtime. Ex. 1 at 18:20-19:12.

52.     However, it was Unit Managers who determined the hours worked by both Group Leaders and Coach Counselors. Ex. 1 at 19:17-20:3.

53.     As a Group Leader, Mr. Keele was expected to stay on-site at least one entire night per shift, just like the Coach Counselors were, and their nights to stay overnight did not overlap. Ex. 1 at 42:3-43:6.

54.     Mr. Keele as a Coach Counselor received commendation directly from the Unit Manager, not a Group Leader, for following instructions from the Unit Manager. Ex. 1 at 47:21-49:8.

55.     As a Group Leader, Mr. Keele got his instructions on what to on a daily basis – including the schedule and activities – from either a Unit Manager or a CS-3. Ex. 1 at 54:16-55:23.

56.     For example, the Unit Managers or CS-3s were responsible for monitoring the weather to determine which activities would be allowed. Ex. 1 at 74:17-75:21.

57.     Though the Group Leader position description states that Mr. Keele was to provide "consistent interactive supervisor of the Coach Counselor and student athletes," he testified that it was impossible for him to provide that as he was not allowed proper staff. Ex. 1 at 62:6-15 & Ex. 4.

58.     Though the Group Leader job description states that Group Leaders were to provide



1  "staff coverage on logistical requirements in conjunction with the shift supervisor," in reality, Ms.

2  Keele had no control over that function. Ex. 1 at 82:18-25 and Ex. 4

3      59.    Though the Group Leader job description states that Group Leaders were to interact

4  and supervise "during community service events," in reality, the Unit Manager provided all of

5  the direction, and Mr. Keele's "supervision" was over the kids in the same function as a coach.

6  Ex. 1 at 83:1-21.

7      60.    Though the Group Leader job description states that Group Leaders were to

8  organize "all program elements," in reality, the Unit Managers and CS-3s exercised all the day-

9  to-day control over the program. Ex. 1 at 65:24-67:12 & Ex. 4.

10      61.    Though the Group Leader job description states that Group Leaders were to be

11  "primarily responsible for the mentoring, training and evaluation of Coach Counselors," in

12  reality, the Unit Manager or CS-3s determined which Coaches needed training and when.  Group

13  Leaders only relayed the messages. Ex. 1 at 68:5-69:7.

14      62.    Though the Group Leader job description states that Group Leaders were to

15  develop "athletic training schedules" and competitions, in reality, the Unit Managers or CS-3s

16  did that.  Mr. Keele was not allowed to implement any of his own plans. Ex. 1 at 72:20-73:25 & Ex.

17  4.

18      63.    Though the Group Leader job description states that Group Leaders were to ensure

19  "adequate staffing" for sports and vocational programs, in reality, it was Mr. Keele's Unit

20  Manager and CS-3 who handled that. Ex. 1 at 76:6-19 & Ex. 4

21      64.    The Group Leaders and Coach Counselors had identical responsibilities to

22  participate in coaching sports and vocations. Ex. 1 at 75:22-76:5; Ex. 2 & Ex. 4.

23      65.    Though the Group Leader job description states that Group Leaders were to review,

24  revise, and approve Coach Counselor time, in reality, Mr. Keele got all of his information from a

25  Unit Manager who handled that. Ex. 1 at 92:23-93:12.  As a Group Leader Mr. Keele had no

26  authority to approve Coach Counselor time off – the CS-3 or Unit Manager handled that and

27  communicated it to the Group Leaders. Ex. 1 at 93:13-23 & Ex. 4.

28      66.    For write-ups related to Coach Counselors clocking in and out incorrectly, Mr.



1   Keele would receive the information from his Unit Manager, who would direct him to pass it along
2   to the Coach Counselor. Ex. 1 at 137:8-140:13.

3          67.     Mr. Keele's recommendations for hiring and staffing were not considered by upper
4   management and he was never training to do interviewing as a Group Leader. Ex. 1 at 78:21-80:21.

5          68.     Though Mr. Keele "interviewed" four people, he was not told what position they
6   were interviewing for, and the purpose of the interview was solely to see if the individuals were a
7   "good fit" for the culture and team. Ex. 1 at 80:3-81:23.

8          69.     Though Mr. Keele reported another Coach Counselor for inappropriately touching
9   another student, that employee was not fired. Ex. 1 at 65:5-19.

10         70.     With respect to the report of inappropriate touching by one Coach Counselor and a
11  report made regarding another Coach Counselor that Mr. Keele felt was not performing his duties,
12  Mr. Keele made written disclosures of that information to his superiors, but did not issue written
13  reprimands to either Coach Counselor. Ex. 1 at 89:19-91:4.

14         71.     It was a "common joke" to the Mr. Keele's Unit Manager and CS-3 that Group
15  Leaders were just "Coach Counselors who didn't get a break" or lunches, without real control
16  over anything. Ex. 1 at 131:7-19; 171:1-22.

17         72.     As a Group Leader, Mr. Keele never issued assignments to Coach Counselors. Ex.
18  1 at 199:12-25.

19         73.     All employees regardless of job title were expected to ensure safety.  See Child
20  Abuse Reporting Policy & Addendum (ROP/KEELE 000175-178) attached hereto as Ex. 5.

21         74.     Due to the nature of the work involved, Mr. Keele was also trained by Defendant
22  upon his initial employment as a Coach Counselor on the Prison Rape Elimination Act.  See Policy
23  100.405 (ROP/KEELE 000159-167) attached hereto as Ex. 6.

24         75.     Mr. Keele also served on the team that was required to go out and find kids who had
25  escaped the facility or gone "AWOL." Ex. 1 at 99:21-:101:16.

26

27

28



# DECLARATION

I, Joshua W. Carden, declare as follows:

1.      I am the attorney for Plaintiff in this matter.

2.      All deposition pages attached hereto as Exhibit 1 are true and correct copies of the original.

3.      All documentary evidence attached hereto as Exhibits 2 through 6 are true and correct copies of those documents produced by Defendant in this matter in response to requests for production or in Rule 26 disclosures.

4.      I swear under penalty of perjury that the foregoing declaration is true and correct.

Respectfully submitted on this 9th day of February, 2016,

JOSHUA CARDEN LAW FIRM, P.C.

By: s/Joshua W. Carden
Joshua W. Carden
*Attorney for Plaintiff*
*Stephanos Keele*

## CERTIFICATE OF SERVICE

I certify that on the 9th day of February, 2016, I electronically transmitted a PDF version of this document to the Office of the Clerk of the Court, using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants listed for this matter.

Steven G. Biddle
Cory Walker
LITTLER MENDELSON, PC
2425 E. Camelback Rd., Ste. 900
Phoenix, AZ 85016
*Attorneys for Defendant*

/s/Joshua W. Carden

