# EXHIBIT 1

# In The Matter Of:

*Keele vs.*
*Rite of Passage*

---

*Stephanos Keele*
*September 28, 2015*

---

*Griffin & Associates Court Reporters*

*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*

*www.arizonacourtreporters.com*

*602.264.2230*

Original File SK09282015.txt

**Min-U-Script®**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Stephanos Keele,                    )
                                    )
                    Plaintiff,      )
                                    )
            vs.                     )
                                    )        Case No.
Rite of Passage, Inc.,              )2:14-cv-02135-PHX-DLR
                                    )
                    Defendant.      )
                                    )



DEPOSITION OF STEPHANOS KEELE




Phoenix, Arizona
September 28, 2015
9:36 a.m.



REPORTED BY:
LAURA A. ASHBROOK, RMR
Certified Reporter
Certificate No. 50360

PREPARED FOR:
(CONDENSED ASCII)

(Certified Copy)

Stephanos Keele - September 28, 2015

2

# I N D E X

| WITNESS | PAGE |
|---|---|

STEPHANOS KEELE

| | |
|---|---|
| EXAMINATION BY MR. WALKER | 5 |
| EXAMINATION BY MR. CARDEN | 189 |
| FURTHER EXAMINATION BY MR. WALKER | 199 |

# E X H I B I T S

| Deposition Exhibits: | Description | Page |
|---|---|---|
| 1 | Resume of Stephanos Keele (Bates Nos. KEELE000084 through 89) (6 pages) | 34 |
| 2 | Resume of Stephanos K. Keele (Bates Nos. ROP/KEELE 000045 through 48) (4 pages) | 34 |
| 3 | Resume of Stephanos K. Keele (Bates Nos. KEELE000084 through 86) (3 pages) | 38 |
| 4 | Resume of Stephanos K. Keele (Bates Nos. KEELE000087 through 89) (3 pages) | 38 |
| 5 | Letter of Commendation dated October 8, 2011 (Bates No. ROP/KEELE 000202) (1 page) | 47 |
| 6 | Staff Training & Development Documentation (Bates No. ROP/KEELE 000268) (1 page) | 50 |
| 7 | Rite of Passage Position Description (Bates Nos. ROP/KEELE 00002 through 00004) (3 pages) | 51 |
| 8 | Rite of Passage Policy and Procedure form (Bates No. ROP/KEELE000198 through 201) (4 pages) | 112 |

Stephanos Keele - September 28, 2015

3

| | | |
|---|---|---|
| 9 | Rite of Passage Policy and Procedure form (Bates No. ROP/KEELE 000012 through 13) (2 pages) | 115 |
| 10 | Rite of Passage Performance Evaluation (Bates No. ROP/KEELE 000014 through 19) (6 pages) | 119 |
| 11 | Rite of Passage Police and Procedure (Bates No. ROP/KEELE 000468 through 469) (2 pages) | 136 |
| 12 | Rite of Passage Policy and Procedure (Bates No. ROP/KEELE 000472 through 473) (2 pages) | 138 |
| 13 | Rite of Passage Policy and Procedure form (Bates Nos. ROP/KEELE 000465 through 467) (3 pages) | 141 |
| 14 | Rite of Passage Policy and Procedure form (Bates Nos. ROP/KEELE 000479 through 480) (2 pages) | 147 |
| 15 | Rite of Passage Policy and Procedure (Bates Nos.  ROP/KEELE 000481 through 482) (2 pages) | 149 |
| 16 | Staff Training & Develoopment Documentation (Bates No. ROP/KEELE 000023) (1 page) | 152 |
| 17 | Staff Training & Development Documentation (Bates No. 000026) (1 page) | 157 |
| 18 | Staff Training & Development Documentation (Bates No. ROP/KEELE 000027) (1 page) | 159 |
| 19 | Rite of Passage Policy and Procedure form  (Bates No. ROP/KEELE 000020 through 21) (2 pages) | 163 |
| 20 | Rite of Passage Position Description (Bates Nos.  ROP/KEELE 000110 through 112) (3 pages) | 189 |

4

1                     DEPOSITION OF STEPHANOS KEELE was taken

2   on September 28, 2015, commencing at 9:36 a.m. at the law

3   offices of Littler Mendelson, P.C., 2425 E. Camelback

4   Road, Ste. 900, Phoenix, Arizona, before LAURA A.

5   ASHBROOK, a Certified Reporter in the State of Arizona.

6

7

8   COUNSEL APPEARING:

9

    For the Plaintiff:

10

                 JOSHUA W. CARDEN LAW FIRM

11               By:  Joshua W. Carden

                 16427 N. Scottsdale Road, #410

12               Scottsdale, Arizona  85254

13

    For the Defendant:

14

                 LITTLER MENDELSON, P.C.

15               By:  Cory G. Walker

                 2425 East Camelback Road, Suite 900

16               Phoenix, Arizona  85016

17

18

19

20

21

22

23

24

25

5

1                          STEPHANOS KEELE,

2    a witness herein, having been first duly sworn by the

3    Certified Reporter to speak the truth and nothing but the

4    truth, was examined and testified as follows:

5

6                          EXAMINATION

7    BY MR. WALKER:

8         Q.   Good morning.

9         A.   Good morning.

10        Q.   Can you state your name for the record, please?

11        A.   Stephanos Keele.

12        Q.   Can you spell your last name please?

13        A.   K-E-E-L-E.

14        Q.   Have you ever been known by or gone by any other

15   names?

16        A.   Steve.

17        Q.   Is that S-T-E-V-E?

18        A.   Yes.

19        Q.   Have you ever used any other last name?

20        A.   My last name?  No.  Keele.

21        Q.   Other than Keele?

22        A.   No.

23        Q.   Are you presently taking any medications, drugs

24   or any other substance including alcohol that would affect

25   your ability today to testify accurately or to

13

1     A.    UM Farler, F-A-R-L-E-R.

2     Q.    Was anyone else involved in the interviewing

3  process?

4     A.    That was it.

5     Q.    What location did you interview at?

6     A.    Canyon State Academy, the actual location of the

7  school.

8     Q.    What was your first position?

9     A.    Coach counselor.

10    Q.    To whom did you report when you were a coach

11  counselor?

12    A.    At the beginning, it was UM Farler.

13    Q.    Anyone else?

14    A.    At the beginning?  That's what you're asking,

15  while I was a coach counselor?

16    Q.    Right.

17    A.    UM Farler was the manager of the unit and then it

18  was GL, for group leader, Gillette, like the razor.  He

19  was my -- he was just the gentleman that got the

20  instructions from UM Farler and made sure we were in our

21  areas and stuff, so he was the guy that was training me at

22  the time.

23    Q.    Was there anyone else when you were a coach

24  counselor at any point?

25    A.    No.  I spent the entire time as coach counselor

14

1    with one UM, that was it.

2        Q.    Okay.

3        A.    I'm sure, I mean, the CS-3 which is CS -- what

4    did that stand for?  CS-3 is the boss of the neighborhood

5    on your shift, and you would answer to him also if your UM

6    wasn't available.  He was -- I mean you had a lot of --

7    because there were a lot of people telling you what to do,

8    but if you were a coach, on your shift, while you were

9    there, your UM wasn't there as much as the CS-3, so you

10   would answer to the CS-3, as he was your unit manager as

11   well.  It was like he was the immediate unit manager when

12   yours wasn't available.

13       Q.    How often was the CS-3 there?

14       A.    I had contact with him -- there's always the CS-3

15   on-site.

16       Q.    What about the group leader, how often would --

17       A.    GL Gillette was -- I'm sorry.  Did I let you

18   finish the question?

19       Q.    That's okay.  Go ahead.

20       A.    GL Gillette was on-site as much as the coach

21   counselors were, if not more.

22       Q.    So as a coach counselor, if your performance ever

23   needed to be corrected, if discipline was ever issued, who

24   was it who would issue that?

25       A.    Any of those guys, depending on who had the need.

15

1    It's normally like if -- like if it's super bad, that is a
2    UM or CS-3 or GL will be told, hey, you need to talk them
3    and they will send them out to talk to whoever has the
4    issue.  If your GL has a direct issue, he needs to go to
5    the unit manager to approve their write-ups and stuff.
6        Q.   You said if it was really serious, the UM or CS-3
7    would be --
8        A.   Yeah, mm-hmm, yes.
9        Q.   So otherwise, would it be the group leader then?
10       A.   For what?
11       Q.   That would issue the discipline.
12       A.   Your group leader needs to get permission from
13   your UM or the CS-3.  They can verbally give you a
14   write-up, you know, like a -- whatever that is, but as far
15   doing any real discipline, no, you would need to get it
16   from the UM or CS-3.
17       Q.   They would need to get approval from UM or CS-3?
18       A.   To get any serious -- anything really -- like
19   anything that's going to go on your record needs to get
20   approved by somebody above a GL, absolutely.  I didn't
21   have -- well, we're not to that point yet.
22       Q.   And how were you compensated as coach counselor?
23       A.   Very poorly.
24       Q.   Was that by the hour --
25       A.   Yes.

18

1    your question about not included.

2         Q.    Okay.   Well, that's a great starting point,

3    included or not included.   So specifically in this

4    litigation, we're talking about overtime requirements of

5    the Fair Labor Standards Act?

6         A.    Okay.

7         Q.    So as shorthand, oftentimes, in these

8    circumstances, people refer to it as exempt and non-exempt

9    employees, and in this context, that shorthand means

10   you're exempt from overtime and minimum wage requirements

11   of the Fair Labor Standards Act or you're not exempt from

12   overtime requirements.

13        A.    As a coach counselor, is that what you want me to

14   answer as?

15        Q.    Yes.   As a coach counselor, did you have an

16   understanding of whether you were exempt or non-exempt?

17        A.    I should have gotten overtime, yes, so I was --

18   however you want to put that, I was not exempt from

19   overtime as a coach counselor.

20        Q.    So if you reported more than 40 hours in a week

21   as coach counselor, you would have expected to be paid

22   overtime?

23        A.    I would have, yes, and there were often times

24   when we were made to clock out prior to so we wouldn't go

25   over on hours.   I think I had a couple verbals in my file

1   for working my hours and clocking out when I was supposed

2   to, but I'm not here for a coach counselor.  I am here for

3   a GL so --

4        Q.   So in those circumstances where you were, you

5   said, disciplined for --

6        A.   GL Gillette was told by one of the UMs or CS-3s

7   that I was going over in hours, and clocking in and out

8   was a huge deal always on that kind of you're over in

9   hours; we can't budget this kind of thing so, no matter

10  what you do, you need to get clocked out on time.

11       Q.   Okay.

12       A.   So that was a very big thing.

13       Q.   Do you know if there was a process for seeking

14  approval for overtime hours?

15       A.   Not that I'm aware of, because you don't know

16  when a kid's going to run.

17       Q.   Was there someone that you could go to if you did

18  foresee that you might need to work some overtime hours

19  that you could discuss that with?

20       A.   Hours were handled by the UM and distributed

21  schedules through the GL.  So whoever was in charge of

22  seeing -- because the unit managers put in the hours for

23  the GLs, the coach counselors, and then whoever was in

24  human resources that handled that would tell them, hey,

25  you're over in this; you need to talk to this person, and

Stephanos Keele - September 28, 2015

20

1    then that would get filtered down to the GL and then the

2    GL would tell the coach counselor what was being done

3    wrong and rectify that per the UM.

4        Q.    So human resources would identify --

5        A.    Whoever handles that.  I don't know if it's human

6    resources.  I just know that the UMs were told you're over

7    and it would --

8        Q.    So --

9        A.    -- filter.

10       Q.    Okay.  I apologize if I cut you off there.

11       A.    I am trying to go slow, too.  So I apologize.

12       Q.    So someone would tell the UM, hey, your --

13       A.    Hours.

14       Q.    -- unit is over hours.  Then the UM would tell

15   the group leader, hey, we have issues with hours; you need

16   to talk to X, this employee and then the group leader

17   would essentially talk to the coach counselor saying, hey,

18   you're over on hours.  What's going on?

19       A.    Yeah.  The UM wants us to handle this.  Don't let

20   this happen again.  Make sure you work the hours you were

21   scheduled.

22       Q.    Did you ever work at any other Rite of Passage

23   locations?

24       A.    No.  Does that mean a visit, like when I took my

25   students to another place or does that mean I actually go

21

1    physically work in another state or something?

2         Q.   Other than Canyon State Academy.

3         A.   No.

4         Q.   Approximately -- and you already let me know you

5    only have an estimate for this, but approximately when did

6    your employment with Rite of Passage end?

7         A.   December, I think, of 2012, maybe it was '13, but

8    I know it was December because it was like a week before

9    our bonus checks and I didn't receive one.

10        Q.   Do you recall the circumstances under which your

11   employment with Rite of Passage ended?

12        A.   Absolutely.

13        Q.   Can you describe that for me?

14        A.   UM Robinson put an unqualified coach in my

15   cottage and that led to stresses on how to run the cottage

16   safely.  When proper protocol was not observed, I was left

17   to get -- like UM Robinson looked to get me reprimanded or

18   written up or demoted for not handling that person

19   correctly, and I quit.

20        Q.   What do you mean stresses about how to run the

21   cottage safely?

22        A.   I didn't really have a say on who was in my

23   cottage at any time.  I did not have any say of how many

24   coaches I had with me.  They were -- oftentimes I was left

25   in my cottage by myself with 26 plus kids or with a coach

22

1    that wasn't up to standard on being able to handle the

2    kids, so it was very unsafe often.

3        Q.   First of all, what do you mean by cottage?  I

4    guess we should define that.

5        A.   It is exactly what it sounds like.  It is a

6    cottage, and inside the cottage you have 26 students that

7    live there 24 hours.

8        Q.   Okay.

9        A.   And in the cottage, there are usually X amount of

10   coaches per students.  So how many students you have,

11   there has to be this many employees, and there is a ratio

12   they divvy up.  I don't remember it.  It's like one to 10,

13   one to 12, maybe even less now.  I am not sure.

14            So when you're in your cottage, to safely

15   maintain and manage the children, you have to have

16   supervision.  I was often left without that supervision.

17       Q.   Okay.  What do you mean by left without that?

18       A.   They would take my coaches, because they were

19   well trained, and put them in other cottages where they

20   were having problems maintaining the other children.  So I

21   was left maintaining my own cottage with no help, working

22   the hours of three people by myself.

23       Q.   When you did have coach counselors with you in

24   your cottage, approximately how many would there be?

25       A.   One.

23

1      Q.   Did you ever have more than one?

2      A.   I was supposed to have more than one.  You're

3  dictated to have two coach counselors with you in a full

4  cottage.

5      Q.   Were there times where you did have two coach

6  counselors?

7      A.   No.  There were times where I started with two in

8  the a.m., but by breakfast they were pulled out of my

9  cottage, and that was the standard practice for my cottage

10  for the last three months I was there.

11      Q.   What about before those last three months months?

12      A.   I was severely short staffed.  I was in another

13  cottage called Brewster cottage and they did the same

14  thing.  They took my coaches out and used them for

15  substitute teachers, et cetera, that kind of stuff.

16      Q.   During --

17      A.   Go ahead.

18      Q.   During the time you were a group leader, were

19  there ever times where you had more than one coach

20  counselor in your cottage with you?

21      A.   Briefly, yes.

22      Q.   When?

23      A.   Sporadically.  It was never consecutive.  We were

24  either short staffed or they were being taken out and put

25  in other cottages.

42

1  5:00 a.m. through 10:00 p.m.?

2       A.    Roughly, yes, that's correct.

3       Q.    Was there an evening that you needed to stay

4  through the night?

5       A.    They did ask coach counselors to dictate, once

6  they worked there, an evening specifically for them to

7  stay the night.  The GL was recommended at least one

8  night, if not more, but, yes, one night.

9       Q.    How did you determine which night you would stay?

10      A.    Availability of the other coaches would dictate

11  when I would stay or not.

12      Q.    So does that mean if another coach counselor

13  could stay you wouldn't have to or --

14      A.    No.  We would just use days that they were

15  available.  So if one coach was available on Thursday, I

16  would pick Friday or so on, whatever the availability was

17  that -- I would usually let them pick first and I would

18  take the time that they didn't choose or that was left

19  over.

20      Q.    Okay.  Did -- was there always a coach counselor

21  there at the night?

22      A.    Every night?

23      Q.    Yeah.

24      A.    No.

25      Q.    So essentially, the coach counselor would just

1    pick a night and then you would pick a night after they

2    had picked one?

3        A.    That is correct.

4        Q.    And those nights would never overlap?

5        A.    They were not supposed to, no.  That would be

6    counterproductive.

7        Q.    So on a day that you were staying the night, how

8    would your schedule run essentially?

9        A.    From beginning to end?

10       Q.    Well, let's say it was a Thursday or -- I guess

11   it's the same for Thursday, Friday or Saturday.  So you

12   show up at 5:00 a.m. and you go through about

13   10:00 p.m. --

14       A.    Yes.

15       Q.    -- for the regular shift?

16       A.    Yes.

17       Q.    And then what changes if you're staying the

18   night?

19       A.    If you're staying the night, you -- are we

20   talking about from my perspective as a GL or as a coach

21   counselor because they're two different things you have to

22   do?

23       Q.    Let's talk about your time as a group leader.

24       A.    Okay.  Group leader, I would finish up paperwork

25   after the cottage went to bed.  I was responsible for

44

1    paperwork.  The night shift would come in around

2    10 o'clock.  Night shift consisted of a person that was

3    there from when the coach counselors and the GLs were

4    sleeping or not there.  They were there from 10:00 until

5    we came in the next morning.

6              So the night shift would come in.  We would

7    finish our paperwork and if it was our night to stay, we'd

8    either give the night person the low-down that I am going

9    to be in another place or we would stay right there and

10   then we'd either, A, go to bed or whatever we needed to do

11   just at the time.  If somebody escaped, we obviously did

12   not go to bed.  We would look for them, and if it was time

13   to go to bed, we would either stay on-site, finish work

14   and go to sleep there or continue to work if need be.

15       Q.   Okay.  Did you have any time between finishing

16   your paperwork and --

17       A.   When you had to go to bed?

18       Q.   Right.

19       A.   They gave us -- we had to be back on-site by

20   midnight.

21       Q.   So if you finished your paperwork up early, you

22   could go grab a bite to eat?

23       A.   Go up to the store and grab a drink or something,

24   yes.

25       Q.   What sort of paperwork would you be filling out?

**45**

1      A.   At the end of the night, everybody had closing

2    paperwork to do on their day, week-ending, so forth,

3    depending on the day.

4      Q.   When you say everyone, who does that include?

5      A.   All the employees that worked under Canyon State

6    had some sort of responsibility at close to follow, as far

7    as closing paperwork goes, mandated by the state.

8      Q.   So as a group leader, what sort of paperwork

9    would you be filling out at the end of the day?

10     A.   We did the same paperwork that the coach

11   counselors did.  As far as when you're a coach counselor,

12   you have to rate the student.  We rate the students as a

13   whole as well.  We also have to give individual accounts

14   on different students if they acted out, and at the end of

15   that, we just bundled what we did for the week and the GL

16   sends all the coach counselors' paperwork along with our

17   notes into the UM.

18     Q.   Would you review what the coach counselor put

19   together as a group leader?

20     A.   I didn't review them, no.  I handed them to the

21   UM.  We handed all our paperwork in.

22     Q.   So the coach counselor would hand you the

23   paperwork that they had filled out?

24     A.   At the end of the week, we would get a group of

25   paperwork that we bundled for the UM, yes.

46

1     Q.   Did you do anything with the paperwork that the

2    coach counselors gave you?

3     A.   I didn't per se get the coach counselors'

4    paperwork that was handed in.  They had books that they

5    would hand in.  We would all hand them in together or

6    leave them on a counter and somebody would pick them up.

7    It wasn't my responsibility to hand in their paperwork,

8    no.

9     Q.   The paperwork that you filled out as a group

10    leader, were there any differences in that paperwork?

11     A.   Total counts.  So we had to count different

12    things and have responsibilities for, like, you know, the

13    amount of children were there and present, that kind of

14    thing.

15         As a coach counselor you were responsible

16    for the child and behavior.  We had to count the kids,

17    kind of make sure they were all there and take head counts

18    more often.

19     Q.   Other than head counts, was there anything else

20    involved in that?

21     A.   Like the paperwork and stuff?

22     Q.   Yeah.

23     A.   Just overall -- no, because you have to give

24    overall synopsis of your group as a coach counselor and

25    you give overall synopsis of your group as a GL as well.

47

1   My GL paperwork for shift ending was making sure that

2   their checklist was taken care of.  So I was just making

3   sure that everything was handed in, so, I guess,

4   that's the difference is they would ask me did you get

5   your paperwork in.

6        Q.   Who's the they you're talking about?

7        A.   Unit manager or the CS-3.

8             (Deposition Exhibit No. 5 marked for

9   identification.)

10  BY MR. WALKER:

11       Q.   So you've been handed what's been marked Defense

12  Exhibit 5.  Have you seen this document before?

13       A.   I have yes.

14       Q.   In the lower right-hand corner of this document,

15  you will see the letters and numbers ROP/KEELE 000202.  Is

16  that the same as on your paper?

17       A.   That is correct, yes.

18       Q.   And that's the only page of this exhibit,

19  correct?

20       A.   Yes, that is correct.

21       Q.   All right.  What is this document?

22       A.   This is a letter of commendation.

23       Q.   And this was a letter that you received as a

24  group leader; is that correct?

25       A.   That is not correct.

48

1      Q.    When did you receive this letter?

2      A.    As a coach counselor.

3      Q.    Okay.  Excellent.  Who was it who wrote the

4   letter?

5      A.    Unit manager Bennett.

6      Q.    And unit manager Bennett was someone who

7   supervised you as a coach counselor?

8      A.    And as a group leader, yes.

9      Q.    If you look at, let's see, the fifth sentence

10   that starts, you sacrificed your time -- your off time?

11      A.    Yes, I see that.

12      Q.    So it says, "You sacrificed your off time to

13   cover for a GL that was on PTO and ran the building

14   flawlessly."  Do you recall this situation?

15      A.    I do, yes, I do.

16      Q.    Who was the GL that you were covering for?

17      A.    Gillette, the one mentioned earlier that was my

18   boss or overseer in the first cottage I was in as a coach

19   counselor.

20      Q.    And GL here stands for group leader; is that

21   correct?

22      A.    That is correct.

23      Q.    Do you have an understanding of what Rob Bennett

24   meant when he said ran the building flawlessly?

25      A.    I do not.

1      Q.   Great.  Do you have an understanding of what this

2  document is?

3      A.   I do.  It basically says give and complete tasks

4  given to you by your unit manager basically.

5      Q.   More generally, do you have an understanding of

6  this, the purpose of this document?

7      A.   The document is so we have a general outline on

8  what I need to try to do while I'm a group leader, I

9  believe is what this is trying to say.

10      Q.   Under the box that starts, "Position summary," do

11  you see where I'm at there toward the top of the document?

12      A.   Yes.

13      Q.   The first line says, "The group leader is a

14  direct-care staff member of an assigned living unit."

15  What's an assigned living unit?

16      A.   That would be the cottage we referred to earlier.

17      Q.   So cottage, assigned living unit mean the same

18  thing?

19      A.   Yes, sir.

20      Q.   The next line says, "Primarily responsible for

21  the supervision, mentoring, training and evaluation of

22  coach counselors and overseeing the supervision of

23  students to ensure the Rite of Passage normative peer

24  culture program is consistently implemented."  Is that

25  something that you did as a group leader?

54

1    positions that you would have reported to as a group

2    leader?

3        A.   At one time, it was all three of those.  At any

4    given time, it is all three of those positions.

5        Q.   The site program director, do you know who that

6    would have been while you were a group leader?

7        A.   Yes.  That was UM -- I can see his face.  Hold

8    on.  He interviewed me for the group leader position.  I

9    don't remember his name, but yes, there is a position

10   above CS-3 Woodsen on my shift.

11       Q.   And when you say above the CS-3 position, it is

12   your understanding that the CS-3 position would report to

13   the site program director?

14       A.   Yes.  I could be wrong, but that was my

15   understanding.

16       Q.   Okay.  If we go down to the next box there that

17   says, "ESSENTIAL FUNCTIONS.  Number one says, "Adheres to

18   the facility and daily schedule including PM program to

19   ensure the unit is on time for all elements and the

20   students participate in all of the scheduled activities."

21            Do you have an understanding of what's being

22   referred to here as the facility and daily schedule?

23       A.   I do have an understanding, yes.

24       Q.   What was that?

25       A.   At the beginning of the day, we would get a daily

1    schedule that was comprised by the unit manager and CS-3

2    of what we were supposed to do that day, the breakdown of

3    classes that day, where the kids were supposed to be as

4    far as their extracurricular activities that day; also,

5    who was leaving for court that day.  That was drawn up

6    every morning for us.

7        Q.    Do you know who it was who was drawing that up?

8        A.    The leader of the B shift, I believe, with

9    information from the UMs.  As far as who's leaving what

10   unit and when he's going to go court, that all came from

11   the unit managers to, I believe, the shift supervisor or

12   the site program director who gave it to the shift

13   supervisor -- I'm not sure -- or the site director.  I am

14   not sure who gives what to when.

15       Q.    So as a group leader, who would you receive that

16   information from?

17       A.    We would walk in and grab it off of a -- usually

18   there was a slip, like a box where you pick up fliers and

19   stuff and our daily thing was in there when we walked in

20   in the mornings.  It was already up.  If it wasn't up, I

21   would go to the CS-3 to get one.

22       Q.    And then what would you do with that information?

23       A.    Adhere to it for the rest of the day.

24       Q.    So essentially, what it says here in that first

25   essential function bullet point --

**62**

1   Kent, for example, in that situation where there was that

2   altercation that he didn't intervene?

3       A.   His job is on the line if he can't handle the

4   kids when they get out of control like that.  Basically I

5   think that was almost verbatim, your job's on the line.

6       Q.   The third bullet point there under essential

7   functions, "Provides consistent interactive supervision of

8   coach counselor and student athletes to ensure the safety,

9   health and welfare of the program, of staff and students

10  at all times", is that something that you did as a group

11  leader?

12      A.   That was something I could not possibly do as a

13  group leader.  I was not allowed the proper staff to make

14  sure that was properly being done every time for the

15  students' safety and the coaches' safety.

16      Q.   Are there any other reasons you think that you

17  weren't able to complete that third function listed there?

18      A.   I's not that I can't complete it.  It was

19  completed to the best of our ability, given the situation.

20      Q.   What did you do to best complete that task given

21  the resources you had?

22      A.   I did what I needed to do to make sure the kids

23  arrived to their destinations on time and safe and I also

24  verbally discussed it with the CS-3 and the unit manager

25  Robinson.

1      Q.   What about the safety of the coach counselors,

2   did you do anything to make sure that they were able to

3   operate?

4      A.   Seeing as I was the coach counselor and the GL at

5   the time with one other coach counselor, we were very good

6   about watching our backs, but we were one person short, so

7   it was very important that he and I were equal and, you

8   know, made sure that he pulled as much weight as I did as

9   far as making sure the kids were supervised and safe.

10     Q.   I guess practically, as -- when you were a group

11  leader, how did you go about trying to ensure that the

12  other coach counselor could do his job safely?

13     A.   How did I ensure that he could do it safely?

14     Q.   How did you provide for the safety of the other

15  coach counselor?

16     A.   It's hard to explain providing anything, but if I

17  can give you an example of what we do, maybe that will be

18  give you an idea what we go through.

19              They're very, very adamant about where we

20  stand in line, where we stand in a room, where we stand on

21  any occasion about supervision and being safe.  We also

22  have a rule that we have to put our arm up, arm's length

23  apart between us and any other person or human being.

24  It's arm's up and it -- the arm's up.  Make sure you have

25  an arm's length between the two of you.  That was always

1    maintained for safety.  So the little things that we could

2    do was follow the rules and make sure, for the amount of

3    supervision we had, that we followed those rules the best

4    we could for the amount of supervision we had.

5         Q.   Okay.  So as a group leader you would make sure

6    that those rules were being followed?

7         A.   We would try to.  Often we would get a UM or

8    other GL, hey, you're man's out of position, reminding

9    you, you know, hey, make sure that -- you know, when it

10   comes to what you're doing there at Canyon State, there is

11   a lot of liberty and freedom for other group leaders and

12   other unit managers to also be your boss due to seniority

13   and situational events.

14        Q.   So if another group leader, for example, saw one

15   of the coach counselors that were assigned to your cabin

16   doing something improperly --

17        A.   Absolutely.  I'm sorry.  I didn't mean to

18   interrupt.

19        Q.   -- they could sort of intervene into that

20   situation?

21        A.   It would be most likely a seasoned GL that was a

22   UM or on the way to a UM but, yes, seasoned GLs actively

23   corrected other GLs, other coaches.  They had the liberty

24   to do that.

25        Q.   Did you ever notice anybody else's coach

65

1   counselor doing something improperly you had to step in to

2   resolve?

3       A.   I did eventually have to say things to other

4   coach counselors, yes.

5       Q.   What type of situations would those be?

6       A.   I was put in charge of an -- I was taken out of

7   my cottage to help a flailing or faltering cottage.  At

8   this time, I noticed one of the employees inappropriately

9   touching another student.  I had to discipline and write

10  up that employee.

11      Q.   Okay.  And that was someone -- in someone else's

12  cottage essentially?

13      A.   There was nothing done to that employee.  She was

14  not fired.

15      Q.   Do you recall the name of that employee?

16      A.   I do.

17      Q.   What was it?

18      A.   Coach counselor Torres, T-O-R-R-E-S, Viviana

19  Torres.

20      Q.   What were you doing when you noticed this was

21  happening?

22      A.   I was doing my rounds.  I was walking each room

23  to check if the students were in bed.

24      Q.   The fourth bullet point there, "Organizes all

25  program elements efficiently to promote positive

66

1    behavioral traits with the students and ensures staff

2    supervises all elements effectively to reduce incidents,"

3    is that fourth essential function something that you did

4    as a group leader?

5        A.   Actually, we would get that sheet at the

6    beginning of the day produced by the CS-3 and the unit

7    managers telling us what we needed done that day.  That's

8    how we would go and do our things.

9        Q.   Okay.  So essentially you would get a list of the

10   events that would be taking place?

11       A.   If anybody in your cottage had to go to court,

12   had an extracurricular activity, needs to do something off

13   campus, if we were having a pep assembly that day, if a

14   certain unit was not going to happen that day or if a

15   classroom would be closed, that was all handled by above.

16       Q.   Okay.  So did you do anything to ensure that the

17   staff supervised elements to effectively reduce incidents?

18       A.   Which one are we talking about?

19       Q.   The fourth.

20       A.   You said --

21       Q.   The part on that second line.

22       A.   When I did have the correct amount of staff, it

23   was the group leader's ultimate responsibility, fell to us

24   to make sure they were in the right place at the right

25   time, but at the beginning of each unit, the CS-3 called

67

1  on the microphone to make sure everybody was there, the

2  unit manager, CS-3 made sure everybody was in their spots

3  and controlled the breaks, told us when we can go and do

4  things.

5      Q.   So you said the CS-3 would call down and

6  essentially say, hey, do you have everybody?

7      A.    Keele, how you doing over there?  10-4, CS-3.

8  Other Keele, how you doing over there?  Good.  O'Keefe,

9  how's it going?  We're all good, sir.  Anything you need,

10 CS-3?  No, sir.  All right.  Everybody, in 15 minutes have

11 all the coaches and GLs meet me for a quick meeting, and

12 that's how the information was dispersed.

13     Q.   Were there any meetings that GLs would have just

14 as GLs, sort of group leader meetings?

15     A.   We did have a group leader meeting that was run

16 by the unit manager shift leader.

17     Q.   What would happen at that meeting?

18     A.   It depends.  A lot of time we had a group leader

19 meeting at the end of the day, which was genius.  They

20 would pull all the group leaders out of their cottages

21 while the kids are going to bed and we have limited

22 supervision and talk about what we were going to be doing

23 that day or what we did that day or what's coming up.  It

24 was, yeah, well thought out.

25     Q.   Did you have an understanding of why they would

68

1  hold those group leader meetings?

2      A.   No, no clue why we needed to tell them what we

3  just did the entire day when we were to write it down and

4  submit it to them later.  Made no sense.

5      Q.   Was information ever dispersed down at that

6  meeting from the unit manager, for example, have any

7  information to give the group leaders during that meeting?

8      A.   For sure.

9      Q.   What sort of information would be shared?

10     A.   If any of the other group leaders saw something

11 going on in their cottage, it was addressed at that time

12 or the unit managers had heard or any events that were on

13 a level that we hadn't heard about yet were discussed at

14 that time.

15          They would tell us to make sure we get to

16 our training, the GL training.  That's when we would have

17 a class, once every week or once every two weeks that the

18 GLs had to go to and then they said make sure your coaches

19 also know about their training.

20     Q.   With regard to the coaches and their training,

21 how would you make sure that they knew about their

22 training?

23     A.   They have it on that list at the beginning of the

24 day, coach training 11:00 p.m., be there on Wednesday.

25     Q.   Did you ever have to remind your coaches, hey,

69

1   you need to do this training, that sort of thing?

2       A.   I don't know how -- you can't miss that.  He's on

3   the radio saying get to the class.  Hey, guys, you know,

4   coach training's happening.  So if I wasn't on duty maybe,

5   but we generally didn't have to tell them to get there.

6   They either knew they had to be there or they were told to

7   be there by whoever was standing around.

8       Q.   The situation like the one that happened with

9   coach counselor Torres, in a situation like that, would

10  you address the situation with the employee or would you

11  go to the group leader in the cottage that they were

12  assigned in?

13      A.   What happened in this particular event, I went to

14  her boss, which was GL at the time Harris, expected him to

15  handle his coach counselor and take it from there, and I

16  also expected there to be some sort of confidentiality,

17  which there wasn't, and I ended up getting assaulted by

18  her lover which was a female as well, so I -- that didn't

19  end very well.

20      Q.   So --

21      A.   I got written up for that, by the way.

22      Q.   What was the write-up that you received for that?

23      A.   Not reporting it to the appropriate authorities

24  which I didn't know who.  I thought her boss -- exactly

25  who should know is her boss, because if my coach did

72

1    A.   I had a good idea of what they had out, yes.  We

2    looked at that stuff quite a bit at the time.

3    Q.   And as a group leader, for example, when you were

4    doing your rounds, did you ensure that the coach

5    counselors were maintaining compliance with those things?

6    A.   When I had the appropriate amount of coach

7    counselors, that is part of your daily checklist, to make

8    sure they're doing the right thing, yeah, as well as

9    yourself, that is correct.

10    Q.   And it looks like the sixth one probably goes

11    back again to that Torres incident, "Ensures staff

12    maintains age appropriate relationships with the students

13    and that the student's personal rights are intact."

14    A.   Yes.

15    Q.   Is that also something that you did as a group

16    leader?

17    A.   Not something that was directly a group leader

18    thing.  I believe that's something that we all do or had

19    to do to make sure we were being appropriate.

20    Q.   The seventh item, "Develops the athletic training

21    schedules and weekend intramural competition."  Did you?

22    A.   Absolutely not.  That was CS-3 or the unit

23    manager.

24    Q.   Did you have any say at all in, for example,

25    weekend intramural competitions?

73

1      A.    I will give you an example of how I did not have

2  a say.  We thought we had a say, but if, for instance, it

3  didn't fit with what the CS-3 was thinking or the unit

4  manager was thinking was appropriate for your cottage --

5  like say if I thought that it wasn't that hot outside --

6  and we have degrees where it says black flag, red flag,

7  whatever; it's too hot.  You know, we had safety measures

8  in there, and then we were -- within the parameters of

9  that safety measure, I could take them out and play

10  football or soccer.

11              If that didn't fit into what the CS-3

12  wanted, we absolutely could not do it.  He would change

13  and tell us to do team building which was usual.  I was

14  being redirected constantly when I was trying to do things

15  with my cottages.

16      Q.    Were there ever times where you were able to go

17  forward with the activities that you had planned?

18      A.    No.

19      Q.    So there was never an instance when you were --

20      A.    The key there that you said was planned.

21      Q.    Okay.

22      A.    I was never at liberty to plan anything for my

23  cottages.  I was told what needed to be done and I needed

24  to find a way to get that done within the parameters of

25  CSA.

1      Q.   So, for example, if you were told that some sort
2   of physical activity needed to be going on, you would need
3   to get that done any way you could or --
4      A.   No.  See, I actually got written up for that as
5   well, because one time it was too rainy and I had plantar
6   fasciitis which I developed from running, being on my feet
7   too much at Canyon State, and it was muddy and I said I'm
8   short staffed.  I, again, do not have a coach present to
9   do this three-mile run.  Can I run them around the field
10   for the equivalent of the three miles so I can keep a
11   visual on them and I got told no and I got written up for
12   that.
13      Q.   What did you do instead?
14      A.   I did that.
15      Q.   You did, had them run around the field?
16      A.   Yes, because it was prudent and safe.
17      Q.   With regard to the heat flags, is that what I
18   understood, you said there is a flag?
19      A.   Yeah, for outside, just in case you were going to
20   say something like it might not be safe to be out there
21   and I was not making an educated decision.  We were within
22   the parameters of the black flag or red flag or yellow
23   flag days.
24      Q.   Okay.  So my question was just so you would --
25   you would have to take things like weather into account

1    when you were trying to implement the activity that the --

2         A.    Right.   The CS-3 at the beginning of the day and

3    through the period of the day -- if it wasn't the site

4    manager or the program director, it would be the CS-3

5    saying today is a yellow flag day; this is the rules that

6    we need to adhere to and make sure there is water at

7    certain intervals, make sure you're not doing more than

8    this amount of time outside, all the health stuff that we

9    were supposed to keep in mind.   He would make sure he

10   would tell us where everything was located and what needed

11   to do if something happened.

12        Q.    And when would he tell you?

13        A.    It would be during the day that -- he would start

14   in the morning today's going to be a hot day.   Sometimes

15   he would say it's already black flag.   Most of the time it

16   was after lunch.   Hey, it's a yellow flag day.   Let's be

17   careful of the water and let's be mindful of the heat.

18        Q.    So that would be information that the unit

19   manager would disseminate to the group leaders?

20        A.    Or the CS-3, whoever was in charge of the site

21   that day.

22        Q.    Number eight, "Assist with coaching sports or

23   vocations."   Is that something you would do as group

24   leader?

25        A.    That was something we were doing as a coach

1    counselor and a group leader, yes. The reason I say it

2    like that is because I didn't change in my

3    responsibilities from a coach counselor to a GL from

4    assisting in sports or the amount of activities I did with

5    them.

6        Q.    Number nine, "Ensures the afternoon sports and

7    vocational programs have adequate staffing and that the

8    staff is actively involved in the programs."

9        A.    I had no control over that.  I was often being

10   short staffed by the site.

11       Q.    Did you ever attempt to address those staffing

12   issues with --

13       A.    Repeatedly, yes.

14       Q.    Who would you address those issues with?

15       A.    UM Robinson, CS-3 Woodsen, those two.

16       Q.    And what were you told when you would address the

17   situation with them?

18       A.    Stay in my lane, mind my business.  We need them

19   elsewhere.  Your cottage is fine.

20       Q.    Was there ever a situation where in response to

21   you bringing the staffing issue, that additional staff was

22   assigned for an event or --

23       A.    Absolutely not.

24       Q.    Why was it you decided to go though those two

25   individuals with the staffing concerns?

1  straw.  I ended up quitting over that.

2      Q.  Were you told at any point that someone would try

3  to address your concerns?

4      A.  We were ostracized if we brought up anything that

5  created an issue or a speed bump in the road.  It was --

6  things were made difficult for you.

7      Q.  But did anyone ever say that they would look into

8  it or ask you for additional information?

9      A.  Absolutely not.  This is something that was

10  rampant all over the site at the time.  There was a

11  shortage of employees.

12      Q.  Is that the reason that was given to you when you

13  asked for --

14      A.  We're short.  We need your guys because you have

15  a good cottage.  We're going to take your employees.

16      Q.  Did you have a response to that?

17      A.  If they are my employees, can I say no?

18      Q.  And you were told no?

19      A.  They essentially took them, yes, and I was told,

20  no.

21      Q.  Going back for a second, since we mentioned him

22  again, coach counselor Kent, you said that he was

23  interviewed by your brother --

24      A.  Constantine Keele.

25      Q.  -- who was a group leader at the time?  Do you

79

 1  know if he was trained at all in interviewing?

 2      A.   No, he was not, nor was I, but we were expected

 3  to interview and hire people.

 4      Q.   Do you know if any group leaders were given any

 5  training in hiring or interviewing?

 6      A.   I do not know if any at all were.

 7      Q.   But can you say at least you weren't given any

 8  training?

 9      A.   I was never trained and I interviewed a few

10  people.

11      Q.   Did you ever recommend that anyone be hired?

12      A.   Yes.

13      Q.   Was that individual hired?

14      A.   No.

15      Q.   Did you ever recommend that an individual not be

16  hired?

17      A.   The only recommendation I had was they should not

18  have the guy in my cottage that they had.

19      Q.   So other than the one instance we just talked

20  about where you recommended somebody be hired and they

21  weren't hired was --

22      A.   The other instance, my brother recommended that

23  he not be hired and he was hired and then I recommended

24  somebody be hired that was not hired, that's right.

25      Q.   Other than that, after you had interviewed

80

1    someone, was your recommendation ever not followed?

2       A.   Yes.

3       Q.   When?

4       A.   I had recommended the first one, and then the

5    second one where they had talked to me about how I felt

6    about that particular individual, my personal feeling was

7    it wasn't a good fit and they were still hired.

8       Q.   Do you recall the names of these two individuals

9    that were hired?

10      A.   I do not.  I absolutely do not.

11      Q.   And when you talk about the one where you were

12   asked your feelings about the individual, had you done a

13   formal interview with that person?

14      A.   I had.

15      Q.   And your eventual recommendation was you didn't

16   feel they were a good fit?

17      A.   That is correct.  One was a good fit; one was not

18   a good fit.  On both circumstances, I don't believe either

19   one of them were -- listened to my opinion.

20      Q.   Do you recall approximately when that occurred?

21      A.   Probably about four months before I quit.

22      Q.   Do you recall how many people you interviewed

23   when you were a group leader?

24      A.   Four.

25      Q.   And those were all for the position of coach

1   counselor?

2       A.   No.   I don't know what the position was for, to

3   be honest with you.   I was just interviewing to see if

4   they fit the culture.

5       Q.   What sort of things would you ask them during the

6   interview process?

7       A.   I would just ask how they heard about us, how

8   they felt about disciplining kids, how they felt about our

9   overall philosophy once it was explained to them what we

10  do there, just basic questions.   I wasn't really given any

11  script or anything.   It was kind of like if you think they

12  will fit, let us know, and when I gave them my opinion,

13  they did what they wanted with it.

14      Q.   So what would you base your determination on

15  then?   How would you assess --

16      A.   Gut feeling.   I had nothing to predicate as far

17  as -- like if they fit the requirement of age, they looked

18  like they were in a physical ability and they had the

19  requirements to work with Canyon State, because they give

20  you requirements.   You have to have some experience in the

21  field.   If you have those minimal requirements, they --

22  you technically could do the job, so it was more about if

23  they would fit in with the team.

24      Q.   Looking at essential function number ten on

25  Exhibit 7, "Ensures that PE program is operated in

82

1  compliance with the site operations manual and that the

2  daily scores and grades are recorded in the PE grade

3  books."

4      A.   I don't know what the PE grade books are.

5      Q.   Do you know what the PE program is?

6      A.   Physical education program was our daily

7  workouts, what we were supposed to do, yeah.  That one's

8  kind of -- we didn't do that.

9      Q.   Were there, I guess, regulations or policies that

10 governed how the PE program was supposed to be run in the

11 site operations manual?

12     A.   That is correct.

13     Q.   Did you have any responsibility for insuring that

14 the PE program was run in accordance with the policies in

15 the site operations manual?

16     A.   Depending on the day, but yes, I did have some

17 overall overseeing of that yes.

18     Q.   Number 11 says, "Provides staff coverage on

19 logistical requirements in conjunction with the shift

20 supervisor."

21     A.   We covered that already.  That wasn't happening

22 and it wasn't anything I could control.  If I can say

23 dangerous more in this interview, I would.  It was

24 dangerous working there in the conditions they allowed to

25 happen.

1      Q.   Number 12, "Interacts during and supervises
2   community service events."
3      A.   We were told what to do, where to do it.  If we
4   had to be somewhere off campus, we were told if we could
5   go or not by our unit managers.
6      Q.   Once you were there, did you supervise the
7   community service event?
8      A.   No.  I have never supervised anything.  I didn't
9   even supervise my sock room.
10     Q.   Okay.  Did you ever go to a community service
11  event as a group leader?
12     A.   Yes.  We had car washes -- not a group leader.
13  Let me think here because they were kind of -- with a
14  group leader, they didn't like you leaving too much unless
15  you were the head coach.  So let me think of -- I don't
16  know if there was one for active parenting.  Would this be
17  under swim and dive off-site stuff where we had to go to
18  tournaments and stuff?  I don't know.  I mean, yes, I had
19  to go off-site with the kids and make sure they were okay.
20  That was in a coaching capacity and a supervisor capacity,
21  not like a coach but as a coach counselor.
22     Q.   Okay.  So in your capacity as a group leader, you
23  didn't really go off-site with the students?
24     A.   Not as a group leader.  I wasn't in charge of
25  their court appointments.  That was somebody else.

1   Hospital visits, somebody else.

2        Q.   If you look down at number 15, "Assists with

3   facilitating the scheduled guided group meetings, provides

4   feedback and interaction with students and staff," first,

5   do you know what a guided group meeting is?

6        A.   In CSA terms?

7        Q.   As it would be used in this group leader

8   document.

9        A.   So Canyon State would have group meetings, and if

10  it's the group meeting I am thinking of, they have a topic

11  that they give you, and with your group, you're supposed

12  to do this topic or subject that they give you to teach.

13  Each day it is something different.  Working on your

14  skills for when you're angry or working on your skills for

15  a job interview, working on your skills for handling an

16  argument with your roommate, these were all different

17  assignments we were assigned to do and had to facilitate

18  on a daily basis which was also given to us in the

19  morning.

20       Q.   As a coach counselor, did you ever, I guess, run

21  these guided group meetings?

22       A.    I actually ran more guided group meetings as a

23  coach counselor than I did as a GL.

24       Q.   Did your group leader ever give you feedback on

25  the group -- the guided group meeting?

85

1      A.   If you look at our progress reports, you will see

2   that all mine are turned in late or were never on time.

3   It is because I had to constantly remind them to give me

4   my -- to give me my performance reviews.   So it was

5   something that was supposed to be done but very rarely

6   was.

7      Q.   So group leaders were supposed to at least give

8   feedback to coach counselors on how they were running the

9   guided group meetings?

10     A.   It's either -- I think a unit manager may have

11   done -- Farler may have done my first one.   Gillette did

12   the second one.   It is just whoever is in charge of you,

13   whoever needs to get it done at the time or get it done on

14   time.

15     Q.   So as a group leader, did you ever observe a

16   coach counselor doing a guided group meeting?

17     A.   A guided group meeting, sure, yeah.

18     Q.   Did you ever provide feedback to the coach

19   counselor on how they were doing?

20     A.   Feedback like good job kind of thing?

21     Q.   Yeah.

22     A.   Sure, I have said good job.

23     Q.   Okay.   What about good job but you need to --

24     A.   You mean like did I guide them and try to coach

25   them in what they were doing to help them along?

1     Q.   Yeah.

2     A.   If you didn't, you would get eaten alive.  The

3  kids would eat you alive.

4     Q.   If you look at the 16th point there, it

5  references preparing daily assessment plan notes?

6     A.   Yes.

7     Q.   What is a daily assessment plan note?

8     A.   They are -- DAPS is the acronym that we used.  At

9  the end of the day, coach counselor and the GL, depending

10  on the -- kids, so if there's 24 kids, there is three of

11  us, you got eight kids per employee.  So for your eight

12  kids, you would write their assessment of the day, what

13  they did, if they got to school on time, so forth, if they

14  were good or bad.  So we would have to do that as coach

15  counselors and as GLs depending on what group you got.

16     Q.   So this was part of that paperwork you were

17  talking about?

18     A.   Yeah.

19     Q.   And then if you look at the next one, we talked a

20  little bit about some of these, but evaluations -- for

21  example, you mentioned that it was a requirement that

22  evaluations be done, although they weren't always done on

23  time?

24     A.   I don't even think I did one.  I might have done

25  one.

89

1  thought you said somebody had asked you to do a certain

2  number?

3      A.   They would say, hey, have you written anything on

4  your coaches positively and I would say no, and then they

5  would say, hey, we have to get that done and I would say

6  okay.

7      Q.   Okay.  But to your recollection, you don't

8  recall --

9      A.   Not doing anything extra for them.  I felt kind

10  of bad about it because I had a good coach and some other

11  good employees that could have used it, but I don't

12  believe I ever did it.

13      Q.   Nine, next item there, talks about reprimands.

14      A.   Are we done with Exhibit 5?

15      Q.   Oh, yeah.  Back to Exhibit 7.  Sorry about that.

16  We're on Item 17.  So Item Number 17 references

17  reprimands.  Do you recall ever issuing a reprimand to

18  anyone as a group leader?

19      A.   I recall being reprimanded quite a bit, but I

20  don't recall writing one, no.

21      Q.   The incident with coach counselor Torres?

22      A.   That was the -- that's not --

23      Q.   Go ahead.

24      A.   Finish your question.

25      Q.   I was going to say did that involve a written

1    reprimand?

2        A.   No.  That involved a written disclosure of what

3    happened.  That was -- I was not involved in any

4    punishment or -- what I did was, like, I was covering

5    myself because I was so taken aback by what I saw, so I

6    submitted it to my boss and let it go.

7        Q.   What if someone was late, did you have to do any

8    counseling or reprimanding in that situation?

9        A.   We were told usually if they were late, because

10   they have to clock in up front, so, yeah, if they were

11   late, we would be told your dude's late, make sure he

12   doesn't do that again.  We got to get him here on time or

13   what happened.

14       Q.   What about with coach counselor Kent, when you

15   spoke with him about, you know, intervening in physical

16   altercations, was there a written reprimand that went

17   along with your sort of verbal counseling with him?

18       A.   No.

19       Q.   Do you recall any other situation where you

20   either verbally or in a written document reprimanded a

21   coach counselor?

22       A.   Coach counselor?  No, man, no.  We focused a lot

23   of our attention on the kids.  That's where our

24   reprimanding would go, no talking, get in line.  So short

25   of, hey, you need to stand over here; you're in the wrong

91

1   position which everybody, you know, can do to you or

2   whatever -- I got told it a million times, Keele, get with

3   your group.  So I don't remember reprimanding, no, I do

4   not.

5        Q.   As a coach counselor, do you ever remember being

6   reprimanded by a group leader?

7        A.   Yes.

8        Q.   In what situations would that occur?

9        A.   UM Farler --

10       Q.   I'm talking about as a group leader

11  reprimanding --

12       A.   No, no.  I got promoted pretty quickly though.

13       Q.   The final item here says dismissals.  Did you

14  ever recommend that an employee be dismissed?

15       A.   Yes.

16       Q.   Who?

17       A.   Mr. Kent.

18       Q.   Okay.  Anyone else?

19       A.   No, sir.

20       Q.   How did you make the recommendation that Mr. Kent

21  or coach counselor Kent be dismissed?

22       A.   Verbally to UM Robinson and CS-3 Woodsen.

23       Q.   Why did you do that?

24       A.   I can't dismiss him.  I mean their thing to me

25  was, all right, you got to start a paperwork trial and

1    we'll fire him.

2         Q.   What was it that made you go to them in the first

3    place?

4         A.   They're my boss.

5         Q.   And what was it that you requested of them?

6         A.   Hey, you got to get this guy out of my cottage or

7    he's not fit; this guy is not fit.  He needed to do

8    something less strenuous than the job description.

9         Q.   And their response to you was to create a paper

10   trial?

11        A.   Yeah.  They said you got to do -- if you want us

12   to do something, you want us to fire her, you have to give

13   us a reason -- or fire him, sorry -- you have to give us a

14   reason.

15        Q.   And did you -- what paperwork did you understand

16   they were referring to there?

17        A.   I guess they wanted me to write him up for

18   something or I guess document what had happened on that

19   physical encounter that was earlier in the week.

20        Q.   Did you do that?

21        A.   No.  I shortly thereafter got called into a

22   meeting where I quit.

23        Q.   Number 18 talks about reviewing, revising and

24   approving coach counselor time and attendance in the

25   Stromberg system.  Do you know what the Stromberg system

1   is?

2       A.   Yeah.  It's like, I guess, where they do the

3   time.  That's what I was talking about when you clock in.

4   They figure out if you're late or not.  That's the system.

5   I have never used it.  I clocked in and out but never used

6   the system.

7       Q.   Did you ever review coach counselor time punches?

8       A.   No.  We were given updates, hey, your guy's over.

9       Q.   Did you ever have to help a coach counselor

10  revise a time punch, maybe a missed time punch?

11      A.   No, absolutely not.  I would send them to UM

12  Bennett.  He handled all that or Robinson.

13      Q.   What about approving time and attendance, did you

14  ever approve time off?

15      A.   I can't approve time off, absolutely not.

16      Q.   Would a coach counselor ever call you if they

17  were going to be late or unable to attend their shift?

18      A.   The instructions were to call the CS-3, the shift

19  supervisor, and let them know 24 hours in advance -- I

20  believe that's in writing -- and then we would get a

21  trickle-down effect.  It is usually your coach because you

22  have a relationship, but not all the time.  We would hear

23  from the shift manager or their UM.

24      Q.   Number 19 says, "Assists with developing coach

25  counselors by conducting daily training sessions and

1    Woodsen, about the event.  I handled that gentleman with

2    another staff member, but he was actively involved at the

3    beginning of the physical management and he was instructed

4    to leave him alone.

5         Q.   And did you -- what was the reason that you

6    reported that?

7         A.   I didn't report it.  It didn't get reported.  I

8    told my boss -- I thought he was my boss -- that I thought

9    the other boss I had was a little under the influence and

10   that I could smell alcohol, and it wasn't smart to have

11   him intervening or even being on campus.

12        Q.   What do you mean by smart?

13        A.   You're not supposed to drink and be on the job.

14        Q.   I guess what I am getting at, it sounds like that

15   was to ensure the safety of the students; is that correct?

16        A.   Yeah.  I mean, I just don't know what they

17   expected from me as an employee.  All I do know is that

18   any time a kid got down on the ground and was being

19   touched by somebody, I made sure that both parties were

20   safe, no matter if they worked there or not.

21        Q.   25 says, again Exhibit 7, "Assists other staff

22   members with emergency situations."  Did you ever need to

23   assist a staff member with an emergency situation?

24        A.   I was actually put on the team to handle

25   emergency situations.  That's called the -- sorry.  It's

100

1  been a while -- the de-escalation team, DT.

2      Q.   What would an emergency situation be?

3      A.   Again, the question's kind of vague.  From my

4  perspective or an overall site emergency?

5      Q.   Well, just the team that you were on, and this

6  specifically refers to emergency situations, did you have

7  an understanding of what those emergency situations would

8  be?

9      A.   Well, they would call for you.  Like if you were

10  on the de-escalation team, they would say DT to Brewster

11  cottage immediately.  That means something's going on at

12  Brewster.  The designated team needs to run over there and

13  handle business.

14      Q.   So do you have an understanding of what would

15  qualify as an emergency situation?

16      A.   No clue, bro, just whenever they called me.  It

17  could be a kid not going back to his class to somebody

18  trying to stab another student.

19      Q.   So a kid not going back to his class or someone

20  trying to stab another student --

21      A.   You don't say it over the radio; you just hear

22  it, and that could be a myriad of things.

23      Q.   Any other instance of emergency situations that

24  can you recall?

25      A.   Yes.

Stephanos Keele - September 28, 2015

101

1     Q.   Okay.  What were they?

2     A.   Several.  I would get called almost every AWOL

3 situation.

4     Q.   By AWOL you mean?

5     A.   Escape.  They would leave the campus without

6 permission.

7     Q.   Okay.

8     A.   That happened often.  Any fighting situation.  I

9 was referred to as the de-escalator, the guy who could

10 talk them down without having to put hands on them.  At

11 certain times, Canyon State Academy was under scrutiny for

12 being too rough with the kids and had a lot of complaints,

13 so they were physically and verbally backing off, like

14 they wouldn't touch them as much and it was put over the

15 radio that do not put your hands on the kids.  Keele, go

16 handle that and that was me.

17     Q.   Okay.  Any other example of what an emergency

18 situation would be?

19     A.   One kid almost drown.  One young man got burned

20 by a fire all over his body, grease burns.  Another

21 situation, I had a student with some weights, fighting his

22 teachers with hand weights, the two metal bars I was

23 telling you about, drug situations, suicidal situations.

24 It was constant.

25     Q.   What do you mean by drug situations?

130

1    wayside, and shortly after this, I was transferred to

2    Wilber cottage, so he wasn't even my boss other than the

3    two months.

4        Q.    The box that's labeled 2, it says, "Learn to

5    supervise"?

6        A.    Yeah.

7        Q.    So that was a developmental goal that you had as

8    a group leader?

9        A.    No.  It was something that was supposed to be

10   done for me.  I was supposed to mentor with GL Bradley

11   which never happened.

12       Q.    So was it your understanding that as a group

13   leader, you were expected to supervise?

14       A.    It was my understanding that at one point that I

15   would be called to supervise in a fashion or order, but it

16   really doesn't discuss when and where that supervision is

17   going to take place.  If I had a bunch of children that I

18   needed to take to a football game, yeah, absolutely I

19   needed to do know the regulations and supervision and

20   where everybody should be standing and -- for the safety

21   of the kids.

22       Q.    What do you mean by where everybody should be

23   standing?

24       A.    Again, as a coach counselor, they beat it into

25   your head, one person up front, one person in the middle,

131

1    one person in the back for line formations.  But as far as

2    these reviews go, they're really gone over pretty quickly

3    because I wasn't even trained on half this stuff by Rocky

4    because he quit and I was still pushed through as a GL and

5    then put into Wilber cottage by myself basically to learn

6    and do everything on my own.

7        Q.   Okay.  And part of what you were doing in the

8    cottage was supervising?

9        A.   Making sure the kids were safe.  So I would -- I

10   don't know what you want me to say.  My stuff didn't

11   change as coach counselor other than I was there more and

12   I got paid less.  I learned everything I needed to know to

13   be a GL as a coach counselor and that's all that I was

14   going off of when I was a GL.  As a matter of fact, their

15   slang for GLs is coach counselor because that's what we

16   are but we don't get a break.

17       Q.   Whose slang?

18       A.   CS-3, UM Robinson, UM Bennett.  We're just coach

19   counselors but we don't get a break.  It is a common joke.

20       Q.   So when you wrote learn to supervise on this

21   evaluation --

22       A.   Yeah.  I had to learn to be a -- supervise, I

23   guess.  He says put some things in there that you can work

24   on as a GL, that you think you would need to know.  At

25   that time, I thought group leader consisted of being a

137

1      Q.   In the lower right-hand corner of Exhibit 11 --
2  you've been handed what's been marked Defense Exhibit 11.
3  In the lower right-hand corner, you should see the Bates
4  number that ends in 468 and then 469 on the next page?
5      A.   Yes.
6      Q.   Do you recognize this document?
7      A.   I don't -- no, no.
8      Q.   Do you know who James Kimball is?
9      A.   Coach Kimball was assigned to my cottage.  I do
10 remember UM Robinson, I believe, saying something about
11 his times and he needed to be written up, but I don't
12 remember writing him up.
13     Q.   Do you recall ever discussing with coach Kimball
14 his clocking in and out?
15     A.   No, I don't remember doing that, to be honest
16 with you.  I am pretty sure that it was brought to my
17 attention by my boss, but I don't remember doing this.
18     Q.   Do you have an understanding of why your boss
19 would tell you about coach Kimball's clocking in and out?
20     A.   Yeah.  He was responsible for maintaining the
21 hours allotted and when they go awry, he needs to, you
22 know, discipline and, you know, bad news rolls downhill.
23 He got it from his boss and they gave it to me and they
24 said to pass it on to the coach counselor that we can't be
25 doing it, but I don't remember writing this.  I don't

138

1    remember writing this at all.

2        Q.   You don't remember writing this?  Is it possible

3    that you did write it?

4        A.   It is, but usually if I agree or disagree with

5    something, I will make a note or I will sign it, but I

6    didn't sign this one and I didn't write any notes on it

7    either so I don't know.  Robinson was all over people for

8    clocking in and out, so was Gillette.  I don't remember

9    doing it.  I don't remember doing it.

10                 (Deposition Exhibit No. 12 marked for

11   identification.)

12   BY MR. WALKER:

13       Q.   You've been handed what's been marked Defense

14   Exhibit 12 in the lower left-hand corner.  You will see

15   the numbers that end in 472 and the second page is 473?

16       A.   Yep, yes.

17       Q.   And if you look at the second page on this one,

18   next to your name at the top of the page there's a

19   signature.  Is that your signature?

20       A.   Yep, yes, it is.

21       Q.   Do you recognize this document?

22       A.   I do not, but it looks similar to the other

23   exhibit.  This is an action form, it looks like, for

24   clocking in.

25       Q.   Do you have the same concern with this document

139

1  as to whether or not you completed it?

2      A.   No, I don't.

3      Q.   And when you completed this document, what was

4  your position with Rite of Passage?

5      A.   GL.

6      Q.   And that's group leader?

7      A.   That is correct.

8      Q.   What is the name that you would give to this

9  document?  What would you describe this as?

10     A.   An acknowledgment that they clocked in; the

11 written acknowledgment that they clocked in

12 inappropriately.

13     Q.   On the form, there is an X next to the

14 description written counseling?

15     A.   Correct, that's correct.

16     Q.   And this is with regard to coach Kimball working

17 unapproved overtime; is that correct?

18     A.   I guess, yeah.

19     Q.   Do you remember discussing this issue with coach

20 Kimball?

21     A.   I do not remember discussing this issue with

22 coach Kimball.

23     Q.   How would coach Kimball have been notified about

24 this?

25     A.   UM Robinson usually or the UM in charge would

140

1    bring it up to them immediately or the GLs, and we all sit

2    in the same meeting on Wednesday's and we go over what's

3    going on on the previous shift as opposed to what's going

4    on on the shift now, and that would be covered in

5    something like this.  Hey, Keele, your coach had overtime

6    that wasn't approved; have him sign this or whatever and

7    you either print it up or they have it printed up for you

8    already.

9        Q.   And then you would deliver it to the employee to

10   have him or her sign it?

11       A.   We could either deliver it.  I believe we can

12   pull it up on the computer as well.  That could have been

13   what happened here.  I just typed it on the computer.

14       Q.   Okay.  Do you recall if coach Kimball had any

15   questions about --

16       A.   I do not recall, no.

17       Q.   -- this?

18                MR. CARDEN:  Let him finish his whole

19   question.

20                THE WITNESS:  Sorry.

21   BY MR. WALKER:

22       Q.   Do you recall any situation of delivering written

23   counseling of this type where the employee had questions

24   about the counseling?

25       A.   About the counseling?  No.  If you had asked me

171

1     Q.   But you were still a group leader, correct?

2     A.   For intents and purposes, my title was group

3  leader, yes.

4     Q.   What do you mean by your title was group leader,

5  yes?

6     A.   The running joke at Canyon State academy is we're

7  glorified coaches.  We just don't get lunches now.  I was

8  never allowed to come up with any new rule.  I was never

9  allowed to come up with anything innovative.  Anything I

10 had achieved there was told to be done.  If you would

11 think outside the box, you were reprimanded and you got in

12 trouble.  It was very, very, very specific.  They told you

13 exactly what to do, when to do it.

14    Q.   Any other reason you can think you weren't a

15 supervisor?

16    A.   I'm sorry?

17    Q.   Is there any other reason you think you weren't a

18 supervisor?

19    A.   I had no control over anything.  I was always

20 told to be somewhere.  If anything, accepting that

21 position, it only gave you more of a headache.  They had

22 more control over what you were supposed to be doing.

23    Q.   How so?

24    A.   They just told you more things that you had to

25 do.  They told you more responsibilities you had to do.

189

1                          EXAMINATION

2    BY MR. CARDEN:

3        Q.   I am handing you what's been marked as

4    Exhibit 20, Bates label ROP/KEELE 110 through 112.  Do you

5    recognize Exhibit 20?

6        A.   Yes.

7        Q.   What is Exhibit 20?

8        A.   My position description for CSA.

9        Q.   Is that as a group leader or coach counselor?

10       A.   They look the same.  Hold on.  Coach counselor --

11   group living counselor.

12       Q.   Is that your signature on the last page of

13   Exhibit 20?

14       A.   Yes.

15       Q.   In terms of the time that you spent, after you

16   became a group leader, working with kids versus working on

17   any kind of oversight of coach counselors, if you had to

18   peg it to a percentage, what percentage would you say you

19   spent with the kids versus any kind of oversight work?

20            MR. WALKER:  Objection, form.

21       Q.   Go ahead.

22       A.   Do I still answer?

23       Q.   Yeah.

24       A.   As a coach, I spent all my time with the kids.

25   Like that's the only thing we wanted to worry about, and

190

1    as a group leader, it was even more on your shoulders.  So

2    I would say 95, 90 percent kids, maybe five, ten percent

3    coach, if that.

4         Q.   In terms of the people who were supposed to be in

5    your cottage, what was your understanding of what a full

6    allotment of group leaders and coach counselors would have

7    been in your cottage?

8         A.   Minimal employees --

9              MR. WALKER:  Objection, form.

10        A.   Minimal employees for the cottage was stated at

11   least three, two coaches and a group leader at all times.

12        Q.   And during your time as a group leader, how many

13   days a week on average would you have the full three

14   employees, two coaches and a group leader?

15        A.   I cannot remember a full week of having my entire

16   staff ever.

17        Q.   During your entire time as a group leader?

18        A.   I never had an entire shift with my staff, that I

19   can remember.  It was -- yeah, always piecemeal or I just

20   had one.

21        Q.   In a given week -- and I think you started down

22   this line earlier with Mr. Walker's questions, but the

23   time you spent on campus doing your job, when would that

24   start in a given shift and when would it end?

25             MR. WALKER:  Objection form.

199

1    alleviated of that duty.

2        Q.   Completely?

3        A.   It seemed to be something happened.  I don't know

4    what the deal was.

5              MR. CARDEN:  Pass the witness.

6

7                    FURTHER EXAMINATION

8    BY MR. WALKER:

9        Q.   Looking back to Exhibit 20, this is the coach

10   counselor job description?

11       A.   Yes, I believe so.

12       Q.   So did you understand that it was a job duty of

13   the coach counselor to adhere to the facility's schedule,

14   assist with ensuring that the unit is on time for all

15   elements and completing daily assignments as specified by

16   the group leader, unit manager and/or shift supervisor?

17       A.   Normally, it is just the shift supervisor so,

18   yeah, that's the sheet I was telling you about.

19       Q.   Okay.

20       A.   That was never done by the group leader.

21       Q.   So it is your testimony that you never assigned

22   anything to any coach counselor?

23       A.   That's my testimony.  I had no authority to put a

24   coach counselor anywhere without getting it okayed from

25   somebody else, zero authority.

202

1     A.   I do not know.

2     Q.   Now, you mentioned write-ups that they gave you

3  but aren't in here --

4     A.   Mm-hmm.

5     Q.   -- I think was what you said.  What did you mean?

6     A.   When I was assaulted, I got written up for not

7  reporting to the correct authority about the assault.

8     Q.   And when you say that aren't in here, you mean

9  the things I have showed you today?

10     A.   The things that you showed me, there was a couple

11  things that I thought that I would be seeing that is not

12  in here.

13     Q.   There are additional write-ups that you know of

14  that we haven't gone over?

15     A.   That is correct.

16     Q.   Do you know if other GLs or group leaders would

17  request additional assistance from coach counselors to

18  come into their cabin to help with things or cottage?

19     A.   I'm sure it's happened.

20     Q.   Do you know if those requests were ever honored?

21     A.   I don't.

22     Q.   Okay.

23     A.   To be honest with you, I think they were taking

24  coaches out of cottages that could stand to be without a

25  coach because of their GL or whatever and they would take

203

1    and put it in the weaker cottages.  Again, I had no say

2    when or what coach would be taken.

3        Q.   Did you ever interview anyone as a coach

4    counselor?

5        A.   No, I don't think so.  I think you asked me that,

6    but I don't think I did.

7                 MR. WALKER:  All right.  We are done.

8                 MR. CARDEN:  We will read and sign.

9

10            (Deposition concluded at 3:32 p.m.)

11

12                _____

13                     Stephanos Keele

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Stephanos Kelle,                              )
                                             )
                          Plaintiff,          )
                                             )
           vs.                               )     Case No.
Rite of Passage, Inc.,                        )  2:14-cv-02135-PHX-DLR
                                             )
                          Defendant.          )
_____)

**STATE OF ARIZONA**          )    ss.
**COUNTY OF MARICOPA**        )

        **BE IT KNOWN** that the foregoing deposition of **Stephanos Keele** was taken before me, Laura A. Ashbrook, a Certified Reporter in the State of Arizona, on  September 28, 2015, that the witness elected to sign the deposition before filing with the taking attorney; that on  October 15, 2015,

        _____**SIGNATURE** page from the original transcript was forwarded to **Attorney** so the transcript could be reviewed by the witness.  As of this date, the signature page has not been returned, and being charged with the responsibility for filing the original transcript with the appropriate party, I herewith file said deposition.

        _____**ATTORNEY** was notified by mail to advise the witness to come to the office of **GRIFFIN AND ASSOCIATES**, Court Reporters within 30 days for the purpose of reviewing the transcript.  As of this date, the witness has not contacted our office for an extension of time, and being charged with the responsibility for filing the original transcript with the appropriate party, I herewith file said deposition.

    X   **WITNESS** was requested by mail to come to the office of **GRIFFIN AND ASSOCIATES**, Court Reporters, within 30 days for the purpose of reviewing the transcript.  As of this date, the witness has not contacted our office for an extension of time, and being charged with the responsibility for filing the original transcript with the appropriate party, I herewith file said deposition.

        _____**COURTESY** copy was sent to the witness to be reviewed and for the purpose of making corrections.  As of this date, the signature page has not been returned to this office, and being charged with the responsibility for filing the original transcript with the appropriate party, I herewith file said deposition.

I certify that GRIFFIN & ASSOCIATES, LLC, has complied with the ethical obligations set forth in ACJA 7-206(J) (g) (1) through (6).

Pursuant to Rule 80(i), Arizona Rules of Civil Procedure, I declare under penalty of perjury that the foregoing is true and correct.

DATED at Phoenix, Arizona, this ___2nd___ day of ___Dec___, 20_15_.

LAURA A. ASHBROOK, RMR
Certified Reporter
Arizona CR No. 50360
Griffin & Associates, LLC
RRF No. R1005

# Exhibit 2




# *Rite of Passage*
## *Position Description*

033

| Title | Department |
|---|---|
| Coach Counselor / Group Living Counselor | Group Living |

**Status**

☒ Full-Time  ☐ Part-Time  ☐ Part-Time On Call  ☐ Temporary

**Class**

☐ Exempt  ☒ Hourly  ☐ Salaried Nonexempt

## SHIFT:

Typical schedule:  Shifts (number of days and hours) vary depending on location.  Weekend days and overnights required during the scheduled shift.

## POSITION SUMMARY:

The Coach Counselor works as a direct-care staff member of an assigned living unit.  Primarily responsible for the supervision and mentoring of students to ensure the Rite of Passage normative peer culture program is consistently implemented.  Depending on location, Coach Counselors report to Group Leaders, Unit Managers, Shift Supervisors and/or Program Director or Manager.

## ESSENTIAL FUNCTIONS:

1.  Adheres to the facility schedule, assists with ensuring that the unit is on time for all elements and completes daily assignments as specified by the Group Leader, Unit Manager and/or Shift Supervisor.
2.  Assists with ensuring the daily schedule, including the PM Program, operates on time and the students participate in all of the scheduled activities as listed on the PM schedule.
3.  Provides encouragement, guidance and resources to the students.
4.  Models and ensures all program norms are upheld without compromise.
5.  Acts as a positive role model and mentor for both staff and students.
6.  Treats others with respect, confronts negative behavior and supports confrontations.
7.  Provides consistent interactive supervision of student athletes to ensure the safety, health and welfare of staff and students at all times.
8.  Ensures proper safe physical management techniques are followed at all times.
9.  Assists other staff members with emergency situations.
10.  Monitors students and prepares Daily Assessment Progress Notes.
11.  Provides feedback and interacts with students during the scheduled Guided Group Meetings.
12.  Acts as an educational aide while supervising students in the classrooms.  Acts as a substitute teacher when necessary, if applicable.
13.  Assists with extra-curricular activities.
14.  Interacts during and supervises community service events.
15.  Assists with student transportation.
16.  Assists with coaching sports or vocations, if required.
17.  Assists with food preparation (Qualifying House locations).
18.  Encouraged to participate in at least 50% of the daily physical activities required of the students.
19.  Completes required reports and documentation in a timely manner, provides management with required reports and advises of any problematic situations.
20.  Complies with and implements the Rite of Passage Policies and Procedures as detailed in the appropriate manuals/handbooks.
21.  Ensures the highest standards are maintained to prevent illegal, unethical, or improper conduct and to ensure the program remains in compliance with agency licensing and Rite of Passage policies and procedures.
22.  Assists with the correction of deficiencies and quality improvement efforts.
23.  Attends and participates in all required meetings.
24.  Commits to attending all training and staff development classes in order to ensure sufficient hours of training on an annual basis.  Notifies supervisor if annual training hours are deficient.
25.  Other duties as assigned, verbally or in written form.

ROP/KEELE 000110

 

033

## MARGINAL FUNCTIONS:

1.   Participates in Site, Region and/or Company events as required.

## MINIMUM QUALIFICATIONS:

1.   Possess a high school diploma or equivalent.
2.   Completion of 60 hours of college education or one year of experience working with at-risk youth.
3.   If required to operate a company vehicle during the course of employment, must meet the requirements to be an eligible ROP driver.  Must possess a current State Driver's License and have an acceptable driving record for the past three (3) years.
4.   Ability to pass a criminal background clearance check, drug screen, physical and TB test.
5.   Ability to utilize resources available to complete assigned projects.
6.   Ability to prepare written reports and correspondence.
7.   Ability to understand and follow verbal and written instructions.
8.   Ability to effectively communicate, verbally and in writing.
9.   Able to work in excess of 40 hours per week with the possibility of a varied schedule.
10.  Must be able to maintain a high level of confidentiality.
11.  Must have excellent organization and time management skills.
12.  Ability to build and maintain positive internal and external relationships.
13.  Ability to provide exemplary customer service to all employees and outside constituents.
14.  Ability to function independently and as a member of a team in a multi-task environment.
15.  Must be flexible and able to handle multiple priorities, with the ability to adjust to high pressure and rapidly changing business conditions.
16.  Proficient in the use of computers and associated software.

## WORK CONDITIONS and PHYSICAL REQUIREMENTS:

This section identifies "Physical Requirements" of a particular job.  All requirements are subject to possible modification to reasonably accommodate individuals with disabilities.  Individuals who pose a direct threat or significant risk to the health and safety of themselves or others in the workplace, because physical requirements cannot be eliminated or reduced by reasonable accommodation, will not be considered qualified for employment. Notify the Human Resources Manager if you require any accommodation(s) to perform any of the essential functions of this position.

☐ **Sedentary work** - Exerting up to 10 pounds of force occasionally, and/or a negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time.  Jobs are sedentary if walking and standing are required only occasionally, and all other sedentary criteria are met.

☐ **Light work** - Exerting up to 20 pounds of force frequently, and/or a negligible amount of force constantly to move objects.  If the use of arm and/or leg control requires exertion of forces greater than that of sedentary work and if the worker sits most of the time, the job is considered light work.

☐ **Medium work** - Exerting up to 50 pounds of force occasionally, and/or up to 20 pounds of force frequently, and/or up to 10 pounds of force constantly to move objects.

☐ **Heavy work** - Exerting up to 100 pounds of force occasionally, and/or up to 50 pounds or force frequently, and/or up to 20 pounds of force constantly to move objects.

☒ **Very heavy work** - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force constantly to move objects. Applies to all Group Living Employees.

| Physical Requirements | | | Conditions | |
|---|---|---|---|---|
| ☒ Climbing | ☒ Balancing | ☒ Stooping | **Environment:** | |
| ☒ Kneeling | ☒ Crouching | ☒ Reaching | ☒ Noise ☒ Extreme temperatures ☒ Wet and/or humid | |
| ☒ Standing | ☒ Walking | ☒ Pushing | ☒ Dust ☐ Fumes ☐ Exposure to _____ | |
| ☒ Pulling | ☒ Lifting | ☒ Grasping | ☒ Limited/office environment | |
| ☒ Seeing | ☒ Hearing | ☒ Talking | | |
| ☒ Tactile sense | ☒ Repetitive motions | | **Hazards:** | |
| ☒ Visual acuity (color, depth perception and field of vision) | | | ☐ Mechanical ☐ Electrical ☐ Chemical | |
| ☐ Other: | | | ☒ Physical Activities ☐ Burns ☐ Other, _____ | |

ROP/KEELE 000111

 

033

**IMPORTANT NOTICE:**
This position is not limited to those duties in the job description.  Duties and responsibilities can be changed, expanded, reduced, or deleted to meet the business needs of Rite of Passage.  The duties listed above are intended only as illustrations of the various types of work that may be performed. The omission of specific statements of duties does not exclude them from the position if the work is similar, related or a logical assignment to the position.
All employees of this Company are employees at will and, as such, are free to resign at any time without reason. The Company, likewise, retains the right to terminate an employee's employment at any time with or without reason or notice.  Nothing contained in this document or any other document provided to the employee is intended to be, nor should it be, construed as a guarantee that employment or any benefit will be continued for any period of time. Any salary figures provided to an employee in annual or monthly terms are stated for the sake of convenience or to facilitate comparisons and are not intended and do not create an employment contract for any specific period of time.

**ACKNOWLEDGEMENT:**
I have read and understand the contents of this Position Description. I also acknowledge that it is my responsibility to notify the Human Resources Manager if I require an accommodation to perform any essential function(s) of this position.

I do ☒ or do not ☒ require an accommodation to perform the essential functions of this position.

| | | |
|---|---|---|
| Stephanos Keele | 5/13/11 | |
| Employee Name (Please Print) | Date | Employee Signature |
| Jeah H. | 5/13/11 | |
| Human Resources (Please Print) | Date | Human Resources Signature |

* Employee Completes the Request for Accommodation Form

Coach Counselor / Group Living Counselor—June 2009          3 of 3

ROP/KEELE 000112

# EXHIBIT 3



**RITE OF PASSAGE**

**COACH COUNSELOR PAYROLL DECLARATION**

**FOR 3.5 DAY PER WEEK SHIFT**

I acknowledge that I have read and understand the Compensation/Pay Policy (100.301). I also understand that I am required to keep an accurate record of time worked by means of the appropriate time and attendance system and shall be compensated using the payroll schedule referenced below:

I understand and accept that my employment is considered an alternative shift of 48 continuous hours with appropriate breaks and sleep time. I agree that each 48 hour shift consists of three (3) 24-hour days and one (1) 7-hour day (days and hours to be determined by Program Director). Twenty-four hour days include 14 hours of work time, two (2) hours of uncompensated break time and an unpaid eight (8) hours of sleep time. The one 7-hour day includes six (6) hours of work time and one (1) hour of uncompensated break time. Work related interruptions during sleep time will be compensated. If work related interruptions prevent five (5) hours of continuous sleep, I will be compensated for the entire day.

I understand and agree that I will be compensated using the payroll schedule referenced below:

> *NOTE: This schedule is based on various starting rates and serves only as an example of how pay is calculated. Individual wages will vary based on pay scale and Evaluations and Pay Increases Policy (100.409).*

Payroll calculations are as follows:

| Hourly (x40) | Overtime (x8) | Weekly | Bi-weekly | Annual | Daily |
|---|---|---|---|---|---|
| 11.10 | 16.65 | $ 577.20 | $ 1,154.40 | $30,014.40 | $ 164.91 |
| 11.84 | 17.76 | $ 615.68 | $ 1,231.36 | $32,015.36 | $ 175.91 |

The bi-weekly rate is an estimate based on working a 96-hour bi-weekly pay period, which includes 80 hours at the hourly rate and 16 hours at the overtime rate.

The daily rate, which is used for Personal Time Off (PTO), is an estimate based on a bi-weekly rate divided by seven (7).

The annual rate is based on working complete shifts for an entire year without deviation.

| Stephanos Keele | | 12/1/11 |
|---|---|---|
| Print Name | Employee Signature | Date |

| Rochelle Lindsey | R. Lindsey | 12/1/11 |
|---|---|---|
| Print Name | Human Resources Signature | Date |

EXHIBIT 4

# Rite of Passage
## Position Description

069

| Title | | Department | |
|---|---|---|---|
| Group Leader | | Group Living | |

**Status**

☒ Full-Time ☐ Part-Time ☐ Part-Time On Call ☐ Temporary

**Class**

☒ Exempt ☐ Hourly ☐ Salaried Nonexempt

**SHIFT:**

Typical schedule: Shifts (number of days and hours) vary depending on location. Weekend days and overnights required during the scheduled shift.

**POSITION SUMMARY:**

The Group Leader is a direct-care staff member of an assigned living unit. Primarily responsible for the supervision, mentoring, training and evaluation of Coach Counselors and overseeing the supervision of students to ensure the Rite of Passage normative peer culture program is consistently implemented. Group Leaders report to the Unit Manager, Site Director of Group Living and the Site Program Director and supervise the Coach Counselors and students in the assigned living unit.

**ESSENTIAL FUNCTIONS:**

1. Adheres to the facility and daily schedule, including PM Program, to ensure the unit is on time for all elements and the students participate in all of the scheduled activities.
2. Completes daily assignments as specified by the Unit Manager.
3. Provides consistent interactive supervision of Coach Counselors and student athletes to ensure the safety, health and welfare of staff and students at all times.
4. Organizes all program elements efficiently to promote positive behavioral traits with the students and ensures staff supervises all elements effectively to reduce incidents.
5. Ensures the coaching staff maintains compliance with all current policies and procedures, the Site Operations Manual and licensing regulations.
6. Ensures staff maintain age appropriate relationships with the students and that the student personal rights are intact.
7. Develops the athletic training schedules and weekend intramural competition.
8. Assists with coaching sports or vocations.
9. Ensures the afternoon sports and vocational programs have adequate staffing and that the staff is actively involved in the programs.
10. Ensures the PE Program is operated in compliance with the Site Operations Manual and that the daily scores and grades are recorded in the PE Grade Books.
11. Provides staff coverage on logistical requirements in conjunction with the Shift Supervisor.
12. Interacts during and supervises community service events.
13. Assists with extra-curricular activities.
14. Ensures adequate classroom coverage by direct-care staff.
15. Assists with facilitating the scheduled Guided Group Meetings, provides feedback and interaction with students and staff.
16. Monitors students and prepares Daily Assessment Plan Notes.
17. Conducts Coach Counselor hiring, evaluations, commendations, reprimands and dismissals.
18. Reviews, revises and approves Coach Counselor time and attendance in the Stromberg system if applicable.
19. Assists with developing Coach Counselors by conducting daily training sessions and action plans.
20. Provides encouragement, guidance and resources to the staff and students when needed.
21. Models and ensures all program norms are upheld without compromise.
22. Acts as a positive role model and mentor for both staff and students.
23. Treats others with respect, confronts negative behavior and supports confrontations.
24. Ensures proper safe physical management techniques are followed at all times.
25. Assists other staff members with emergency situations.
26. Encouraged to participate in at least 50% of the daily physical activities required of the students.
27. Completes required reports and documentation in a timely manner; collects, collates and summarizes all weekly paperwork. Provides management with required reports and advises of any problematic situations.
28. Complies with and implements the Rite of Passage Policies and Procedures as detailed in the appropriate manuals/handbooks.
29. Ensures the highest standards are maintained to prevent illegal, unethical, or improper conduct and to

ROP/KEELE 000002

ensure the program remains in compliance with agency licensing and Rite of Passage policies and procedures.
30. Assists with the correction of deficiencies and quality improvement efforts.
31. Attends and participates in all required meetings.
32. Commits to attending and tracking all training and staff development classes in order to ensure sufficient hours of training for this position and all supervised staff are completed on an annual basis. Notifies the supervisor if annual training hours are deficient.
33. Other duties as assigned, verbally or in written form.

## MARGINAL FUNCTIONS:
1. Participates in Site, Region and/or Company events as required.

## MINIMUM QUALIFICATIONS:
1. Internal applicants must be a Coach Counselor with no less than standard performance and at least three months of experience at Rite of Passage. External candidates must have prior experience working with at-risk youth, at least 60 hours of college education and/or military experience.
2. Supervisory experience preferred.
3. For sites operating in Maryland, all direct-care staff must comply with COMAR 14.31.06.06.
4. Good interpersonal skills including the ability to interview potential employees if required.
5. If required to operate a company vehicle during the course of employment, must meet the requirements to be an eligible ROP driver. Must possess a current State Driver's License and have an acceptable driving record for the past three (3) years.
6. Strong knowledge of overall company operations and an ability to understand correlations between internal operating departments.
7. Ability to pass a criminal background clearance check, drug screen, physical and TB test.
8. Ability to perform work with little or no supervision.
9. Ability to utilize resources available to complete assigned projects.
10. Ability to prepare written reports and correspondence.
11. Ability to understand and follow verbal and written instructions.
12. Ability to effectively communicate, verbally and in writing.
13. Able to work in excess of 40 hours per week with the possibility of a varied schedule.
14. Must be able to maintain a high level of confidentiality.
15. Must have excellent organization and time management skills.
16. Ability to build and maintain positive internal and external relationships.
17. Ability to provide exemplary customer service to all employees and outside constituents.
18. Ability to function independently and as a member of a team in a multi-task environment.
19. Must be flexible and able to handle multiple priorities, with the ability to adjust to high pressure and rapidly changing business conditions.
20. Proficient in the use of computers and associated software.

## WORK CONDITIONS and PHYSICAL REQUIREMENTS:
This section identifies "Physical Requirements" of a particular job. All requirements are subject to possible modification to reasonably accommodate individuals with disabilities. Individuals who pose a direct threat or significant risk to the health and safety of themselves or others in the workplace, because physical requirements cannot be eliminated or reduced by reasonable accommodation, will not be considered qualified for employment. Notify the Human Resources Manager if you require any accommodation(s) to perform any of the essential functions of this position.

☐ **Sedentary work** - Exerting up to 10 pounds of force occasionally, and/or a negligible amount of force frequently or constantly to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time. Jobs are sedentary if walking and standing are required only occasionally, and all other sedentary criteria are met.

☐ **Light work** - Exerting up to 20 pounds of force frequently, and/or a negligible amount of force constantly to move objects. If the use of arm and/or leg control requires exertion of forces greater than that of sedentary work and if the worker sits most of the time, the job is considered light work.

☐ **Medium work** - Exerting up to 50 pounds of force occasionally, and/or up to 20 pounds of force frequently, and/or up to 10

ROP/KEELE 000003

pounds of force constantly to move objects.

☐ **Heavy work** - Exerting up to 100 pounds of force occasionally, and/or up to 50 pounds or force frequently, and/or up to 20 pounds of force constantly to move objects.

☒ **Very heavy work** - Exerting in excess of 100 pounds of force occasionally, and/or in excess of 50 pounds of force constantly to move objects. Applies to all Group Living Employees.

| Physical Requirements | | | Conditions |
|---|---|---|---|
| ☒ Climbing<br>☒ Kneeling<br>☒ Standing<br>☒ Pulling<br>☒ Seeing<br>☒ Tactile sense<br>☒ Visual acuity (color, depth perception and field of vision)<br>☐ Other: | ☒ Balancing<br>☒ Crouching<br>☒ Walking<br>☒ Lifting<br>☒ Hearing<br>☒ Repetitive motions | ☒ Stooping<br>☒ Reaching<br>☒ Pushing<br>☒ Grasping<br>☒ Talking | **Environment:**<br>☒ Noise ☒ Extreme temperatures ☒ Wet and/or humid<br>☒ Dust ☐ Fumes ☐ Exposure to _____<br>☒ Limited/office environment<br><br>**Hazards:**<br>☐ Mechanical ☐ Electrical ☐ Chemical<br>☒ Physical Activities ☐ Burns ☐ Other, _____ |

## IMPORTANT NOTICE:

This position is not limited to those duties in the job description. Duties and responsibilities can be changed, expanded, reduced, or deleted to meet the business needs of Rite of Passage. The duties listed above are intended only as illustrations of the various types of work that may be performed. The omission of specific statements of duties does not exclude them from the position if the work is similar, related or a logical assignment to the position.

All employees of this Company are employees at will and, as such, are free to resign at any time without reason. The Company, likewise, retains the right to terminate an employee's employment at any time with or without reason or notice. Nothing contained in this document or any other document provided to the employee is intended to be, nor should it be, construed as a guarantee that employment or any benefit will be continued for any period of time. Any salary figures provided to an employee in annual or monthly terms are stated for the sake of convenience or to facilitate comparisons and are not intended and do not create an employment contract for any specific period of time.

## ACKNOWLEDGEMENT:

I have read and understand the contents of this Position Description. I also acknowledge that it is my responsibility to notify the Human Resources Manager if I require an accommodation to perform any essential function(s) of this position.

I do* ☐ or do not ☒ require an accommodation to perform the essential functions of this position.

| Stephanus Keele | 1/28/12 | *(signature)* |
|---|---|---|
| Employee Name (Please Print) | Date | Employee Signature |
| Rochelle Lindsey | 1/28/12 | R Lindsey |
| Human Resources (Please Print) | Date | Human Resources Signature |

* Employee Completes the Request for Accommodation Form

ROP/KEELE 000004

# EXHIBIT 5

 

*Rite of Passage*
*Policy and Procedure*

| Policy Number: | 100.407 | |
|---|---|---|
| Policy Name: | Child Abuse Reporting Policy | |
| Creation Date: N/A | | Author: N/A |
| Revision Date: 11/01/2010 | Revision #: 02 | Author: RDW |

**Policy:**

Rite of Passage protects the safety, health and welfare of all students by providing a safe environment free from physical, mental and/or sexual abuse.

Rite of Passage prohibits student abuse, harassment, neglect, mistreatment and/or sexual misconduct. ROP has a zero tolerance policy regarding abuse, mistreatment, harassment, neglect and/or sexual misconduct with students.

This policy is applicable to all employees, interns, contractors, vendors and/or volunteers working for or providing services to Rite of Passage.

**Definitions:**

**Abuse:** Actual physical or psychological harm to a student; substantial risk of physical or psychological harm to a student; or abandonment. The term includes, but is not limited to, actual physical or psychological harm to a student or substantial risk of physical or psychological harm to a student by the acts or omissions of a person responsible for the student's welfare.

**Harassment:** to harass, annoy, plague, pester, tease, tantalize a student because of a student's race, color, national origin, age, physical or mental disability, religion, creed, sex, gender, sexual orientation and/or any other protected class under federal, state and/or local laws. Harassment may also include coercion of employees, clients, customers, service providers, etc., in the participation or non-participation in religious activities, or ethnic slurs, repeated jokes, innuendoes, or other verbal or physical conduct because of a student's race, color, national origin, age, physical or mental disability, religion, creed, sex, gender, sexual orientation and/or any other protected right under federal, state and/or local laws.

**Mistreatment:** means purposely or knowingly assaults or otherwise injures a student; intimidates, threatens, endangers, humiliates or withholds reasonable necessities from a student; and/or violation to a student's civil rights. Mistreatment also includes verbal harassment, name calling, corporal or unusual punishment, and/or punitive interference with the daily functions of living, such as eating and sleeping. Corporal punishment or any other punishment is further defined as an act or any act designed to cause physical pain, contempt, or ridicule, including wearing of special clothing or insignia; restriction of diet; alteration of regular sleeping patterns; imposition of arduous physical labor and/or exercise.

**Neglect:** means the failure to exercise a minimum degree of care in supplying a student with food, clothing, shelter, education and/or medical care by a parent or guardian. Neglect also occurs when the

ROP/KEELE 000175

 

parent or guardian fails to provide the student with proper supervision or guardianship by allowing the student to be harmed, or to be at risk of being harmed.

**Procedures:**

Rite of Passage employees, contract workers, volunteers, vendors, interns or any persons providing services in the facility who receive any information, regardless of its source, concerning student abuse, harassment, neglect, mistreatment and/or sexual misconduct, or who have reason to suspect, or who observe an incident of student abuse, harassment, neglect, mistreatment and/or sexual misconduct, are required to immediately report the incident to the Shift Supervisor, Human Resources and the Program Director.

The staff member must give an immediate verbal incident report to the Shift Supervisor, Human Resources, and the Program Director. A written incident report will be accomplished within one hour of reporting. Immediate notification must also be made to the local county department of social or human services or the police department by the Program Director or designee. It is not the staff's role to investigate suspected abuse, only to report it.

Any employee, contractor, vendor, intern or volunteer who fails to report an allegation, or coerces or threatens another person to submit inaccurate, incomplete, or untruthful information with the intent to alter a report, may face disciplinary, administrative and/or criminal action, even on a first offense.

Persons who make a good faith report are immune from civil and criminal liability. Additionally, the law provides for the protection of the identity of the reporting party. All complaints, including all information and documents pertinent to the complaint, will be handled with sensitivity and the appropriate level of confidentiality. Information will only be revealed on a "need to know" basis or in defense of disciplinary, administrative and/or legal action.

Retaliation by any person against any other person to include students for reporting complaints of abuse, mistreatment, harassment and/or neglect, assisting in making a report, or for cooperating in the investigation of such complaints regardless of the merits or disposition of the complaint is prohibited. Any such occurrence is a very serious matter that may result in disciplinary, administrative and/or criminal action.

Employees who are terminated for abuse, harassment, neglect, mistreatment and/or sexual misconduct of a student will not be eligible for re-employment with any Rite of Passage facility.

Information regarding additional reporting requirements will be communicated during Pre-Service training, included in each site's Pre-Service Curriculum and posted in a visible location for employee referral.

All employees, interns, contractors and/or volunteers must acknowledge their understanding of this policy and state specific addendum(s) regarding reporting requirements in the state in which they are employed or providing services.

ROP/KEELE 000176




*Rite of Passage*
*Policy and Procedure*

| Form Number: | 100.407 | |
|---|---|---|
| Form Name: | Acknowledgement of Child Abuse Reporting Policy | |
| Creation Date: | | Author: |
| Revision Date: 11/01/2010 | Revision #: 02 | Author: RHW |

I acknowledge I have read and agree to abide by Rite of Passage's Child Abuse Reporting Policy with state specific addendum(s) regarding reporting requirements in the state in which I am employed or providing services. I understand that if I have questions, or I do not understand any provisions of this policy/procedure, I will ask my supervisor, human resources or Program Director or designee for assistance.

Stephanos Keele                                                   5/13/11
_____     _____     _____
Printed Name                          Signature                              Date

ROP/KEELE 000177

 

*Rite of Passage*
*Policy and Procedure*

| Addendum Number: | 100.407 |
|---|---|
| Addendum Name: | Acknowledgement and Reporting of Child Abuse - AZ |
| Creation Date: | Author: RW |
| Revision Date:   1/1/06 | Revision #:   Initials: |

Addendum:

IT IS THE PRIMARY RESPONSIBILITY OF ALL CANYON STATE ACADEMY (CSA) EMPLOYEES, REGARDLESS OF JOB DESCRIPTION OR ASSIGNED DUTIES, TO ENSURE THE SAFETY, HEALTH AND WELFARE OF ALL RESIDENTS UNDER THE SUPERVISION OF CSA.

All CSA staff have the oral, ethical and fiduciary responsibility to report any observed or suspected incidents of resident maltreatment or variance from any CSA policy that relates to resident safety, health and welfare of residents. Examples of CSA policies that relate to resident safety, health and welfare are Behavior Management Policy, Physical Intervention Policy and Medical Policy.

Any staff <u>observing</u> suspected incidents of maltreatment or variance from CSA policies regarding resident safety, health and welfare has a moral, ethical, and fiduciary responsibility to intervene immediately and attempt to prohibit the suspected maltreatment or variance from CSA policies and report it directly to their supervisor or the program manager.

Any staff <u>suspecting</u> incidents of maltreatment or variance from CSA policies regarding resident safety, health and welfare has a moral, ethical and fiduciary responsibility to report it directly to the Program Coordinator. Suspicions may arise from staff or resident comments, observed bruising or marks on a resident, or any other source observed or heard.

Staff who do not intervene and/or report suspected incidents of maltreatment or variance of CSA's policies regarding resident safety, health and welfare will be disciplined up to and including termination of employment.

CSA has a zero tolerance policy toward staff abuse, neglect or maltreatment of residents. Any staff found to be engaged in abuse, neglect or maltreatment of residents will be disciplined and such discipline may include referral for criminal prosecution and/or termination of employment. While Arizona law may at times be subject to interpretation, there are some specific practices and behaviors which are not permitted at CSA. These are:

1. Spanking, paddling or striking in any manner intended to cause physical pain or any form of physical violence inflicted in any manner upon the body;
2. Verbal abuse, ridicule or humiliation including name calling;
3. Deprivation of shelter, bedding, food, water, clothing, sufficient sleep or opportunity for toileting;
4. Force-feeding, except as prescribed by a licensed medical practitioner;
5. Use of seclusion;
6. Requiring a resident to take a painfully uncomfortable position such as squatting or bending for extended periods of time;
7. Administration of prescription medications without specific physical authorization;
8. Failure to administer medications in accordance with medication log instructions; and
9. Failure to report observed or suspected instances of child abuse, neglect or mistreatment

Staff who are engaged in any of these or other activities deemed to be abusive or neglectful will be immediately suspended, without pay, pending investigation of the situation and review of their employment status.

I, _Stephanos Keele_, have received a copy of this policy and, on the date below, have attended training regarding this policy.

| _Stephanos Keele_ | _[signature]_ | _5/13/11_ |
|---|---|---|
| Printed Name | Signature | Date |

**ROP/KEELE 000178**

# Exhibit 6

 

*Rite of Passage*
*Policy and Procedure*

| Policy: | 100.405 |
|---|---|
| Creation Date: October 30, 2008 | Author: RHW |

**Policy:**

Rite of Passage is committed to the prevention and elimination of sexual abuse/misconduct perpetrated against Student Athletes (S/A) by employees, volunteers, contractors and other student athletes. Meeting the objectives of the Prison Rape Elimination Act (PREA) shall be a major priority for all sites and employees and an ongoing focus for all employees of Rite of Passage.

Rite of Passage has a zero tolerance involving employee, contractor and/or volunteer-on-student and student-on-student sexual misconduct and/or abuse. All intentional acts of sexually abusive behavior or intimacy between a student and employee, contractor or volunteer or student and a student, regardless of consensual status, are prohibited and the perpetrator shall be subject to administrative, criminal and/or disciplinary actions.

Rite of Passage is committed to investigating, disciplining and referring to prosecution employees, contractors, volunteers, intern and students who engage in sexually abusive behavior and/or misconduct. Rite of Passage is equally committed to providing crisis intervention and ongoing treatment or referrals to the victims of these acts.

**Definitions:**

**Sexual Abuse:** Shall include, but not be limited to the subjecting of another person who is incapable of giving consent by reason of his custodial status, to sexual contact by persuasion, inducement, enticement or forcible compulsion. Sexual acts or contacts between employees, contractors, volunteers and/or students, even when no objections are raised are prohibited acts.

Sexual abuse does not include kicking, grabbing, or punching genitals when the intent is to harm rather than sexually exploit.

**Sexual Contact:** Shall include, but not be limited to carnal knowledge, oral sodomy, sexual assault with an object, or sexual fondling or molestation of a student (doesn't matter whether or not it is consensual or not), rape, or otherwise sexually exploiting another student, (e.g. compelling them to perform acts of prostitution). Sexual acts or contacts between a student and student, student and employee, student and contractor, student and intern and/or student and volunteer, even with no objections raised, are always prohibited and are always illegal.

Sexual contact does not include kicking, grabbing or punching the genitals when the intent is to harm or debilitate rather than sexually exploit.

ROP/KEELE 000159



**Employee Sexual Harassment (Includes contractors, interns and volunteers):**  Verbal statement or comments of a sexual nature to a student by an employee, contractor and/or volunteer to include but not be limited by demeaning references to gender or derogatory comments about body or clothing and repeated profane abusive, threatening or obscene language or gestures.

Staff Sexual Harassment also includes but is not limited to: jokes about sex or gender specific traits, emails, faxes, touching, attention or conduct of a sexual nature, or threats of retaliation for refusing sexual advances.

**Employee Sexual Misconduct (Includes contractors, interns and volunteers):**  Shall include but not be limited to any verbal, physical or offensive conduct of a sexual nature by an employee, contractor or volunteer, directed toward a student under the care, custody and supervision of Rite of Passage.

Consensual or nonconsensual prohibited sexual acts include, but are not limited to: an attempt, threat, request or the completed act of intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks, either directly or through clothing, with the intent to abuse, arouse, or gratify sexual desire; or occurrences of indecent exposure, invasion of privacy, or voyeurism for sexual gratification.

Sexual advances, request for sexual favors or other verbal, physical or offensive conduct of a sexual nature are also expressly prohibited.

All sexual contact between a student and an employee, contractor, intern or volunteer is considered sexual misconduct even if the student seemingly "consents" because students are deemed incapable of "consent."

**Sexually Abusive Behavior:**  Describes all prohibited sexual behavior whether it is a student, employee, contractor and/or volunteer.  Sexually abusive behavior includes acts of intimacy, sexual contact, sexual abuse and staff harassment and misconduct as defined in this policy.

**Reporting Sexually Abusive Behavior:**  (Employees, Volunteers, Interns, Contractors)

It is critical that all employees, contractors, interns and volunteers understand the sensitivity towards students who are victims of sexually abusive behavior.  All allegations received from students regarding sexually abusive behavior shall be taken seriously by the person receiving the allegation and respond supportively and non-judgmentally.

Any student that alleges that he/she has been subjected to sexually abusive behavior shall be immediately separated and protected from the assailant (s) and will be referred for medical examination as well as a clinical assessment of the potential for self-harming or other related symptomatology.  **All medical examinations must me performed by a S.A.N.E qualified nurse.  The area where the alleged act took place will be preserved for investigation by law enforcement official** (See Section 8, "RESPONSE PROCEDURES TO SEXUALLY ABUSIVE BEHAVIOR ALLEGATIONS", page 7 of this document).

Steps of Reporting

1.   Regardless of its source, employees, contractors and/or volunteers who receive information concerning a student and sexually abusive behavior, or who observe an incident of sexually abusive behavior, or who have a reasonable cause to suspect that student has been or is being subject to sexually abusive behavior must immediately report such to his/her supervisor and the shift supervisor and/or designee.

ROP/KEELE 000160

 

2.     The shift supervisor will immediately notify the Director of Student Services (DSS) and Program Manager/Director (PM/PD). The DSS, PM/PD and/or designee will immediately make the appropriate reporting of the allegations to their state/local and law enforcement officials and take the appropriate actions listed in this policy under the section labeled Student Implementing Procedures.

3.     If an employee is accused of sexually abusive behavior with a student, the employee will be separated and prohibited from speaking, supervising and/or having any contact with the alleged victim, witnesses and potential witness related to the allegation.

4.     The Program Manager/Director will notify the Corporate Human Resources Director and discuss further sanctions and/or restrictions regarding the employee while the investigation is underway.

5.     Contractors, interns and/or volunteers will be suspended from activities with students pending the completion of the investigation.  Any changes to this directive must be approved by the Executive Cabinet.

6.     The Shift Supervisor, DSS, PM/PD and/or designee will ensure that all employees, volunteers, interns, contractors, witnesses and/or any person (s) that may have knowledge of the alleged sexually abusive behavior submit an incident report before their shift ends or within 24 hours, whichever comes first.

7.     Any employee, contractor, intern or volunteer who fails to report an allegation of sexually abusive behavior, or coerces or threatens another person to submit inaccurate, incomplete, or untruthful information with the intent to alter a report will face administrative, disciplinary and/or criminal action.

8.     Employees who are terminated for sexually abusive behavior will not be eligible for re-employment with Rite of Passage.

9.     Contractors, interns and/or volunteers whose services are terminated for sexually abusive behavior will not be eligible for reinstatement with Rite of Passage.

## False Reporting:

Substantiated deliberately malicious or false reports by students or other parties associated with an allegation or investigation of sexually abusive behavior will result in administrative, disciplinary, corrective, and or criminal actions.

## Retaliation:

Employees, contractors, interns and/or volunteers will not retaliate against the complainant, alleged victim or victim, accused, witnesses, or any informants in the filing and investigation of any sexually abusive behavior.

Retaliation in any form may result in administrative or disciplinary action up to and including termination of employment or services.

## Confidentiality:

ROP/KEELE 000161

 

All sexually abusive behavior allegations, investigations, etc., including information and documents pertinent to the allegation, will be handled with sensitivity and the appropriate level of confidentiality.

Information will normally only be revealed on a "need to know" basis or in defense of disciplinary and/or legal action.

Breaches of confidentiality may result in administrative, disciplinary, civil and/or criminal action.

**Training:**

1. Sexually Abusive Behavior Prevention Training shall be provided to all Rite of Passage employees, interns, volunteers, and contract workers during Pre-service Training and annually thereafter. Training shall include, but is not limited to:

    i. Review of this policy, the Prison Rape Elimination Act of 2003, 19-2-214, C.R.S. and any other applicable state or federal laws, and

    ii. The prevention, investigation, and prosecution of sexually abusive behavior and

    iii. Zero tolerance, and

    iv. Recognition of signs of sexually abusive behavior; sensitivity to juvenile allegations of sexual assault or sexual <u>misconduct</u>; confidentiality; recognition of signs of predatory juveniles and potential victims; required reporting of incidents; consequences of failure to report; informed supervision; therapeutic care.

2. Employees, interns, contractors, volunteers or any other required party will verify their receipt of this policy and acknowledgement by completing the Employee PREA Acknowledgement form to be maintained in personnel files or equivalent. All training will also be documented and retained in the appropriate database and training files.

**Records Management:**

The Site Director of Student Service or Program Manager/Director are responsible for all record keeping duties associated with the allegation, investigation, findings and statistical information associated with sexually abusive behavior.

Duties include;

1. Maintaining (2) two types of files:

    a. General files which include data on the alleged or actual victim (s) and assailant (s) of a sexually abusive behavior, characteristics of the allegation/crime and actions taken. This data may have to be reported to federal and state authorities annually.

    b. Investigative files to include all allegations or substantiated sexually abusive behavior, copies of all reports, written statements/incidents, medical forms, supporting memos, video/audio tapes and any other evidentiary materials pertaining to the allegation, investigation and findings.

**Student Implementing Procedures:**

1. <u>Juvenile Orientation and Education:</u>

ROP/KEELE 000162

 

    a.    During the intake process to an ROP Program, all students shall receive (2) two brochures on "What you should know about sexual abuse" and "What to do in case of abuse". The information shall be communicated orally and in written form in a language that is clearly understood by the juvenile. Information provided shall include, but not be limited to self-protection, prevention/intervention, reporting procedures, treatment and counseling, protection against retaliation, disciplinary actions for making false allegation and the zero-tolerance policy of Rite of Passage.

    b.    Students shall be required to sign an acknowledgment of having received the policy and procedure information during the intake process. A copy of the acknowledgment shall be maintained in the student's working file.

2.    <u>Screening</u>:
    a.    All new arrivals as well as juveniles returning to a ROP Program shall be screened upon arrival for potential risk. The Vulnerability to Victimization (VV), Sexually Aggressive Behavior (SAB), and Overall Risk Assessment Tool shall be utilized as deemed necessary to assess potential risk.

    b.    Results from the SAB/VV/Overall Risk Assessment Tool shall be entered in the applicable database system and maintained in the student's working file.

    c.    If the results from the SAB/VV/Overall Risk Assessment Tool indicate a probability for victimization or sexually aggressive behavior, and an overall high or low level of risk, appropriate intervention shall be implemented to ensure the safety of the student such as referral to clinician, treatment interventions, or special management program (SMP). Completed tools shall be maintained in a binder on the unit at all times. At no time can room changes take place without Case Manager and/or Shift Supervisor notification and approval. In addition to this authorization the DSS and/or PD have approval authority.

3.    <u>Sexual Aggressive Behavior/Vulnerability to Victimization (SAB/VV)/Overall Risk Assessment Instrument</u>:

    a.    If a student is suspected of being a potential sexual victim or a documented/potential sexual aggressor at any time during his/her commitment, or is convicted of a Major Rule Violation for sexual assault, sexual misconduct, or sexual harassment, the following steps shall be initiated:

    b.    The appropriate SAB/VV/Overall Risk Re-assessment shall be completed to determine the appropriate risk level. The updated assessment shall be entered into the appropriate database system as required by site and/or licensing requirements.

    c.    If a student is identified as sexually aggressive, the Director of Student Services or designee, along with the Placing Agency Official and other members of the Collaborative Team will evaluate the student to determine his appropriateness for placement and potential access to further treatment services.

    d.    Students identified as sexual assault victims shall be referred to the Director of Student Services or designee for recommended counseling and/or programs.

    e.    Students identified as being involved in juvenile-juvenile sexual misconduct (victim and perpetrator) shall be referred to a Director of Student Services or designee

ROP/KEELE 000163

 

for recommended counseling or programs. All students involved will also be placed on a Trauma Plan.

    f.    The SAB/VV/Overall Risk Assessment information regarding sexual aggressors or victims shall be available in the student's working file at the unit level. Confidentiality of the SAB/VV/Overall Risk Assessment information shall be maintained and limited to those with a need to know.

4.    <u>Mental Health Intervention:</u>

    a.    Mental health intervention shall be directed by a Director of Student Services or designee when indicated by the SAB/VV/Overall Risk Assessment. The assessment shall include, but not be limited to, a review of any history of sexual victimization or sexually aggressive behavior.

    b.    Students identified as being sexually vulnerable shall be referred to the Director of Student Services or designee to assess for safety needs and/or treatment (such as room assignment, special needs, etc.).

    c.    Any Rite of Passage employee or volunteer shall refer a juvenile who is a victim of sexual assault, sexual misconduct, or at risk for being sexually vulnerable, to the Director of Student Services or designee.

5.    <u>Room Assignments</u>

    a.    Results of the SAB/VV/Overall Risk Assessment shall primarily be used to establish rooming assignments and to increase employee awareness of potential safety concerns. Rooming assignments shall be made with the intent of keeping victims and aggressors separate. Under no circumstances shall those identified or confirmed as sexually aggressive or sexually vulnerable be housed in the same room (Only in rare situations will this requirement be waived and only by the Case Manager, Shift supervisor, Director of Student Services and or Program Director Manager authorization and only for as long as it takes to remedy the situation.

6.    <u>Reporting of Sexual Abusive Behavior</u>

    a.    Once every six months, a self-report survey shall be given to all juveniles in the facility, providing the opportunity to confidentially report sexually abusive behavior.

    ALL cases involving sexually abusive behavior shall be referred to local law enforcement and the Department of Social Services for investigation.

7.    <u>Student Reporting Procedure:</u>

    a.    Students placed in a Rite of Passage Program may report any act of sexually abusive behavior in writing or verbally to any Rite of Passage employee, contract worker or volunteer.

8.    <u>Response Procedure to Sexually Abusive Behavior Allegations:</u>

**ROP/KEELE 000164**

 

a.   If any sexually abusive behavior is reported to an employee or is observed by an employee, the employee shall immediately separate the allegedly involved students. An incident report shall be completed, and the Shift Supervisor shall be notified, who shall notify the Facility Director/Designee.

   i.   If there is a reason to believe that sexual abuse/assault has occurred, the employee shall take reasonable and appropriate measures to assure victim safety by doing the following:

      a.   A victim safety plan shall be developed.
      b.   The alleged victim and the aggressor shall be physically separated. Non-punitive change in housing shall be provided.
      c.   An initial victim safety plan/acute trauma plan will be developed by the responding staff and then the appropriate Collaborative Team shall be convened. The Case Manager shall ensure the safety plan appropriately addresses all victim psychological and physical safety needs.

b.   When an incident involves potential physical evidence, local law enforcement shall need to maintain a chain of custody. Facility staff shall do the following:

   i.   The alleged victim shall not be allowed to shower until all investigation and examination protocols are completed.

   ii.   The room/area where the alleged sexually abusive behavior occurred shall be secured until it is released by law enforcement.

   iii.   Collection of evidence shall be done in coordination with and at the direction of local law enforcement. In most circumstances the extent of this cooperation shall involve securing the possible crime scene and securing articles of clothing. Examples of securing the scene may include restricting access to a particular area or securing a lockable room.

c.   The Facility Director or Designee shall complete an incident report and report the incident to the local department of Social Services and local law enforcement. When applicable, the Facility Director/Designee shall complete a critical incident report.

d.   All investigations shall be kept confidential. Information shall be shared only with persons who have a "need to know", as defined by prevailing statute or policy.

9.   <u>Treatment for Victims of Sexually Abusive Behavior:</u>

a.   A student shall be taken to the facility's medical clinic for an initial medical assessment. The student shall be provided outside medical treatment pursuant to the clinical protocols, and when necessary, transported to a medical facility. When available, the student shall be treated by the sexual assault nurse examiner program (SANE).

b.   Victims that are employees, contract workers, interns or volunteers shall be immediately transported to a local medical facility for necessary medical care and the collection of evidence. The Facility Director/Designee shall provide information on local support services to alleged victims.

ROP/KEELE 000165

 

    c.     Acute trauma care shall be provided to victims of sexual assault, including but not limited to, treatment of injuries, HIV/AIDS education, and testing for sexually transmitted diseases. The facility shall maintain and implement a trauma plan. Ongoing counseling shall be provided at the direction of the Director of Student Services or designee to the student victim(s) and their family.

    d.     Victims shall be provided trauma assessment, crisis intervention, safety planning and address treatment needs.

        i.  The Director of Student Services or designee shall see the student as soon as possible, but no later than the end of the workday for assessment and crisis intervention as appropriate.

       ii.  If the allegation is made after hours, Facility Director/Designee shall arrange for appropriate follow-up.

10.   <u>Juvenile Sexual Assault Victims Rights:</u>

    a.     The Director of Student Services shall ensure that a "Sexual Assault Victim Offender Rights" brochure is provided to the victim of a sexual assault, in a language they understand, with an explanation of any right(s) the student may have concerning the investigation and prosecution. This information shall be provided immediately upon reporting the incident to law enforcement.

11.   <u>Disciplinary Actions for Making False Allegations:</u>

    a.     Students who make false allegations may be charged with a Major Rule Violation and /or criminally charged.

12.   <u>Physical Plan Assessment:</u>

    a.     A physical vulnerability assessment shall be completed annually and submitted to the Facility Director.

**RELATED FORMS:** (Located on Intranet Site, Human Resources, Forms Section)

PREA Vulnerability Assessment

PREA Vulnerability Tool

PREA Victim Brochure

PREA Student Admissions Brochure

ROP/KEELE 000166

*Rite of Passage*
*Policy and Procedure*

| Form Number: | 100.405 |
| --- | --- |
| | |
| **Creation Date: 11/01/2010** | **Author:  RHW** |
| | |

I, __Stephanos Keele__ *(print name)*, have received a copy of ROP Policy 100.405 Prison Rape Elimination Act (PREA).  I have read, or had these policies read to me, and understand the policies' terms and directives.

Stephanos Keele                                                                       5/13/11
Printed Name                              Signature                                    Date

ROP/KEELE 000167